IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

UNITED STATES SUGAR CORPORATION,

Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

On Petition For Review of a Final Rule of the
United States Environmental Protection Agency

## PAGE PROOF OPENING BRIEF OF INDUSTRY PETITIONERS

Timothy S. Bishop
Matthew C. Sostrin
Nicholas Vera
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600

*Counsel for United States
Sugar Corporation*

Shannon S. Broome
HUNTON ANDREWS KURTH LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Charles H. Knauss
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20007
(415) 975-3718

*Counsel for American Forest & Paper
Ass'n, American Wood Council,
Council of Industrial Boiler Owners*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Industry Petitioners state as follows:

## 1.     Parties and Intervenors

### Petitioners:

Case No. 22-1271:        United States Sugar Corporation

Case No. 22-1302:        American Forest & Paper Association, American Wood Council, and Council of Industrial Boiler Owners

Case No. 22-1303:        California Communities Against Toxics, Coalition for a Safe Environmental, Sierra Club, and Utah Physicians for a Healthy Environment

### Respondent:

The U.S. Environmental Protection Agency is the respondent in each of these cases.

Michael S. Regan, Administrator, U.S. Environmental Protection Agency, is also named as a respondent in No. 22-1303.

### Intervenors:

Sierra Club is an intervenor-respondent in No. 22-1271.

American Chemistry Council, American Forest & Paper Association, American Iron and Steel Institute, American Wood Council, Coalition for

Responsible Waste Incineration, and Council of Industrial Boiler Owners are intervenor-respondents in No. 22-1303.

2.  **Rulings Under Review**

These petitions challenge EPA's final rule, National Emission Standards for Hazardous Air Pollutants for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters, 87 Fed. Reg. 60,816 (Oct. 6, 2022).

3.  **Related Cases**

Each of the petitions for review consolidated under No. 22-1271 is related. These cases consist of Case Nos. 22-1302 and 22-1303. The consolidated cases on review have not previously been reviewed by this or any other Court.

Case No. 23-1060 was severed from Case No. 22-1303 on March 10, 2023. Case No. 23-1060 addresses issues raised in Case No. 22-1303 that are currently under reconsideration by respondent. That case is being held in abeyance pending administrative reconsideration proceedings. *See* Order (Doc. #1989619).

Case No. 23-1156 was severed from Case No. 22-1302 on June 20, 2023. Case No. 23-1156 addresses issues that the parties in Case No. 22-1302 are attempting to amicably resolve. That case is being held in abeyance pending the parties' attempts to amicably resolve those issues. *See* Order (Doc. #2004070).

# RULE 26.1 CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Industry Petitioners provide the following disclosures:

*The American Forest & Paper Association (AF&PA)* serves to advance U.S. paper and wood products manufacturers through fact-based public policy and marketplace advocacy. The forest products industry is circular by nature. AF&PA member companies make essential products from renewable and recyclable resources, generate renewable bioenergy, and are committed to continuous improvement through the industry's sustainability initiative — *Better Practices, Better Planet 2030: Sustainable Products for a Sustainable Future*. The forest products industry accounts for approximately 5% of the total U.S. manufacturing GDP, manufactures about $350 billion in products annually and employs about 925,000 people. The industry meets a payroll of about $65 billion annually and is among the top 10 manufacturing sector employers in 43 states. No parent corporation or publicly held company has a 10% or more ownership interest in AF&PA.

*The American Wood Council (AWC)* is the voice of North American wood products manufacturing, an industry that provides over 450,000 men and women in the United States with family-wage jobs. AWC represents 86% of the structural wood products industry, and members make products that are essential to everyday

life from a renewable resource that absorbs and sequesters carbon. Staff experts develop state-of-the-art engineering data, technology, and standards for wood products to assure their safe and efficient design, as well as provide information on wood design, green building, and environmental regulations. AWC represents the North American structural wood products industry in rulemakings and administrative proceedings before the Environmental Protection Agency under the Clean Air Act, 42 U.S.C. § 7401 *et seq*., and in litigation arising from such proceedings that affect its members. AWC states that it is a "trade association" for purposes of Circuit Rule 26.1(b). AWC has no parent corporation and no publicly held company has a 10% or more ownership interest in AWC.

***The Council of Industrial Boiler Owners (CIBO)*** is a trade association of industrial boiler owners, architect-engineers, related equipment manufacturers, and University affiliates representing many major industrial sectors. CIBO members have facilities in most regions of the country and a representative distribution of most types of boiler and fuel combinations currently in operation. CIBO was formed in 1978 to promote the exchange of information about issues affecting industrial boilers, including energy and environmental equipment, technology, operations, policies, laws and regulations. CIBO is a "trade association" for purposes of Circuit Rule 26.1(b). CIBO has not issued shares to the public and has no parent company.

***United States Sugar Corporation (U.S. Sugar)*** owns and farms approximately 245,000 acres of farmland in Glades, Hendry, Palm Beach, and Martin counties, Florida. It grows sugarcane, oranges, sweet corn, and winter vegetables, and accounts for approximately 10% of all sugar produced in America. U.S. Sugar is a privately-held company, has no corporate parent, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ I

RULE 26.1 CORPORATE DISCLOSURE STATEMENTS ...............................III

TABLE OF CONTENTS....................................................................... VI

TABLE OF AUTHORITIES ................................................................VIII

GLOSSARY OF TERMS ...................................................................XIII

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION.........................................................3

STATEMENT OF THE ISSUES.............................................................3

STATUTES AND REGULATIONS........................................................3

STATEMENT OF THE CASE................................................................3

      I.      PROCEDURAL HISTORY ................................................3

      II.     BOILERS IMPACTED BY THE CHALLENGED PROVISIONS ...................................................................9

            A.     U.S. Sugar's Boiler No. 9 .......................................9

            B.     Biomass Boilers ....................................................11

      III.    SPECIFIC REVIEW SOUGHT BY PETITIONERS........................12

            A.     Retroactive Application Of The 2022 Rule's Revised HCl And Other New Source Standards Is Unlawful. ..............12

            B.     HCl Standard for New Solid Fuel Boilers Is Unlawful. ..........14

SUMMARY OF THE ARGUMENT ....................................................16

STANDING ......................................................................................18

STANDARD OF REVIEW ..................................................................19

ARGUMENT.....................................................................................19

      I.      THE 2022 RULE UNLAWFULLY APPLIES REVISED NEW SOURCE STANDARDS TO BOILERS THAT COMMENCED CONSTRUCTION BEFORE THE RULE WAS FIRST PROPOSED IN 2020. .................................19

A.     EPA's Retroactive Application Of The 2022 Rule's Revised New Source Standards Violates The Plain Language Of The Clean Air Act And EPA's Own Regulations..................................................................20

B.     EPA's Interpretation Of "First Proposed" Is Not Reasonable. ..............................................................27

       1.     This Court's Remand In *U.S. Sugar* Did Not Require That EPA Revise The HCl Standard. ..............27

       2.     Section 112 Cannot Reasonably Be Interpreted To Apply The 2022 Rule's Revised New Source Standards To Sources That Commenced Construction Before August 4, 2020. ...........................30

II.     EPA'S REVISED HCL STANDARD FOR NEW SOLID FUEL BOILERS IS UNLAWFUL. ...................................35

CONCLUSION..................................................................40

CERTIFICATE OF COMPLIANCE....................................42

CERTIFICATE OF SERVICE .............................................42

# TABLE OF AUTHORITIES[*]

**Cases**                                                                **Page(s)**

*Chamber of Com. v. EPA*,
  642 F.3d 192 (D.C. Cir. 2011)...........................................................18

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)..........................................................................19

*Ctr. For Energy & Econ. Dev. v. EPA*,
  398 F.3d 653 (D.C. Cir. 2005)...........................................................18

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019)......................................................................27

*Nat. Res. Def. Council v. EPA*,
  489 F.3d 1250 (D.C. Cir. 2007)....................................................5, 26

*Nat'l Lime Ass'n v. EPA*,
  233 F.3d 625 (D.C. Cir. 2000)...........................................................30

*Nat'l Ass'n of Clean Water Agencies v. EPA*,
  734 F.3d 1115 (D.C. Cir. 2013).........................................................28

*U.S. Sugar Corp. v. EPA*,
  830 F.3d 579 (D.C. Cir.), *revised in part on rehearing*,
  844 F.3d 268 (D.C. Cir. 2016)................................. 6, 13, 15, 24, 29, 36, 37, 39

*Util. Air Regulatory Grp. v. EPA*,
  573 U.S. 302 (2014)..........................................................................23

**Statutes, Rules and Regulations**

42 U.S.C. § 7401(b)(1)........................................................................33

42 U.S.C. § 7412(i)............................................................................20

*42 U.S.C. § 7412(i)(1) .....................................................................20, 23

---

[*] Authorities upon which this brief chiefly relies are marked with asterisks in the left margin.

\*42 U.S.C. § 7412(i)(2) ...................................................21

42 U.S.C. § 7412(a)(4) ...................................................22

42 U.S.C. § 7412(c)(1) .....................................................3

42 U.S.C. § 7412(d)(2) ...................................................13

\*42 U.S.C. § 7412(d)(3) ............................13, 14, 36, 40

42 U.S.C. § 7412(e)(1) .................................................4, 5

42 U.S.C. § 7412(e)(2)(A)-(C) ....................................4, 5

42 U.S.C. § 7412(e)(3) ....................................................3

40 C.F.R. Part 63, Subpart DDDDD tbl. 1 (2023)..............8

40 C.F.R. Part 63, Subpart DDDDD tbl.1 (2021)...............8

40 C.F.R. § 63.2 ............................................................33

40 C.F.R. § 63.5(a)(1) ...................................................32

40 C.F.R. § 63.5(a)(2) ...................................................32

\*40 C.F.R. § 63.5(b)(1)........................20, 22, 23, 26, 27

40 C.F.R. § 63.5(b)(3)....................................................20

40 C.F.R. § 63.6(b) ........................................................22

\*40 C.F.R. § 63.6(b)(1)........................ 21, 22, 23, 26, 27, 32

40 C.F.R. § 63.6(b)(3)....................................................21

Initial List of Categories of Sources Under Section 112(c)(1) of the
  Clean Air Act Amendments of 1990,
  57 Fed. Reg. 31,576 (July 16, 1992)....................................4

\*National Emission Standards for Coke Oven Batteries, Final Rule,
  70 Fed. Reg. 19,992 (Apr. 15, 2005) ........................24, 26, 31

National Emission Standards for Hazardous Air Pollutants for
Industrial / Commercial / Institutional Boilers and Process Heaters,
Proposed Rule, 68 Fed. Reg. 1,660 (Jan. 13, 2003) .......................................5, 25

National Emission Standards for Hazardous Air Pollutants for
Industrial, Commercial, and Institutional Boilers and Process
Heaters, Final Rule,
69 Fed. Reg. 55,218 (Sept. 13, 2004) ....................................................................5

National Emission Standards for Hazardous Air Pollutants for
Industrial, Commercial, and Institutional Boilers and Process
Heaters: Reconsideration, Final Rule, Amendments,
70 Fed. Reg. 76,918 (Dec. 28, 2005)......................................................................5

National Emission Standards for Hazardous Air Pollutants for Major
Sources: Industrial, Commercial, and Institutional Boilers and
Process Heaters, Proposed Rule,
75 Fed. Reg. 32,006 (June 4, 2010)........................................................................5

National Emission Standards for Hazardous Air Pollutants for Major
Sources: Industrial, Commercial, and Institutional Boilers
and Process Heaters, Final Rule,
76 Fed. Reg. 15,608 (Mar. 21, 2011)...............................................5, 26, 37, 39

National Emission Standards for Hazardous Air Pollutants for Major
Sources: Industrial, Commercial, and Institutional Boilers and
Process Heaters, Final Rule,
78 Fed. Reg. 7,138 (Jan. 31, 2013)........................................................................6

National Emission Standards for Hazardous Air Pollutants for Major
Sources: Industrial, Commercial, and Institutional Boilers and
Process Heaters, Final Rule,
80 Fed. Reg. 72,790 (Nov. 20, 2015) .....................................................................6

National Emission Standards for Hazardous Air Pollutants for Major
Sources: Industrial, Commercial, and Institutional Boilers and
Process Heaters; Amendments, Proposed Rule,
85 Fed. Reg. 52,198 (Aug. 24, 2020) .....................................................................8

National Emission Standards for Hazardous Air Pollutants for
  Major Sources: Industrial, Commercial, and Institutional Boilers
  and Process Heaters, Final Rule,
  87 Fed. Reg. 60,816 (Oct. 6, 2022)
  ...................................................... 1, 6, 8, 13, 14, 16, 21, 22, 23, 26, 34, 36, 39

National Emission Standards for Hazardous Air Pollutants from the
  Portland Cement Manufacturing Industry, Proposed Rule,
  70 Fed. Reg. 72,330 (Dec. 2, 2005)...................................................................31

*National Emission Standards for Hazardous Air Pollutants from the
  Portland Cement Manufacturing Industry, Final Rule,
  71 Fed. Reg. 76,518 (Dec. 20, 2006)..................................................................30

National Emission Standards for Hazardous Air Pollutants Schedule
  for the Promulgation of Emission Standards Under Section 112(e)
  of the Clean Air Act Amendments of 1990,
  58 Fed. Reg. 63,941 (Dec. 3, 1993)...................................................................5

National Emission Standards for Hazardous Air Pollutants: Carbon
  Black Production and Cyanide Chemicals Manufacturing Residual
  Risk and Technology Reviews, and Carbon Black Production Area
  Source Technology Review, Final Rule,
  86 Fed. Reg. 66,096 (Nov. 19, 2021) ................................................................25

National Emission Standards for Hazardous Air Pollutants: Integrated
  Iron and Steel Manufacturing Facilities Residual Risk and
  Technology Review, Final Rule,
  85 Fed. Reg. 42,074 (July 13, 2020)..................................................................25

National Emission Standards for Hazardous Air Pollutants: Surface
  Coating of Wood Building Products Residual Risk and Technology
  Review, Final Rule,
  84 Fed. Reg. 7,682 (Mar. 4, 2019).....................................................................25

National Emission Standards for Hazardous Air Pollutants; Notice of
  Reconsideration,
  76 Fed. Reg. 15,266 (Mar. 21, 2011).................................................................5

National Perchloroethylene Air Emission Standards for Dry Cleaning
  Facilities, Final Rule,
  71 Fed. Reg. 42,724 (July 27, 2006)..................................................................24

**Other Authorities**

Regulatory Impact Analysis: National Emission Standards for
    Hazardous Air Pollutants for Industrial, Commercial, and
    Institutional Boilers and Process Heaters, EPA-HQ-OAR-2002-
    0058-3290  (Feb. 2011) .......................................................................................4

# GLOSSARY OF TERMS

EPA        U.S. Environmental Protection Agency

HCl        Hydrogen Chloride

MACT      Maximum Achievable Control Technology

NESHAP  National Emission Standards for Hazardous Air Pollutants

UPL        Upper Prediction Limit

## INTRODUCTION

Industry Petitioners seek judicial review of certain elements of the Environmental Protection Agency's final rule entitled National Emission Standards for Hazardous Air Pollutants for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters, 87 Fed. Reg. 60,816 (Oct. 6, 2022) ("2022 Rule") (A6).[1]

As part of the 2022 Rule, EPA finalized revisions to emission standards for boilers covered by the Rule. Among these and of particular focus here are the emission standards for hydrogen chloride ("HCl") and particulate matter that apply to new solid fuel boilers (including biomass-fired boilers). The 2022 Rule's HCl standard for new solid fuel boilers is more than ***100 times*** more stringent than the prior standard. *See* 87 Fed. Reg. at 60,832 tbl.4 (A22). Also at issue here are the more stringent new source particulate matter standards EPA adopted in the 2022 Rule. *Id.* Although emission standards for "new sources" typically apply only to sources that commence construction ***after*** a standard is proposed (*i.e.*, to sources that are actually new), EPA applied the 2022 Rule's revised new source standards to all boilers constructed after June 4, 2010—more than ten years before EPA proposed the 2022 Rule. EPA required that operators demonstrate compliance with the revised HCl and other new source standards within three years.

---

[1] "JA" refers to the joint appendix. "A" refers to the addendum to this brief.

That retroactive imposition of stringent and costly revised new source standards to already operating boilers is forbidden by the Clean Air Act and even by EPA's own regulations, and it is inconsistent with EPA's prior practice. Already, this Court found that U.S. Sugar is likely to succeed on the merits of its challenge to EPA's retroactive application of the revised HCl standard and "satisfied the stringent requirements for a stay pending court review." Mar. 10, 2023 Order 1-2 (Doc. #1989619) ("Stay Order") (JA__). The Court therefore stayed the 2022 Rule until resolution of this challenge, "insofar as the rule purports to apply its hydrogen chloride limit for new solid-fuel boilers, rather than its limit for existing solid-fuel boilers, to [U.S. Sugar's] Boiler No. 9 at its facility in Clewiston, Florida." *Id.* Industry Petitioners' challenge addresses all of the 2022 Rule's revised new source standards to the extent EPA purports to apply those revised standards to sources that commenced construction prior to the August 24, 2020 date of the proposed standards that led to the 2022 Rule revisions.

EPA's retroactive application of the 2022 Rule's revised new source standards exceeds its statutory authority and is arbitrary, capricious, and an abuse of discretion. It should be vacated under Clean Air Act § 307(d)(9), 42 U.S.C. § 7607(d)(9). The Court should also vacate, or at least remand, the revised HCl standard, apart from any retroactivity issues, because EPA erred in identifying the emission control achieved in practice by the best controlled similar source.

## STATEMENT OF JURISDICTION

Industry Petitioners sought review of a final EPA action, the 2022 Rule, pursuant to Clean Air Act § 307(b)(1), 42 U.S.C. § 7607(b)(1). Petitions were filed within the statutorily-prescribed 60-day period. This Court has jurisdiction under that provision.

## STATEMENT OF THE ISSUES

1.      Whether the 2022 Rule unlawfully applies revised new source standards to boilers that commenced construction before the Rule was first proposed in the Federal Register on August 24, 2020.

2.      Whether the 2022 Rule's revised HCl standard for new solid fuel boilers violates the Clean Air Act, 42 U.S.C. §§ 7401-7671q.

## STATUTES AND REGULATIONS

Relevant statutes and regulations are reproduced in the accompanying Addendum.

## STATEMENT OF THE CASE

## I.      PROCEDURAL HISTORY

Congress directed EPA to list categories of major sources of hazardous air pollutants under Clean Air Act Section 112(c), 42 U.S.C. § 7412(c)(1), and to regulate those categories according to a schedule to be established under Section 112(e), 42 U.S.C. § 7412(e)(3). Among EPA's 174 listed source categories

were industrial, commercial, and institutional boilers and process heaters,[2] which provide steam, hot water, and energy to run industrial operations that manufacturers use to produce consumer and industrial products at the heart of our economy.[3]

In 1993, pursuant to Section 112(e), EPA published its schedule for promulgating emission standards for the 174 source categories, and it prioritized the schedule according to statutorily-established criteria:

> (A) the known or anticipated adverse effects of such pollutants on public health and the environment;
>
> (B) the quantity and location of emissions or reasonably anticipated emissions of hazardous air pollutants that each category or subcategory will emit; and
>
> (C) the efficiency of grouping categories or subcategories according to the pollutants emitted, or the processes or technologies used.

42 U.S.C. § 7412(e)(2)(A)-(C). Congress required EPA to promulgate emission standards for 40 source categories by November 15, 1992, for 25% of the listed categories by November 15, 1994, and for the next 25% by November 15, 1997. *Id.* § 7412(e)(1). EPA was required to issue emission standards for the remaining source categories by November 15, 2000, with all actions being prioritized according to the

---

[2] Initial List of Categories of Sources Under Section 112(c)(1) of the Clean Air Act Amendments of 1990, 57 Fed. Reg. 31,576 (July 16, 1992).

[3] *See generally* Regulatory Impact Analysis: National Emission Standards for Hazardous Air Pollutants for Industrial, Commercial, and Institutional Boilers and Process Heaters, EPA-HQ-OAR-2002-0058-3290 (Feb. 2011) (outlining the role of boilers and process heaters in various U.S. economic sectors).

Section 112(e)(2) factors. *Id.* Measured against these factors, industrial, commercial, and institutional boilers and process heaters were placed in the last batch of standards to be issued. *See* National Emission Standards for Hazardous Air Pollutants Schedule for the Promulgation of Emission Standards Under Section 112(e) of the Clean Air Act Amendments of 1990, 58 Fed. Reg. 63,941 (Dec. 3, 1993).

Having worked its way through higher-priority source categories, EPA originally proposed National Emission Standards for Hazardous Air Pollutants ("NESHAPs") for industrial, commercial, and institutional boilers and process heaters in 2003. 68 Fed. Reg. 1,660 (Jan. 13, 2003) (JA__). EPA promulgated final standards in 2004. 69 Fed. Reg. 55,218 (Sept. 13, 2004) (JA__), *as amended* 70 Fed. Reg. 76,918 (Dec. 28, 2005) (JA__) (the "2004 Rule"). In 2007, this Court vacated and remanded the 2004 Rule for EPA to address issues relating to what types of boilers are subject to the Rule. *See Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261-62 (D.C. Cir. 2007).

EPA then proposed revised emission standards for these sources in 2010, and promulgated a final rule in 2011. 75 Fed. Reg. 32,006 (June 4, 2010) (proposed rule) (JA__); 76 Fed. Reg. 15,608 (Mar. 21, 2011) (final rule) (JA__). That same day, EPA proposed to reconsider aspects of the rule it had just finalized. 76 Fed. Reg. 15,266 (Mar. 21, 2011) (JA__). EPA ultimately amended the rule in 2013 and again

in 2015. 78 Fed. Reg. 7,138 (Jan. 31, 2013) (JA__); 80 Fed. Reg. 72,790 (Nov. 20, 2015) (JA__) (collectively, the "2011 Rule").

Numerous petitioners sought review of the 2011 Rule. In 2016, this Court issued its decision on the 2011 Rule. *See U.S. Sugar Corp. v. EPA*, 830 F.3d 579 (D.C. Cir.) ("*U.S. Sugar I*"), *revised in part on rehearing*, 844 F.3d 268 (D.C. Cir. 2016) ("*U.S. Sugar II*").[4] In *U.S. Sugar I*, this Court upheld the 2011 Rule "against all challenges brought by industry petitioners, and virtually all challenges brought by environmental petitioners." 2022 Rule, 87 Fed. Reg. at 60,819 (A9). This Court, however, found that EPA had improperly excluded units that burned less than 90% of the subcategory defining fuel from its maximum achievable control technology floor calculations. *U.S. Sugar I*, 830 F.3d at 630-32. This Court therefore "vacate[d] the MACT standards for all major boiler subcategories that would have been affected had the EPA considered all sources included in the subcategories." *Id.* at 632, 667. This Court also found that EPA erred in using carbon monoxide as a surrogate for certain hazardous air pollutants (not including HCl) when EPA established maximum achievable control technology floors and remanded those portions of the 2011 Rule to EPA for further consideration. *Id.* at 628-30.

---

[4] *U.S. Sugar I* also addressed separate rules involving area source boilers (*i.e.*, those located at non-major sources) and solid waste incinerators, 830 F.3d at 591, which are not at issue here.

EPA sought a panel rehearing requesting that this Court remand without vacating the standards affected by the exclusion of units that burned less than 90% of the subcategory defining fuel—which all relevant parties supported. *U.S. Sugar II*, 844 F.3d at 270. This Court granted EPA's request. The remand without vacatur ensured that the 2011 Rule's emission standards would apply "until EPA completes another rulemaking and implements replacement standards." *Id.* In particular, this Court directed EPA "[o]n remand … to identify those standards for which the MACT floor would have differed if the EPA had included all best-performing sources in each subcategory in its MACT-floor analysis" and then "revise those standards consistent with our July 29, 2016 opinion." *Id.* This Court made clear that it "expect[ed] the EPA to complete this rulemaking promptly." *Id.*

In seeking rehearing, EPA had identified, based on its preliminary analysis, which emission standards were affected by *U.S. Sugar I*. *See* Decl. of Panagiotis E. Tsirigotis ¶¶ 7-9, *U.S. Sugar I* (No. 11-1108), Doc. #1635275 (JA__). Relevant here, EPA represented that the HCl standard for new solid fuel boilers would not be affected. *Id.* ¶ 9 (JA__). EPA further represented that the HCl standard for existing solid fuel boilers would be affected, but only by "approximately … 10 percent," which "will not likely impact the [emission] controls needed to comply with the

revised standards." *Id.* ¶ 10 (JA__).[5] Moreover, in seeking remand without vacatur, EPA represented that "a remand would not create undue hardship for source operators" and that "[i]t is not unreasonable for covered sources to continue to comply with the statutorily-mandated standards." EPA's Petition for Panel Rehearing as to Remedy at 1-2, 12, *U.S. Sugar I* (No. 11-1108), Doc. #1635275 (JA__).

Four years later, on August 24, 2020, EPA proposed revised emission standards purportedly in response to the remand in *U.S. Sugar*. 85 Fed. Reg. 52,198 (Aug. 24, 2020) (JA__). EPA promulgated final standards on October 6, 2022. 2022 Rule, 87 Fed. Reg. at 60,816 (A6). With respect to HCl, EPA revised the emission standard for new solid fuel boilers down to more than one one-hundredth of the previous standard—0.00021 lb/MMBtu compared to 0.022 lb/MMBtu previously. *Id.* at 60,832 tbl.4 (summary of changes in the 2022 Rule's emission standards) (A22).[6] EPA also adopted more stringent new source standards for particulate matter, among other pollutants. *Id.* EPA announced that all sources constructed after June 4, 2010—the date it first proposed the *2011 Rule*—would be considered new sources subject to the "significantly more stringent" HCl and other standards. *Id.* at

---

[5] With respect to particulate matter, EPA represented that depending on the subcategory of solid fuel boiler, some particulate matter standards would be affected by the remand and some would not. *Id.* ¶ 9 (JA__).

[6] *Compare* 40 C.F.R. Part 63, Subpart DDDDD tbl. 1 (2023) *with* 40 C.F.R. Part 63, Subpart DDDDD tbl.1 (2021).

60,830-31 (A20-21). As an "allowance," EPA provided that "facilities have up to 3 years after the effective date of the final rule to comply with the revised emission limits." *Id.* at 60,832 (A22).

Industry Petitioners sought review of the 2022 Rule in this Court. After filing its Petition, U.S. Sugar sought a stay from EPA insofar as the 2022 Rule sought to retroactively apply the revised HCl standard for new solid fuel boilers to Boiler No. 9 at U.S. Sugar's Clewiston, Florida facility. *See* U.S. Sugar's Mtn. to Stay Effective Date of the Boiler MACT Rule 1-2 & Ex. A (Doc. #1980099) (JA__). EPA never addressed U.S. Sugar's request for a stay. *Id.* at 1-2 (JA__). U.S. Sugar then sought a stay from the Court, which granted a stay after finding that U.S. Sugar "satisfied the stringent requirements for a stay pending court review," including likelihood of success on the merits. Stay Order at 1-2 (JA__).

## II.  BOILERS IMPACTED BY THE CHALLENGED PROVISIONS

### A.  U.S. Sugar's Boiler No. 9

U.S. Sugar commenced construction of Boiler No. 9 at its Clewiston, Florida facility in December 2016 and began operating the boiler in March 2019. U.S. Sugar Comments at 1, 5, EPA-HQ-OAR-2002-0058-3969 (JA__). U.S. Sugar uses Boiler No. 9 to burn bagasse (the leftover byproduct from milling sugarcane) to provide required steam and heat for its sugar mill. *Id.* at 1 (JA__). U.S. Sugar constructed Boiler No. 9 to replace three older bagasse-fueled boilers (Boilers Nos. 1, 2, and 4),

which resulted in significant emission reductions for a variety of pollutants. *Id.* at 5 (JA__).

U.S. Sugar invested over $65 million to design Boiler No. 9 with state-of-the-art control technology that makes it the best-controlled bagasse-fueled boiler in the country, cleaner-emitting than the boilers used by U.S. Sugar's competitors. U.S. Sugar Comments at 5 (JA__); U.S. Sugar's Mtn. to Stay Effective Date of the Boiler MACT Rule, Ballenger Decl. ¶ 9, Doc. #1980099 (A60). Boiler No. 9 fully complies with the 2011 Rule's HCl standard for new sources that was in place when the boiler commenced construction in December 2016 (*i.e.*, when the boiler was new), when it began operating in March 2019, and when U.S. Sugar notified regulators of the boiler's compliance with emission requirements in June 2019. U.S. Sugar Comments at 2 & n.1 (JA__); Ballenger Decl. ¶ 11 (A61). At those times, the 2011 Rule's HCl standard for new solid fuel boilers was a mature, final rule—it was promulgated in 2011, amended in 2013 and 2015, and was not subject to this Court's remand in *U.S. Sugar*. Boiler No. 9 also fully complies with the 2022 Rule's HCl standard for existing sources that EPA first proposed in 2020 (*i.e.*, when the boiler was existing). U.S. Sugar Comments at 2 (JA__); Ballenger Decl. ¶ 11 (A61).

U.S. Sugar's upgrade to Boiler No. 9 would not have been financially viable if the 2022 Rule's HCl standard for new solid fuel boilers existed or had been proposed in 2016-2019. U.S. Sugar Comments at 5-6 (JA__). The boiler would have

required a significantly different design and control equipment, costing an additional tens of millions of dollars. *Id.* Now, re-engineering Boiler No. 9 to retrofit control equipment to attempt to comply with the revised HCl standard for new sources is even more costly and complicated. *Id.* at 6 (JA__). U.S. Sugar estimates that engineering control equipment to meet the more than 100 times more stringent HCl standard will take at least three years and cost at least $20 million. Ballenger Decl. ¶¶ 12-28 (A61-69). More time and expense may be required (if compliance is possible at all) because no bagasse-fueled boiler in the country has ever had to meet such a stringent HCl standard. *Id.*[7]

## B.    Biomass Boilers

Like U.S. Sugar's Boiler No. 9, Petitioner American Forest & Paper Association (the "Association") members constructed nine biomass boilers between June 4, 2010 and August 24, 2020. *See* Association Comments at 14, EPA-HQ-OAR-2002-0058-3971 (JA__).[8] These boilers were designed and are currently being operated based on the 2011 Rule's new source standards. *Id.* The Association filed comments on EPA's proposal and explained that applying the 2022 Rule's new

---

[7] The boiler used by EPA to set the revised HCl standard as the "best controlled similar source" does not use bagasse as a fuel source and does not require HCl emission controls. *See, e.g.*, U.S. Sugar Comments at 8 (JA__).

[8] The Association's comments to this effect were submitted with a coalition of trade associations, which included the other trade association Petitioners in this case— American Wood Council and Council of Industrial Boiler Owners. *Id.* at 1 (JA__).

source standards to these nine boilers would be extremely costly. For example, the Association explained that one of its members, WestRock (a manufacturer of packaging products) operated a boiler that would require additional costly controls to meet the revised new source limit if EPA maintained its position. Indeed, the WestRock boiler commenced construction in 2011, was fully operational by 2020, and already had installed the costly controls needed to meet the previously-issued new source standard. *Id.* at 53-54 (JA__). The Association commented that it would be unreasonable and "divorced from reality" to suddenly treat the companies operating these boilers as "having been on notice many years ago of the revised standards," "given the passage of more than ten years since construction of many of them." *Id.* EPA failed to respond or take these costs into account in its analysis, stating that "EPA disagrees that revisions to the cost analysis are necessary, as this action is intended solely to respond to the D.C. Circuit's remand in *U.S. Sugar*." *Id.* at 54 (JA__).

## III.  SPECIFIC REVIEW SOUGHT BY PETITIONERS

### A.  Retroactive Application Of The 2022 Rule's Revised HCl And Other New Source Standards Is Unlawful.

The Clean Air Act requires EPA to establish NESHAPs for major sources that reflect the "maximum degree of reduction in emissions" that EPA determines is "achievable," "taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy

requirements." 42 U.S.C. § 7412(d)(2). These standards are referred to as maximum achievable control technology or "MACT" standards. EPA's practice has been first to establish a "floor" under Section 112(d)(3) that ensures that sources "clean up their emissions to the level that their best performing peers have shown can be achieved." *U.S. Sugar I*, 830 F.3d at 594. EPA then considers whether "current technology makes it possible for a source to perform even better than the best performing similar source or sources." *Id.* at 594-95. In deciding whether to set a "beyond-the-floor" standard, EPA considers cost and non-air quality health and environmental impacts and energy requirements. *Id.*

Maximum achievable control technology floor requirements vary depending on whether a source is new or existing. For "new sources," the floor provisions require that standards must be at least as stringent as "the emission control that is achieved in practice by the best controlled similar source." 42 U.S.C. § 7412(d)(3). For "existing sources" in categories or subcategories with thirty or more sources, emission standards "may be less stringent" but "not less stringent … than … the average emission limitation achieved by the best performing 12 percent of existing sources." *Id.* § 7412(d)(3)(A); *see U.S. Sugar I*, 830 F.3d at 594.

In the 2011 Rule, EPA established a maximum achievable control technology standard for HCl emissions from new solid fuel boilers of 0.022 lb/MMBtu, which was equivalent to what it had determined the floor to be. *See, e.g.*, 2022 Rule, 87

Fed. Reg. at 60,832 tbl.4 (A22). In the 2022 Rule, EPA revised its determination of the floor for HCl emissions to be more than 100 times more stringent than the prior floor determination and standard—0.00021 lb/MMBtu. *Id.* EPA then set the emission standard at this newly-determined floor level. *Id.*

EPA required that all boilers constructed after June 4, 2010—the date it proposed the 2011 Rule—meet the 2022 Rule's revised new source standards and gave them three years to comply. 2022 Rule, 87 Fed. Reg. at 68,832 (A22). Petitioners challenge EPA's attempt to retroactively apply the revised HCl and other new source standards first proposed on August 24, 2020 to boilers that commenced construction after June 4, 2010, more than ten years earlier, including the retroactive application of those standards to U.S. Sugar's Boiler No. 9 and to nine boilers operated by the Association's members (including WestRock's Boiler No. 1), which was highlighted in the Association's comments on the August 2020 proposed rule. Association Comments at 14 (JA__).

## B. HCl Standard for New Solid Fuel Boilers Is Unlawful.

Apart from retroactivity, Petitioners also challenge the 2022 Rule's HCl standard itself. EPA reviewed emissions data for solid fuel boilers and sought to identify the emission control "achieved in practice by the best controlled similar source." 42 U.S.C. § 7412(d)(3). In doing so, EPA relied on a statistical tool known as the Upper Prediction Limit ("UPL") to estimate emissions from each source

because actual data is limited. Emissions data provides "'snapshots' of a source's emissions in a limited set of conditions" and "fails to demonstrate accurately a source's emissions during all times and under all conditions." *U.S. Sugar I*, 830 F.3d at 598. Thus, EPA relies on the Upper Prediction Limit "[t]o compensate for the lack of adequate emissions data" and "account for the expected variability in emissions levels." *Id.*

In August 2019, EPA adopted new guidelines for applying the Upper Prediction Limit to limited data sets (*i.e.*, sources with less than seven test runs) for purposes of the 2022 Rule. *See* Approach for Applying UPL to Limited Datasets for Boilers and Process Heaters at Major Sources (Aug. 2019) (EPA-HQ-OAR-2002-0058-3946) ("August 2019 Guidelines") (JA__). Those guidelines recognize that "sample size is important for UPL calculations" and that using the Upper Prediction Limit to estimate emissions is inappropriate unless a source has at least "3 test runs (independent data points)." *Id.* at 4-6 (JA__). EPA recognized that "for a sample size of fewer than three data points … we should not develop emission limits using the UPL" because the results are too uncertain and that EPA "would have to develop a different procedure … that does not rely on the UPL." *Id.* at 2 (JA__).

In selecting the best controlled similar source, EPA bypassed its top-ranked boiler (ARPotlatchForestWarren Wellons) in favor of a different boiler (TXDibollTemple-Inland, PB-44) "with the second lowest emission test results" but

supposedly "the lowest variability." 2022 Rule, 87 Fed. Reg. at 60,822 (A12). EPA

concluded that PB-44 had the "lowest variability" based on three test runs from a

single stack test that did not provide "independent data points" on HCl but instead

reported *non-detect* values—*i.e.*, some amount of HCl was likely present but "the

emission results were below the detection level of the instrumentation." *Id.* at 60,823

(A13). By failing to use independent data points—and instead using non-detect

values—EPA's analysis could not possibly have assessed the true variability of the

data set. And, if EPA does not even know whether the data had variability, it would

be incorrect to describe the analysis as having accounted for it. EPA's reliance on

the limited PB-44 data likely caused the Upper Prediction Limit to significantly

underestimate PB-44's HCl emissions. U.S. Sugar Comments at 11-12 (JA__).[9]

## SUMMARY OF THE ARGUMENT

The 2022 Rule should be vacated in part to address flaws that render the rule

beyond EPA's statutory authority, inconsistent with statutory language, and

otherwise arbitrary and capricious.

First, EPA violated the Clean Air Act (and even its own regulations) by

retroactively applying the revised HCl and other new source standards to all boilers

constructed since 2010. New sources are subject to emission standards in effect (or

---

[9] Because EPA's data does not include the real emission values from PB-44 it is
impossible to know for certain what emissions PB-44 was achieving or the degree
of variability in the achieved emission controls.

at least proposed) when the source commences construction. After a source is constructed and operational, it is not subject to future changes to new source standards. EPA has no basis for creating a special rule based on this Court's remand in *U.S. Sugar*. EPA did not revise the HCl standard for new solid fuel boilers in response to this Court's remand, and even if it did, the Clean Air Act is not permissibly interpreted to apply the 2022 Rule's revised new source standards to sources that commenced construction before the August 2020 proposal date. The Rule should be vacated insofar as it applies new source standards retroactively to boilers constructed before the Rule was proposed or promulgated.

Second, the 2022 Rule's HCl standard for new solid fuel boilers violates the Clean Air Act and is arbitrary and capricious because EPA erred in identifying the emission control achieved in practice by the best controlled similar source. EPA bypassed its top-ranked boiler with the lowest emission test results in favor of a different boiler with the second lowest emission test results but supposedly lower variability. The supposedly lower variability led EPA to estimate that the second-ranked boiler actually had significantly lower HCl emission control levels achieved in practice than its top-ranked boiler. However, EPA reached that conclusion by relying on only three test runs that were "non-detect" for HCl, which masked the real variability and led EPA to significantly underestimate emissions from the hand-selected new "best controlled similar source." As a result, the 2022 Rule's HCl

standard for new solid fuel boilers should be vacated (which would leave the correctly-calculated standard in the 2011 Rule in place), or at least should be remanded to EPA.

## STANDING

Industry Petitioners are subject to, or represent members who are subject to,[10] regulation under the 2022 Rule and will suffer concrete, particularized injury as a result. *See, e.g.*, U.S. Sugar Comments at 1-2 (JA__); Ballenger Decl. ¶¶ 7-28 (A59-69); Association Comments at 14 (JA__); Decl. of John Piotrowski (June 16, 2023) (Packaging Corporation of America Filer City, Michigan facility Boiler B5 on which construction commenced in August 2018 required to spend $584,000 plus ongoing excess operating costs to comply with the 2022 Rule's revised HCl standard) (A84); Decl. of Corey A. Brandt (June 24, 2023) (WestRock Corporation's Boiler No. 1 required to expend additional funds to comply with the 2022 Rule's revised standards for HCl and particulate matter) (A79). The relief requested by Industry Petitioners will redress these harms in that these expenditures would not be required if their petitions are granted. Thus, Industry Petitioners have Article III standing. *See, e.g.*, *Ctr. For Energy & Econ. Dev. v. EPA*, 398 F.3d 653, 656-58 (D.C. Cir. 2005).

---

[10] The Association petitioners have standing through representation of their members. *See Chamber of Com. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011).

## STANDARD OF REVIEW

EPA must comply with the plain language of the Clean Air Act. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). But even where language is ambiguous, EPA's interpretation of the statute still must be reasonable. *Id.* Thus, under Clean Air Act § 307(d)(9), 42 U.S.C. § 7607(d)(9), this Court must overturn agency action that is arbitrary, capricious, an abuse of discretion, or otherwise unlawful.

## ARGUMENT

## I. THE 2022 RULE UNLAWFULLY APPLIES REVISED NEW SOURCE STANDARDS TO BOILERS THAT COMMENCED CONSTRUCTION BEFORE THE RULE WAS FIRST PROPOSED IN 2020.

In granting a stay, this Court found that U.S. Sugar's motion demonstrated a likelihood of success on the merits "insofar as the [2022 Rule] purports to apply its hydrogen chloride limit for new solid-fuel boilers, rather than its limit for existing solid-fuel boilers, to [U.S. Sugar's] Boiler 9 at its facility in Clewiston, Florida." Doc. #1989619 (JA__). EPA's attempt to apply the 2022 Rule's more than ***100 times*** more stringent HCl standard for new solid fuel boilers and other revised new source standards to boilers constructed as far back as 2010 is indeed unlawful. EPA's attempt to retroactively apply the 2022 Rule's revised new source standards is

contrary to the Clean Air Act, EPA's own regulations, and prior practice and, in any event, is not a reasonable interpretation of the Clean Air Act.

A.   **EPA's Retroactive Application Of The 2022 Rule's Revised New Source Standards Violates The Plain Language Of The Clean Air Act And EPA's Own Regulations.**

Section 112(i) of the Clean Air Act governs the "schedule for compliance" for new sources and specifies which emission standards apply. 42 U.S.C. § 7412(i). Section 112(i)(1) provides the general rule that new sources are subject to emission standards in effect when the source is constructed:

> *After the effective date* of any emission standard, limitation, or regulation … , no person may construct any new major source … subject to such emission standard, regulation or limitation unless the Administrator (or a State with a permit program approved under subchapter V) determines that such source, if properly constructed … , will comply with the standard, regulation or limitation.

*Id.* § 7412(i)(1) (emphasis added); *accord* 40 C.F.R. § 63.5(b)(3) ("*After the effective date* of any relevant standard … , no person may, without obtaining written approval in advance from the Administrator … [c]onstruct a new affected source that is major-emitting and subject to such standard.") (emphasis added).

EPA's own regulations confirm that new sources are subject only to emission standards that have at least been proposed when the source commences construction. *See* 40 C.F.R. § 63.5(b)(1) ("A new affected source for which construction commences *after proposal* of a relevant standard is subject to relevant standards for

new affected sources, including compliance dates.") (emphasis added); *id.* § 63.6(b)(1) ("[T]he owner or operator of a new … affected source for which construction … commences ***after proposal*** of a relevant standard that has an initial startup before the effective date of a relevant standard … must comply with such standard not later than the standard's effective date") (emphasis added).

Section 112(i)(2) of the Clean Air Act provides a "special rule" if an emission standard becomes "more stringent" between a rule's proposal and promulgation. 42 U.S.C. § 7412(i)(2). In that circumstance, "a new source which commences construction … ***after a standard, limitation or regulation applicable to such source is proposed*** and before such standard, limitation or regulation is promulgated shall not be required to comply with [the more stringent] promulgated standard until the date 3 years after the date of promulgation." *Id.* (emphasis added); *accord* 40 C.F.R. § 63.6(b)(3).

In response to U.S. Sugar's comments on the proposed rule, EPA conceded that Section 112(i)(2)'s "special rule" does not apply here. 2022 Rule, 87 Fed. Reg. at 60,830 ("EPA agrees that section 112(i)(2) does not address the commenter's request") (A20); U.S. Sugar Comments at 3-4 (JA__). That is because EPA is attempting to apply the 2022 Rule's revised new source standards to boilers that commenced construction long before 2020, when it proposed the 2022 Rule. EPA does not contend that Section 112(i)(2) allows it to apply the 2022 Rule's HCl and

other revised new source standards to boilers that commenced construction after it proposed the mature, final *2011 Rule* more than a decade earlier.

EPA's concession is dispositive. Because Section 112(i)(2)'s "special rule" does not apply, the 2022 Rule's HCl and other revised new source standards are governed by Section 112(i)(1) and 40 C.F.R. §§ 63.5(b)(1), 63.6(b)(1) and apply to boilers that commenced construction after the rule was proposed in 2020. EPA did not—and cannot—point to any other provision of the statute that would allow it to retroactively apply the 2022 Rule's revised new source standards to boilers constructed as far back as 2010. Nor did EPA point to any provision in its own regulation on compliance dates for new sources (40 C.F.R. § 63.6(b)) that would allow it to retroactively apply the 2022 Rule's revised new source standards.

Seeking to avoid this straightforward, plain-language application of Section 112(i), the 2022 Rule relies on the definition of "new source" in Section 112(a)(4). *See* 87 Fed. Reg. at 60,830-31 (A20-21). Section 112(a)(4) defines "new source" as "a stationary source the construction … of which is commenced after the Administrator first proposes regulations … establishing an emission standard applicable to such source." 42 U.S.C. § 7412(a)(4). EPA contends that it "first proposed" emission standards applicable to new boilers on June 4, 2010 as part of the *2011 Rule* and seeks to subject all boilers that commenced construction

after that date to the *2022 Rule's* revised new source standards, including the revised HCl standard. 2022 Rule, 87 Fed. Reg. at 60,830-31 (A20-21).

As might be expected of an approach that is so obviously unfair to regulated entities that carefully followed the rules in place when they designed and commenced construction of their boilers, EPA's interpretation of Section 112(a)(4)'s "new source" definition is legally defective. First, EPA cannot reconcile its reading of the definition with the operative provisions of the Clean Air Act and its own regulations—which make clear that new sources are subject to emission standards in effect (or at least proposed) when the source commences construction. 42 U.S.C. § 7412(i)(1); 40 C.F.R. §§ 63.5(b)(1), 63.6(b)(1). This makes sense because embarking on the construction of a major project requires committing capital to the design (including emission controls) based on known standards that are either already in effect or at least proposed. EPA cannot use a single definition to circumvent the operative provisions of the Clean Air Act, much less its own regulations. *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 316-20 (2014) (rejecting EPA's reliance on the general, Act-wide definition of "air pollutant" and holding that where the definition appears in the Act's operative provisions, it must be given "context-appropriate meaning").

Second, EPA misreads the "new source" definition. At most, that definition can be read to mean that if a source is constructed after EPA "first proposed"

particular emission standards applicable to that source, the source is new and must comply with the standards for new sources at start-up. *See, e.g.*, *U.S. Sugar I*, 830 F.3d at 594 ("new sources" are "those built after promulgation of a HAPs limit"). But that does not mean that the source is forever new and perpetually subject to future changes to new source standards. Nothing in Section 112 or EPA regulations provides for the retroactive application of revised new source standards to sources that commenced construction years earlier. Had Congress intended that outcome, it would have used the word "any" before "emission standard" in Section 112(a)(4)'s new source definition.

Indeed, when EPA periodically updates new source standards, its normal practice has been to apply revised standards prospectively. *See, e.g.*, National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities, Final Rule, 71 Fed. Reg. 42,724, 42,731-32 (July 27, 2006) (applying revised new source standards for dry cleaning machines "only" to machines constructed after the revised standards were proposed and explaining that machines constructed earlier "are ***subject to the new source requirements of the original rule, and to any additional requirements of the revised rule that would apply to existing sources***") (emphasis added); National Emission Standards for Coke Oven Batteries, Final Rule, 70 Fed. Reg. 19,992, 20,009-10 (Apr. 15, 2005) ("We concluded that it was not appropriate to increase the stringency of the current NESHAP for ***already-operating*** non-

recovery batteries. This limit is appropriate for ***new sources, which are those constructed after the date of proposal of these final rule amendments***, because it allows the new requirements to be incorporated into the considerations of design and operation of the new source.") (emphasis added).[11] Thus, to the extent EPA may argue that its interpretation is compelled by the statutory definition of "new source," that cannot be the case in light of EPA's previous—and opposite—approach.

Third, EPA's selection of *2010* as the "first proposed" date is entirely arbitrary and has no basis in Section 112(a)(4)'s text. EPA originally proposed emission standards for industrial, commercial, and institutional boilers and process heaters in 2003, not 2010. 68 Fed. Reg. 1,660 (JA__). Yet EPA agrees that the 2022 Rule's revised new source standards (including for HCl) do not reach back to 2003. In fact,

---

[11] *See also* National Emission Standards for Hazardous Air Pollutants: Carbon Black Production and Cyanide Chemicals Manufacturing Residual Risk and Technology Reviews, and Carbon Black Production Area Source Technology Review, Final Rule, 86 Fed. Reg. 66,096, 66,102-03 (Nov. 19, 2021) (updating NESHAPs for carbon black production and cyanide chemicals manufacturing and defining "new sources" as those constructed after January 14-15, 2021, the date of the proposed updates); National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Residual Risk and Technology Review, Final Rule, 85 Fed. Reg. 42,074, 42,110 (July 13, 2020) (updating NESHAPs for iron and steel manufacturing and defining "new sources" as those constructed after August 16, 2019, the date of the proposed update); National Emission Standards for Hazardous Air Pollutants: Surface Coating of Wood Building Products Residual Risk and Technology Review, Final Rule, 84 Fed. Reg. 7,682, 7,685 (Mar. 4, 2019) (updating NESHAPs for surface coating of wood building products and defining "new sources" as those constructed after May 16, 2018, the date of the proposed update).

when EPA promulgated the 2011 Rule, it defined "new sources" as those constructed after June 4, 2010—the date it proposed that rule—and did not seek to retroactively apply revised new source standards to 2003. 76 Fed. Reg. at 15,665 (JA__).[12] Like the 2011 Rule, the only "first proposed" date consistent with Section 112(i)(1) is August 24, 2020—the date EPA first proposed the 2022 Rule.

As EPA's normal practice and its decision not to try to reach back to 2003 reflect, it is both unfair and arbitrary to apply revised new source standards to boilers constructed under old standards just because *some* standard applied at the time of construction. Because emission standards for new sources are especially strict, regulated entities must be able to rely on the standards that actually apply when they design and build new boilers and cannot be expected to predict changes to emission standards years later. As EPA itself pointed out in the 2005 coke oven NESHAP, the approach EPA adopted there and that Industry Petitioners advocate here is necessary "because it allows the new requirements to be incorporated into the considerations of design and operation of the new source." 70 Fed. Reg. at 20,010.

EPA is ultimately attempting to fashion a new exception to Section 112(i)(1) and 40 C.F.R. §§ 63.5(b)(1), 63.6(b)(1) that appears nowhere in the Clean Air Act

---

[12] EPA has pointed to the fact that the 2004 Rule was vacated in *Natural Resources Defense Council*, 489 F.3d at 1250. *See* 2022 Rule, 87 Fed. Reg. at 60,830-31 (A20-21). This further serves to prove the point. The Court vacated the *final rule*. It did not vacate the proposal, yet EPA readily agrees that the 2003 proposal date did not apply to the 2011 Rule.

or EPA's own regulations. It also contradicts EPA's prior positions in numerous rulemakings. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2418 (2019) (declining to give "deference to an agency construction 'conflict[ing] with a prior' one"). EPA's attempt to subject boilers constructed as far back as 2010 to the 2022 Rule's revised new source standards ignores, and violates, Section 112(i)(1) and 40 C.F.R. §§ 63.5(b)(1), 63.6(b)(1). And as shown below, EPA's new exception is based on a mischaracterization of the reasons EPA revised the HCl standard for new solid fuel boilers—which were unrelated to the remand of the 2011 Rule in *U.S. Sugar*.

## B.     EPA's Interpretation Of "First Proposed" Is Not Reasonable.

Even if EPA's retroactive application of the 2022 Rule's revised new source standards did not violate Section 112(i)(1) and 40 C.F.R. §§ 63.5(b)(1), 63.6(b)(1), its selection of June 4, 2010 as the "first proposed" date is not a reasonable interpretation of the Clean Air Act.

### 1.      This Court's Remand In *U.S. Sugar* Did Not Require That EPA Revise The HCl Standard.

EPA has sought to retroactively apply the 2022 Rule's HCl standard for new solid fuel boilers by portraying the 2022 Rule as a merely ministerial recalculation of the 2011 Rule in response to *U.S. Sugar*. EPA has claimed that it was addressing this Court's "express directives" and "instructions" to consider sources that burned less than 90 percent of the subcategory defining fuel and that doing so "generated

the recalculated emission standard for HCl that U.S. Sugar today contests." EPA Resp. to U.S. Sugar's Stay Mtn. at 14-15, Doc. #1983612 (JA__).

EPA's claim simply isn't true. The HCl standard for new solid fuel boilers was not remanded in *U.S. Sugar*. And EPA represented that the HCl standard for new solid fuel boilers (along with some particulate matter standards) would not be affected by the remand. *See* Tsirigotis Decl. ¶¶ 7-9 (JA__). That turned out to be the case—EPA's consideration of sources that burned less than 90% of the subcategory defining fuel did not change EPA's ranking of the lowest-emitting solid fuel boiler for setting the HCl new source standard. *See* Revised MACT Floor Analysis (August 2019), App'x B-2b (identifying ARPotlatchForestWarren Wellons Boiler as the lowest-emitting solid fuel boiler, the same as its previous rank) (EPA-HQ-OAR-2002-0058-3948) (JA__).

In reality, EPA revised the HCl standard for reasons unrelated to the issues addressed in *U.S. Sugar*. In *National Association of Clean Water Agencies v. EPA*, 734 F.3d 1115 (D.C. Cir. 2013) ("*NACWA*"), the Court remanded EPA's emission standards for sewage sludge incinerators under Section 129 of the Clean Air Act due to issues with EPA's use of the Upper Prediction Limit. In August 2019, EPA decided to apply an updated Upper Prediction Limit methodology in setting maximum achievable control technology standards for boilers as well. *See* 2019

Guidelines (JA__).[13] When EPA proposed the 2022 Rule, it confirmed that the updated Upper Prediction Limit methodology—not the *U.S. Sugar* remand—led to the selection of a different boiler (TXDibollTemple-Inland, PB-44) as the best-performing solid fuel boiler, which led to the 2022 Rule's significantly more stringent HCl standard for new sources. 85 Fed. Reg. at 52,205-06 (JA__).

EPA's HCl standard revision was not in response to this Court's remand in *U.S. Sugar*. Nor was it in response to any challenge lodged against the 2011 Rule. *NACWA* involved standards for a different category of sources (sewage sludge incinerators), issued under a different part of the Clean Air Act (Section 129), and was decided three years before *U.S. Sugar*. And this Court in *U.S. Sugar* did not direct EPA to apply its updated Upper Prediction Limit methodology to its boiler emission standards under Section 112. *See, e.g.*, *U.S. Sugar I*, 830 F.3d at 632-39 (upholding EPA's use of the Upper Prediction Limit in the 2011 Rule against certain challenges raised by environmental petitioners). EPA decided to update its Upper Prediction Limit methodology for its boiler emission standards on its own initiative three years later in August 2019. In light of this, EPA has no basis for retroactively applying the 2022 Rule's HCl standard for new solid fuel boilers to boilers constructed after the date it first proposed the 2011 Rule.

---

[13] Although EPA's internal memo is dated August 2019, Industry Petitioners did not learn about the memo until EPA uploaded it to the rulemaking docket on August 24, 2020—the same day it proposed the 2022 Rule.

2. **Section 112 Cannot Reasonably Be Interpreted To Apply The 2022 Rule's Revised New Source Standards To Sources That Commenced Construction Before August 4, 2020.**

Even if EPA revised new sources standards in response to *U.S. Sugar*, it is unreasonable to interpret Section 112 to apply the 2022 Rule's revised standards to sources that commenced construction before EPA first proposed the 2022 Rule on August 4, 2020. Otherwise, existing sources would be required to engage in costly retrofits to attempt to comply, which was never the intent of new source standards. EPA has acknowledged as much in nearly identical circumstances.

In 2000, EPA promulgated NESHAPs for Portland cement manufacturing, which this Court remanded because EPA failed to set emission standards for HCl and other constituents. *See Nat'l Lime Ass'n v. EPA*, 233 F.3d 625 (D.C. Cir. 2000). Following the remand, EPA promulgated revised standards in 2006. *See* National Emission Standards for Hazardous Air Pollutants from the Portland Cement Manufacturing Industry, Final Rule, 71 Fed. Reg. 76,518 (Dec. 20, 2006). Contrary to its approach here, EPA applied the revised new source standards in the updated rule to sources constructed after 2005 (the date it proposed the revised standards) and rejected comments seeking to apply the revised new source standards to sources constructed after 1999 (the date it proposed the earlier, remanded standards). EPA explained its reasoning at length—and it applies equally here:

> The whole premise of new source standards being potentially more strict than for existing sources … is that

> these sources are being newly constructed and hence can immediately install the best pollution controls without incurring the time or expense of retrofitting. Put another way, new sources know from the beginning of the construction effort what controls will be required, and do not have to incur the higher costs and the time-consuming disruptions normally associated with control retrofits. If we were to require "new sources" that commenced construction prior to [2005] to retroactively install controls because we have changed rule requirements, then these particular sources would have to bear retrofit costs that we do not believe were intended by the [Clean Air Act].

*Id.* at 76,541; *see* National Emission Standards for Hazardous Air Pollutants from the Portland Cement Manufacturing Industry, Proposed Rule, 70 Fed. Reg. 72,330, 72,336 (Dec. 2, 2005) ("The underlying principle for having new sources meet stricter standards … is that such sources are essentially starting from scratch and, therefore, can most efficiently utilize the best means of pollution control. They will not need to retrofit. Sources classified as new under the [original standard] are not in this position. They have already commenced construction (and most likely started operating) and so are not in the position of a source starting de novo.").

In the Portland cement rulemaking, EPA also specifically rejected the very position it asserts here—that Section 112(a)(4)'s "new source" definition supported using the date it "first proposed" the earlier, remanded standard. EPA concluded that "***[t]his reading makes no sense*** in the context of a court action which essentially required EPA to reexamine the entire issue, and re-determine what the standard should be. Under such circumstances, the only reasonable date for determining new

source applicability for a resulting standard would be the date EPA proposes it." 71 Fed. Reg. at 76,541 (emphasis added); *see* 70 Fed. Reg. at 72,336 ("Note that we are not proposing to retroactively impose this [revised] requirement on currently operating new sources. It will only apply to new sources that commence construction after [2005]. Currently operating sources classified as new under the 1999 Portland Cement NESHAP would be required to meet the same requirements as existing sources."). The same rationale applies here. This Court directed EPA to "complete[] another rulemaking and implement[] replacement standards," *U.S. Sugar II*, 844 F.3d at 270, and EPA did so. It "makes no sense" to retroactively apply the new source standards first proposed in 2020 to boilers constructed years earlier.

EPA followed a similar approach in its 2005 coke oven NESHAP amendments, discussed above. *See* pp. 24-25, *supra.* EPA acknowledged that it would be "inappropriate" to retroactively apply more stringent, revised new source standards to already-operating sources because requirements need to "be incorporated into the considerations of design and operation of the new source." 70 Fed. Reg. 20,010. This could only occur if the source had not yet commenced construction as of the proposal of the more stringent, revised standard.

Indeed, this is why the trigger for new sources is "commence[ment]" of construction rather than actual construction. 40 C.F.R. §§ 63.5(a)(1), (2), 63.6(b)(1). Commencing construction requires only commitment of financial resources, such

that a source will be "existing" after the owner or operator has made a contractual commitment to construct a source that would be regulated by the standard:

> Commenced means, with respect to construction or reconstruction of an affected source, that an owner or operator has undertaken a continuous program of construction or reconstruction or that an owner or operator has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or reconstruction.

*Id.* § 63.2. This approach balances the need for environmental protection with promoting the nation's productive capacity, 42 U.S.C. § 7401(b)(1), by preventing "stranded investment" due to the fact that companies did not have notice of the control requirements prior to making investment decisions. Association Comments at 13 & n.35 (JA__).

The continuing validity of EPA's reasoning in the Portland cement and coke oven rulemakings is readily exemplified by U.S. Sugar's Boiler No. 9. U.S. Sugar began construction on Boiler No. 9 in 2016 in reliance on the HCl standard for new solid fuel boilers in the mature, final 2011 Rule. The 2011 Rule was in full effect— even the emission standards affected by the Court's decision in *U.S. Sugar* were remanded without vacatur. *U.S. Sugar II*, 844 F.3d at 270. EPA also represented that the HCl standard for new solid fuel boilers would not be affected by the remand (Tsirigotis Decl. ¶ 9 (JA__)) and that operators would not be burdened by the remand because they could continue to comply with the 2011 Rule. *See* pp. 7-8, *supra*. And

even for the HCl standard for existing solid fuel boilers that was affected by the remand, EPA represented that the standard would change by approximately ten percent, which would not likely impact the controls needed to comply with the revised standard. Tsirigotis Decl. ¶ 10 (JA__).[14]

Despite this Court's instruction to "complete this rulemaking promptly," *U.S. Sugar II*, 844 F.3d at 270, EPA waited four years to propose the new standards, and contrary to its prior representation, revised the HCl standard for new solid fuel boilers so that it is more than 100 times more stringent than the prior standard in the 2011 Rule. 2022 Rule, 87 Fed. Reg. at 60,832 tbl.4 (A22). And it seeks to retroactively apply the revised HCl standard to sources constructed since 2010— including U.S. Sugar's Boiler No. 9. *Id.* at 60,830, 60,832 (A20, A22). EPA's approach has the anomalous effect of penalizing U.S. Sugar for upgrading to a state-of-the-art boiler in 2016-2019 and other companies for complying with the prior rule at considerable expense. Boiler No. 9 is already more advanced—and cleaner emitting—than the older, pre-2010 bagasse-fueled boilers still used by U.S. Sugar's competitors. U.S. Sugar Comments at 5 (JA__); Ballenger Decl. ¶ 9 (A60).

---

[14] Similarly, the Packaging Corporation of America B5 Boiler identified in the Piotrowski declaration (A84) exemplifies this issue. Packaging Corporation of America designed and committed to the B5 Boiler nearly two years before EPA proposed the revisions to the HCl standard, and it clearly could not have designed this drastic difference in the emission standard into its already developed project when EPA proposed the revision in mid-2020.

The 2022 Rule's HCl standard for new solid fuel boilers would have rendered Boiler No. 9 financially unviable had it been in place (or even proposed) in 2016-2019. U.S. Sugar Comments at 5-6 (JA__). Now, U.S. Sugar would need to attempt a costly and complicated retrofit to attempt to comply with the revised HCl standard, if compliance is possible at all. Engineering control equipment to meet the more than 100 times more stringent HCl standard would take at least three years and cost at least $20 million. Ballenger Decl. ¶¶ 12-28 (61a-69a). No bagasse-fueled boiler in the country has ever met, or had to meet, such a stringent standard.

EPA's interpretation of Section 112 is not reasonable. Nothing in Section 112 suggests that Congress intended to allow EPA to retroactively apply a significantly more stringent emission standard for new sources to sources that are not new and would require costly retrofits. To the contrary, the plain language of Section 112 prohibits that interpretation. *See* pp. 20-22, *supra*. The 2022 Rule's revised new source standards should apply on a prospective basis. The 2022 Rule should be vacated to the extent it provides otherwise. EPA's attempt to retroactively apply the revised HCl and other new source standards is fatally flawed and cannot be "cured" through a remand. *See, e.g.*, *U.S. Sugar II*, 844 F.3d at 270.

## II.   EPA'S REVISED HCL STANDARD FOR NEW SOLID FUEL BOILERS IS UNLAWFUL.

The 2022 Rule's HCl standard for new solid fuel boilers is unlawful apart from any retroactivity issues because EPA erred in identifying the emission control

"achieved in practice by the best controlled similar source." 42 U.S.C. § 7412(d)(3). EPA bypassed its top-ranked boiler (Wellons) with the lowest emission test results in favor of a different boiler (PB-44) "with the second lowest emission test results" but supposedly "the lowest variability." 2022 Rule, 87 Fed. Reg. at 60,822 (A12). The "lowest variability" led EPA to suggest, using its Upper Prediction Limit methodology, that PB-44 actually has lower emissions (by a factor of 100) than Wellons.

The "lowest variability" was a mirage, however, because EPA relied on three test results for PB-44 that were all "non-detect" for HCl and failed to quantify the amount of HCl actually present. The use of such sparse data violated EPA's own guidelines for applying the Upper Prediction Limit to limited datasets and likely caused EPA's calculation of the Upper Prediction Limit to significantly underestimate emissions actually achieved by PB-44.

EPA typically uses emission data from "three-run stack test[s]" to set maximum achievable control technology floors. *U.S. Sugar I*, 830 F.3d at 598. A three-run stack test "provides three 'snapshots' of a source's emissions in a limited set of conditions and, accordingly, it fails to demonstrate accurately a source's emissions during all times and under all conditions." *Id.* Moreover, "no source emits any HAP at a constant level; rather, HAP emissions fluctuate over time and for many reasons, including, *e.g.*, operation of control technologies, variation in combustion

materials and combustion conditions, variation in operation of the unit itself, and variation associated with the emission measurement techniques." *Id.* (internal quotation marks omitted); *see* 2011 Rule, 76 Fed. Reg. at 15,627 ("EPA is mindful of the need to account for sources' variability in assessing sources' performance when developing technology-based standards.") (JA__).

EPA relies on the Upper Prediction Limit "[t]o compensate for the lack of adequate emissions data" and "account for the expected variability in emissions levels." *U.S. Sugar I*, 830 F.3d at 598. As this Court has explained, the Upper Prediction Limit "uses an equation that considers (1) the average of the best performing source or sources' stack-test results (*i.e.*, the mean); (2) the pattern the stack-test results create (*i.e.*, the distribution); (3) the variability in the best performing source or sources' stack-test results (*i.e.*, the variance); and (4) the total number of stack tests conducted for the best performing source or sources (*i.e.*, the sample size)." *U.S. Sugar I*, 830 F.3d at 634-35. The Upper Prediction Limit equation "produces a range of values that is *expected*," with 99% confidence, "given the variance in the relevant stack-test data, to encompass the average emissions levels achieved by the best performing sources a specified percentage of the time." *Id.* at 635. EPA then sets the floor "at the top level of that range … to arrive at a figure that, 99 out of 100 times, it expected the average emissions levels of the best performing sources to 'achieve.'" *Id.*

In applying the Upper Prediction Limit, the variance in stack-test results significantly affects the expected range of emissions. Not surprisingly, with greater variance, the Upper Prediction Limit produces wider ranges of expected emissions. With less variance, the Upper Prediction Limit produces narrower ranges of expected emissions. *See, e.g.*, Use of the Upper Prediction Limit for Calculating MACT Floors 11-12 (July 30, 2014) ("The UPL … is directly related to the confidence level and to the variance, meaning that as either of these values go up or down, so does the UPL value.") (EPA-HQ-OAR-2012-0522) (JA__).

EPA's August 2019 guidelines for applying the Upper Prediction Limit to limited data sets acknowledge that "sample size is important," and that the Upper Prediction Limit requires "at least 3 test runs (independent data points)." 2019 Guidelines at 5 (JA__). EPA further "recognize[d] that for a sample size of fewer than three data points, which has a very large t-score and precludes the appropriate selection of a distribution, we should not develop emission limits using the UPL." *Id.* at 2 (JA__). The "t-score" "is a value that estimates the uncertainty and variability for a certain confidence level associated with a specific number of data points," and with fewer than three independent data points, the t-score "changes dramatically" and is too uncertain. *Id.* at 2-3, 5 (JA__).

EPA did not have three independent, real emission measurements from PB-44 to input to the Upper Prediction Limit equation. Instead, EPA relied on three test

runs that were all *non-detect* for HCl. That means that some amount of HCl was likely present but "results were below the detection level of the instrumentation." 2022 Rule, 87 Fed. Reg. at 60,823 (A13). Notably, EPA has recognized the problems with relying on values at or below detection levels to set emission standards. *See* 2011 Rule, 76 Fed. Reg. at 15,624 ("EPA concluded that it is not appropriate, for development of MACT floors, to use any value less than the MDL [method detection limit]. EPA also disagrees with comments that emission levels at or near the MDLs are appropriate levels to use for standard setting without consideration of measurement imprecision, because the actual performance of sources may differ significantly from the measured values or the MDL … . Measurement imprecision is proportionally highest for values measured below or near a method's detection level and proportionally decreasing for values measured above the method detection level.") (JA__).

The whole point of applying the Upper Prediction Limit is to ensure that variability is built into the estimated emissions. *See, e.g.*, *U.S. Sugar I*, 830 F.3d at 598, 634-35. But, because EPA did not use three independent data points—and instead used three non-detect values—the inputs to the Upper Prediction Limit formula did *not* reflect variability and the Upper Prediction Limit cannot possibly estimate the variable range of emissions from PB-44. U.S. Sugar Comments at 11-12 (JA__). If EPA relies on the Upper Prediction Limit to develop maximum

achievable technology floors based on only three test runs, EPA should have three independent, real emission measurements. The use of three imprecise "non-detect" values cannot reliably estimate emission control "achieved in practice by the best controlled similar source." 42 U.S.C. § 7412(d)(3).

Accordingly, this Court should vacate the 2022 Rule's revised HCl standard for new solid fuel boilers. Vacating the 2022 Rule's revised HCl standard would leave the 2011 Rule's HCl standard for new solid fuel boilers in place—which was correctly based on the boiler with the lowest emission test results (Wellons) as the "best controlled similar source." 42 U.S.C. § 7412(d)(3). At a minimum, the Court should remand the HCl standard to EPA for recalculation of the standard using a corrected methodology.

## CONCLUSION

For the foregoing reasons, Industry Petitioners respectfully request that the 2022 Rule be vacated with respect to the retroactive application of the revised HCl and other new source standards to the period before the 2022 Rule was proposed on August 24, 2020. The Rule should also be vacated, or at least remanded to EPA, as to the revised HCl standard for new solid fuel boilers.

Respectfully submitted,

/s/ Timothy S. Bishop
Timothy S. Bishop
Matthew C. Sostrin
Nicholas Vera
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600

*Counsel for United States
Sugar Corporation*

*Of Counsel*:

/s/ Shannon S. Broome
Shannon S. Broome
HUNTON ANDREWS KURTH LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Andrew J. Topps
Vice President, General Counsel, and
Corporate Secretary
American Forest & Paper Association
1101 K Street, N.W., Suite 700
Washington, DC 20005

*Counsel for American Forest & Paper
Association*

Charles H. Knauss
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20007
(415) 975-3718

Lisa M. Jaeger
BRACEWELL LLP
2001 M Street, N.W., Suite 900
Washington, DC 20036-3310
(202) 828-5800

*Counsel for American Forest & Paper
Ass'n, American Wood Council,
Council of Industrial Boiler Owners*

*Counsel for Council of Industrial
Boiler Owners*

Dated: June 26, 2023

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 9,810 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point type for text and footnotes.

/s/ Timothy S. Bishop

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2023, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system which will serve all counsel of record.

/s/ Timothy S. Bishop