**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 22-1271 and Consolidated Cases

---

UNITED STATES SUGAR CORP.,

Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

---

Petition for Review of Administrative Action
of the United States Environmental Protection Agency

---

**BRIEF OF RESPONDENT
ENVIRONMENTAL PROTECTION AGENCY**

---

OF COUNSEL:

SUSMITA DUBEY
LUCAS MAY
U.S. Environmental Protection Agency
Office of General Counsel
William Jefferson Clinton Building
1200 Pennsylvania Ave., NW
Mail Code 2344A
Washington, D.C. 20460

DATE: Sept. 18, 2023

TODD KIM
Assistant Attorney General

PERRY M. ROSEN
United States Department of Justice
Environment & Natural Resources Div.
Environmental Defense Section
P.O. Box 7611
Washington D.C. 20044

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Respondent Environmental Protection Agency ("EPA") acknowledges that Petitioners' briefs correctly set out the parties, rulings and related cases. References to the Ruling(s) at issue appear in the briefs for the Petitioners.

## CORPORATE DISCLOSURE STATEMENT

Respondent EPA is a governmental entity for which a corporate disclosure statement is not required.

So certified this 18th day of September, 2023 by

/s/ *Perry M. Rosen*
Perry M. Rosen
Counsel for Respondents

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................1

JURISDICTION ...........................................................................3

STATEMENT OF ISSUES.............................................................3

STATUES AND REGULATIONS...................................................4

STATEMENT OF FACTS .............................................................4

     A.     Statutory Background ......................................................4

     B.     Regulatory Background ...................................................9

          1.     EPA's Regulatory Approach Under 42 U.S.C. § 7412 .............9

          2.     The Regulation of Boilers .....................................10

     C.     This Court's Decisions on the Major Boiler Rule and Related Rules...................................................................14

     D.     The Challenged Rule ....................................................18

SUMMARY OF ARGUMENT ........................................................20

STANDARD OF REVIEW .............................................................24

ARGUMENT...............................................................................25

I.     EPA'S DETERMINATION THAT SOURCES CONSTRUCTED AFTER THE MAJOR BOILER RULE WAS FIRST PROPOSED ARE "NEW SOURCES" IS A REASONABLE APPLICATION OF 42 U.S.C. § 7412...................................................................25

     A.     Both the Statute and EPA's Regulations Support EPA's Application of Recalculated Emission Standards for New Boilers to All Boilers Constructed After June 4, 2010.......................................25

          1.     42 U.S.C. § 7412 Supports Treating All Boilers Constructed After June 4, 2010 New Sources ...........................................26

2.  Industry Petitioners' Statutory Arguments Lack Merit............30

3.  EPA's Pre-Existing Regulations Treat All Boilers Constructed After June 4, 2010, as New Sources........................................33

B.  Industry Petitioners' Reliance on Other Statutory and Regulatory Provisions Does Not Render EPA's Application of New Source Requirements to Sources Constructed After 2010 Inconsistent with the Statute or Unreasonable ....................................................................36

C.  EPA's Application of Recalculated New Source Requirements to Boilers Constructed After June 4, 2010 is Reasonable ......................39

1.  The Purported Cost of Complying with Regulatory Requirements is Not a Basis to Find EPA's Statutory Interpretation Unreasonable ....................................................39

2.  EPA Never Indicated that Regulated Entities Could Ignore Mandated Recalculation of Emission Standards......................42

3.  EPA's Approach Here is Not Inconsistent with Past Practice ..................................................................................45

4.  The Revised Standards were Issued in Response to a Court Remand, Contrary to Petitioners' Allegation Otherwise..........49

D.  The Application of New Source Standards to Facilities Constructed Before 2020 is Not Impermissibly Retroactive..................................51

II.   THE MACT FLOOR FOR HYDROGEN CHLORIDE (HCl) IS NOT ARBITRARY AND CAPRICIOUS...........................................................56

III.  EPA WAS NOT REQUIRED TO BASE THE RECALULATED EMISSION STANDARDS IN THE CHALLENGED RULE ON UPDATED DATA...62

A.  Neither the Clean Air Act Generally, Nor 42 U.S.C. § 7412

Specifically, Required EPA to Recalculate the Emission
Standards for Boilers Based on an Updated Dataset.........................63

1.   EPA Exercised Sound Judgment in Determining the
     Appropriate Dataset to Consider .............................................63

2.   Nothing in the Statute Requires EPA to Consider the
     Most Recent Data when Recalculating Existing Emission
     Standards ...............................................................................67

3.   EPA Properly Applied the Statute to the Circumstances
     Presented ..............................................................................74

B.   The Recalculated Standards are Not Arbitrary or Capricious ............76

CONCLUSION ................................................................................81

# TABLE OF AUTHORITIES

**Cases**

*Appalachian Power Co. v. EPA*,
  249 F.3d 1032 (D.C. Cir. 2001) ..............................................................66

*Bd. of Cnty. Comm'rs of Weld Cnty., Colo., v. EPA*,
  72 F.4th 284 (D.C. Cir. 2023) ...........................................54, 55, 68, 69

*Bluewater Network v. EPA*,
  370 F.3d 1 (D.C. Cir. 2004) ..................................................................28

*Cement Kiln Recycling Coal. v. EPA*,
  255 F.3d 855 (D.C. Cir. 2001) .........................................................10, 72

*Chem. Waste Mgmt., Inc. v. EPA*,
  869 F.2d 1526 (D.C. Cir. 1989) ......................................................52, 53

*Chevron U.S.A. Inc. v. NRDC, Inc.*,
  467 U.S. 837 (1984) ...........................................................................24, 33

*Collins v. Yellen*,
  141 S. Ct. 1761 (2021) .............................................................................28

*Digital Realty Trust., Inc. v. Somers*,
  138 S.Ct. 767 (2018) ................................................................................32

*DirecTV, Inc. v. FCC*,
  110 F.3d 816 (D.C. Cir. 1997) ...............................................................52

*Ethyl Corp. v. EPA*,
  541 F.2d 1 (D.C. Cir. 1976) ....................................................................25

*Genus Med. Techs. LLC v. FDA*,
  994 F.3d 631 (D.C. Cir. 2021) ...............................................................39

*Guedes v. ATF*,
  45 F.4th 306 (D.C. Cir. 2022) ..........................................................25, 32

*Hardt v. Reliance Standard Life Ins. Co.*,
  130 S. Ct. 2149 (2010) .............................................................................27

Hubbard v. United States,
514 U.S. 695 (1995)......................................................................32

Indep. U.S. Tanker Owners Comm. v. Dole,
809 F.2d 847 (D.C. Cir. 1987) ....................................................11

Landgraf v. USI Film Prods.,
511 U.S. 244 (1994).....................................................................53

Marx v. Gen. Revenue Corp.,
568 U.S. 371 (2013)......................................................................27

Maryland v. EPA,
958 F.3d 1185 (D.C. Cir. 2020) ................................................66

Med. Waste Inst. & Energy Recovery Council v. EPA,
645 F.3d 420 (D.C. Cir. 2011) ............................................35, 46

*Midwest Ozone Grp. v. EPA,
61 F.4th 187 (D.C. Cir. 2023) ..................................24, 25, 66

Miss. Com'n on Env't Quality v. EPA,
790 F.3d 138 (D.C. Cir. 2015) ...........................................67, 68

*Mobile Relay Assocs. v. FCC,
457 F.3d 1 (D.C. Cir. 2006) ...............................52, 53, 55

Mossville Env't Action Now v. EPA,
370 F.3d 1232 (D.C. Cir. 2004) .........................................7, 8

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983)........................................................................25

Nat'l Ass'n for Surface Finishing v. EPA,
795 F.3d 1 (D.C. Cir. 2015) ........................................................74

*Nat'l Ass'n of Clean Water Agencies v. EPA,
734 F.3d 1115 (D.C. Cir. 2013) .........................16, 56, 60, 72

*Nat'l Cable & Telecomms. Ass'n v. FCC,*
    567 F.3d 659 (D.C. Cir. 2009) ...................................................53

*Nat'l Lime Ass'n v. EPA,*
    233 F.3d 625 (D.C. Cir. 2000) ...........................8, 39, 45, 46

*Nat'l Petrochemical & Refiners Ass'n v. EPA,*
    630 F.3d 145 (D.C. Cir. 2010) .................................................53

*NRDC v. EPA,*
    489 F.3d 1250 (D.C. Cir. 2007) ................................................ 7

*NRDC v. EPA,*
    489 F.3d 1364 (D.C. Cir. 2007) ..........................................7, 11

*NRDC v. EPA,*
    529 F.3d 1077 (D.C. Cir. 2008) ................................................ 5

*NRDC v. Gorsuch,*
    685 F.2d 718 (D.C. Cir. 1982) ................................................. 4

*Okla. Dep't of Env't Quality v. EPA,*
    740 F.3d 185 (D.C. Cir. 2014) .................................................35

*PDK Lab'ys Inc. v. DEA,*
    438 F.3d 1184 (D.C. Cir. 2006) ..............................................35

*RoadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
    556 U.S. 639 (2012) ..................................................................39

*Sierra Club v. EPA,*
    167 F.3d 658 (D.C. Cir. 1999) .................................................72

*Sierra Club v. EPA,*
    353 F.3d 976 (D.C. Cir. 2004) ................................................. 5

*Sierra Club v. EPA,*
    884 F.3d 1185 (D.C. Cir. 2018) ........................................18, 51

*Sierra Club v. EPA,*
    895 F.3d 1 (2018) ......................................................................19

*Sinclair Broad. Grp., Inc v. FCC*,
284 F.3d 148 (D.C. Cir. 2002) ........................................................52

*Students Against Genocide v. Dep't of State*,
257 F.3d 828 (D.C. Cir. 2001) .......................................................35

*Tanzin v. Tanvir*,
141 S.Ct. 486 (2020)...................................................................32

*\*U.S. Sugar Corp. v. EPA*,
830 F.3d 579 (D.C. Cir. 2016) ................. 5, 10, 14, 15, 25, 30, 45, 50, 57, 66, 73, 78

*\*U.S. Sugar Corp. v. EPA,*
844 F.3d 268 (D.C. Cir. 2016) ...........................................15, 16, 63, 75

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)...................................................................32

*Van Hollen, Jr. v. Fed. Election Com'n*,
811 F.3d 486 (D.C. Cir. 2016) .......................................................25

*White Stallion Energy Ctr., LLC v. EPA*,
748 F.3d 1222 (D.C. Cir. 2014) .......................................................6

**Statutes**

42 U.S.C. §§ 7401-7671....................................................................4

42 U.S.C. § 7401(a)(2)......................................................................4

42 U.S.C. §§ 7407-08 ......................................................................67

42 U.S.C. § 7411(a)(2)......................................................................27

*\*42 U.S.C. § 7412.........................................1, 4, 20, 23, 26, 41, 66, 68, 72

42 U.S.C. § 7412(a)(1) (1970) ............................................................5

42 U.S.C. § 7412(a)(1) ......................................................................6

42 U.S.C. § 7412(a)(2)......................................................................6

*42 U.S.C. § 7412(a)(4) ........................................... 1, 8, 13, 26, 27, 28, 30, 32, 36

42 U.S.C. § 7412(a)(10) ................................................................. 7

42 U.S.C. § 7412(b)(5) ................................................................ 71

42 U.S.C. § 7412(c) ...................................................................... 6

42 U.S.C. § 7412(d) ...................................................................... 8

42 U.S.C. § 7412(d)(1) .................................................................. 6

42 U.S.C. § 7412(d)(2) ............................................................... 7, 8

42 U.S.C. § 7412(d)(3) .............................................................. 8, 71

42 U.S.C. § 7412(d)(3)(A) ....................................................... 69, 70

42 U.S.C. § 7412(d)(6) ............................................................ 47, 74

42 U.S.C. § 7412(f) ....................................................................... 8

42 U.S.C. § 7412(f)(2) ............................................................. 47, 74

42 U.S.C. § 7412(h) ...................................................................... 8

42 U.S.C. § 7412(i)(1) ............................................................. 36, 38

42 U.S.C. § 7412(i)(2) ............................................................. 31, 37

42 U.S.C. § 7429 ..................................................................... 10, 16

42 U.S.C. § 7607(b)(1) ............................................................. 3, 35

42 U.S.C. § 7607(d)(9) ................................................................ 24

**Code of Federal Regulations**

40 C.F.R. Part 63 Subpart DDDDD ............................................... 6

40 C.F.R. § 63.2 ......................................................................... 38

*40 C.F.R. § 63.7490(b) ...............................2, 13, 34, 35, 38, 39, 40, 49, 56

40 C.F.R. §§ 63.7480-63.7575 ................................................9, 33

40 C.F.R. § 63.5(b)(1) ....................................................38

40 C.F.R. § 63.6(b)(3) ....................................................38

40 C.F.R. § 63.7480 ......................................................33

**Federal Registers**

69 Fed. Reg. 55,218 (Sept. 13, 2004) .......................................10

70 Fed. Reg. 19,992 (Apr. 15, 2005) ........................................47

71 Fed. Reg. 42,724 (July 27, 2006) ........................................47

75 Fed. Reg. 32,006 (June 4, 2010) .........................................11

76 Fed. Reg. 15,266 (Mar. 21, 2011) ........................................12

76 Fed. Reg. 15,608 (Mar. 21, 2011) ....................................6, 10, 12, 13, 34

78 Fed. Reg. 7138 (Jan. 31, 2013)..........................6, 12, 13, 31, 34, 35, 56

78 Fed. Reg. 10,006 (Feb. 12, 2013) ............................12, 29, 48, 49

80 Fed. Reg. 72,790 (Nov. 20, 2015) ........................................14

85 Fe. Reg. 52,198 (Aug. 24, 2020)……….………………………………………77

87 Fed. Reg. 60,816 (Oct. 6, 2022) ...................1, 2, 6, 10, 11, 14, 15, 17, 18,
.......................................................... 19, 23, 27, 28, 29, 37,
.......................................................... 38, 41, 42, 43, 46, 47, 48, 51, 52, 55,
.......................................................... 58, 60, 62, 64, 70, 74, 75, 77, 78, 79, 80

*Authorities chiefly relied upon are marked with an asterisk.*

# GLOSSARY

CAA     Clean Air Act, 42 U.S.C. §§ 7401-7671

EPA     Environmental Protection Agency

HAPs    Hazardous Air Pollutants

HCl      Hydrogen Chloride

JA      Joint Appendix

MACT    Maximum Achievable Control Technology

NESHAP   National Emission Standards for Hazardous Air Pollutants

PM     Particulate Matter

PPM     Parts Per Million

UPL     Upper Prediction Limit

# INTRODUCTION

Pursuant to section 112 of the Clean Air Act ("CAA"), 42 U.S.C. § 7412, the Environmental Protection Agency ("EPA") is tasked with establishing national emission standards ("emission standards") for nearly 190 pollutants classified by Congress as hazardous. EPA does so by dividing sources into categories and subcategories and establishing emission standards for each subcategory, for both major and lower emitting (area) sources. For the major sources at issue here, commercial, industrial, and institutional boilers and process heaters (collectively "Boilers"), EPA sets different standards for new and existing sources, with the standards for new major sources anticipated to be more restrictive than for existing sources.

Responding directly to targeted remands of this Court, in 2022 EPA recalculated a small percentage of emission standards for Boilers that were first proposed on June 4, 2010 and promulgated in 2011. 87 Fed. Reg. 60,816 (Oct. 6, 2022 ) ("Challenged Rule"). Petitioners, United States Sugar Corporation ("U.S. Sugar") and American Forest & Paper Association, *et al.* ("AF&PA") (collectively "Industry Petitioners"), argue that facilities they constructed prior to August 12, 2020 (the date EPA proposed the Challenged Rule) may not be regulated as "new" sources. But 42 U.S.C. § 7412(a)(4) specifically defines a "new" source as one built after EPA "first proposes" hazardous emissions

standards for a source category, which occurred on June 4, 2010. And EPA's regulations applicable specifically to Boilers have declared for better than a decade – and without qualification – that any Boiler where construction commenced after June 4, 2010, shall be regulated as a "new" source. 40 C.F.R. § 63.7490(b). Industry Petitioners' claims are, therefore, inconsistent with the statute and regulation.

While in full agreement that the operable date for application of new source emission standards is June 4, 2010, Petitioners California Communities Against Toxics, *et al*. ("Environmental Petitioners") argue that when recalculating a limited group of those very same emission standards, the Agency must base those recalculations on *current* emissions data, not the original dataset upon which EPA based the emission standards it was directed by this Court to correct. But the statutory provisions cited by Environmental Petitioners do not require EPA to analyze all new data when recalculating existing standards in response to a limited remand. Indeed, this Court has upheld EPA's reliance on an original dataset in similar revision contexts. And given the limited nature of the Court's remand, relying on updated data here would almost certainly have resulted in disparate treatment of different sources within the same source category. 87 Fed. Reg. at 60,822/1.

EPA's recalculation of a limited subset of emission standards, including the timing and nature of the data on which such revisions should be grounded, involve technical determinations that are based on the specific circumstances presented. Given the deference accorded to EPA on such technical matters, and the fact that the Challenged Rule is a focused and direct response to limited infirmities this Court identified in the previously finalized emissions standards, EPA's promulgation of the Challenged Rule is both reasonable and consistent with the statute.

## JURISDICTION

The Court has jurisdiction pursuant to 42 U.S.C. § 7607(b)(1).

## STATEMENT OF ISSUES

1.      Where the CAA defines a "new source" as any source that commences construction after the date on which EPA "first proposes" emissions standards applicable to such source, and where EPA first proposed the relevant standards for major Boilers on June 4, 2010, and set forth in both 2011 and 2013 regulations that a "new" Boiler is one where construction commenced after June 4, 2010, did EPA exceed its statutory authority or act arbitrarily when it reiterated in the Challenged Rule that Boilers constructed after June 4, 2010 shall be regulated as new sources?

2. Did EPA act reasonably in recalculating emission standards for hydrogen chloride ("HCl") from new Boilers when it based those recalculations on actual emission tests showing detectable levels of the covered pollutants and applied a well-recognized – and unchallenged – statistical tool to address the variability of emission tests?

3. In recalculating a limited subset of already applicable emission standards pursuant to court directives, is EPA statutorily required to analyze more recent data for the subset of standards it is correcting, particularly where that would result in an asymmetrical rule in which standards appliable to various sources within a single source category are based on different datasets?

## STATUES AND REGULATIONS

Pertinent statutes and regulations appear in addendums to the parties' briefs.

## STATEMENT OF FACTS

### A.   Statutory Background

The Clean Air Act, 42 U.S.C. §§ 7401-7671, establishes a comprehensive program for controlling and improving the Nation's air quality. *NRDC v. Gorsuch*, 685 F.2d 718, 720-21 (D.C. Cir. 1982); 42 U.S.C. § 7401(a)(2) (the CAA was enacted to address "the growth in the amount and complexity of air pollution ... [which] has resulted in mounting dangers to the public health and welfare...."). The regulation of hazardous pollutants under 42 U.S.C. § 7412 plays

a central role in carrying out this mandate, concentrating on pollutants that increase mortality or serious, incapacitating, and irreversible illnesses. *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 592-93 (D.C. Cir. 2016) ("*U.S. Sugar I*").

When first enacted, 42 U.S.C. § 7412 required EPA to identify and regulate pollutants when they were found to cause or contribute to the types of serious illnesses that were of concern. Pub. L. No. 91-604, §4(a), 84 Stat. 1676, 1685 (1970), 42 U.S.C. §7412(a)(1) (1970). These health-based standards proved exceedingly difficult to generate, leaving vast numbers of sources unregulated. *NRDC v. EPA*, 529 F.3d 1077, 1079 (D.C. Cir. 2008).

In response, Congress amended section 7412 in 1990, directing EPA to regulate the emission of hazardous air pollutants ("HAPs") through technology-based standards. *Sierra Club v. EPA*, 353 F.3d 976, 979 (D.C. Cir. 2004). First, Congress itself identified the pollutants that were deemed to be hazardous, designating 189 pollutants as subject to regulation. The hazardous air pollutants covered by the statute are emitted from over 170 source categories within various industries, including Boilers.

Congress then directed EPA to establish the emission standards for "major" stationary sources of these hazardous pollutants. Major stationary sources, such as U.S. Sugar's Clewiston Boiler 9 and the nine biomass Boilers identified in Industry Petitioners' brief, are those that emit more than ten tons per year ("tpy")

of any hazardous air pollutant or more than twenty-five tons per year of any combination of pollutants. 42 U.S.C. § 7412(a)(1). Sources that emit lower levels of hazardous air pollutants are classified as "area sources" and may be subject to less stringent pollution control requirements. *Id.* § 7412(a)(2). To facilitate the regulation of such sources, Congress directed EPA to establish source categories and subcategories. 42 U.S.C. § 7412(c). *See, e.g.*, 40 C.F.R. Part 63, Subpart DDDDD (covering Boilers); 78 Fed. Reg. 7138, 7142 (Jan. 31, 2013) (identifying 30 Boiler subcategories).

There are 485 Boilers that are operational and subject to numeric emission standards under section 7412 as major sources. 87 Fed. Reg. at 60,833/1. They emit hazardous pollutants such as hydrogen chloride ("HCl"), dioxins, polychlorinated biphenyls ("PCBs"), arsenic, cobalt, benzene, and formaldehyde. 76 Fed. Reg. 15,608, 15,611/1-2 (Mar. 21, 2011). These and other hazardous pollutants emitted by Boilers cause various ailments, including cancer and birth defects, kidney damage, and damage to the central nervous system. *Id.*

Congress gave EPA specific – but limited – direction regarding how to promulgate emission standards for major sources. 42 U.S.C. § 7412(d)(1); *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1229-31 (D.C. Cir. 2014). Section 7412 requires EPA to establish national emission standards within designated subcategories for both new and existing major sources of hazardous air

pollutants that "require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section" that the Administrator determines is achievable based on existing technology, taking cost and other specific factors into consideration. 42 U.S.C. § 7412(d)(2). Accordingly, section 7412 emission standards are known as "maximum achievable control technology" or "MACT" standards.

The establishment of MACT standards is essentially a two-step process and is different for "new" sources and "existing" sources, which are statutorily defined terms. *NRDC v. EPA*, 489 F.3d 1250, 1254 (D.C. Cir. 2007). The statute defines a "new" source as a "source the construction or reconstruction of which commenced after the Administrator *first proposes* regulations under this section establishing an emission standard applicable to such source." 42 U.S.C. § 7412(a)(4) (emphasis added). The term "existing" source is defined as "any stationary source other than a new source." 42 U.S.C. § 7412(a)(10).

Section 7412(d)(3) specifies the minimum level of emission reductions covered sources must achieve. For *new* sources, the MACT standard "shall not be less stringent than the emission control that is achieved in practice by the best controlled similar source, as determined by the Administrator." 42 U.S.C. § 7412(d)(3); *Mossville Env't Action Now v. EPA*, 370 F.3d 1232, 1235 (D.C. Cir. 2004). Emission standards for *existing* sources in subcategories with 30 or more

sources may not be less stringent than "the average emission limitation achieved

by the best performing 12 percent of the existing sources (for which the

Administrator has emissions information)." 42 U.S.C. § 7412(d)(3).[1]  This

minimum level of emission control required for both new and existing sources is

called the "MACT floor" and is generally stated as a numeric standard. *Mossville,*

370 F.3d at 1235.[2]

Section 7412(d)(2) then directs EPA, in its discretion, to go beyond the

minimum stringency requirements of section 7412(d)(3) and set more stringent

MACT standards, where such standards are achievable.  These standards can

include a broad range of measures that reduce or eliminate emissions of hazardous

air pollutants.  In setting these "beyond-the-floor" standards, EPA must consider

costs, energy, and non-air quality related health and environmental impacts.  42

U.S.C. § 7412(d)(2); *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 629 (D.C. Cir.

2000).  Notably, while cost is one of the factors EPA must consider in setting

---

[1]  Where there are fewer than 30 sources in a category or subcategory, EPA sets
the existing source standard based on the best performing five sources. *Id.*

[2] Under 42 U.S.C. § 7412(h), if EPA determines that it is not feasible to prescribe
a numeric MACT standard, it may promulgate a design, equipment, work practice
or operational standard that, in EPA's judgment, is consistent with section 7412(d)
("Emission Standards") or 7412(f) ("Standard to protect health and
environment").  These standards are referred to as "work practice" standards and
are not at issue here.

beyond-the-floor standards, EPA may not consider costs in setting the MACT floor. *Id. See also* Industry Br. at 13.

The claims in this case are limited in scope, focusing solely on the MACT floors for major Boilers. Accordingly, there are no claims here related to health-based or non-numeric work practice standards or standards for area (non-major) sources. Industry Petitioners challenge the MACT floors only for new major Boilers while Environmental Petitioners challenge the MACT floors for both new and existing major Boilers.

## B.     Regulatory Background

### 1.     EPA's Regulatory Approach Under 42 U.S.C. § 7412

The process for assessing and establishing emission standards for different categories of sources is highly technical and involves a detailed analysis of emissions data. EPA's regulations just for the source category at issue here, Boilers, are set forth in over 100 pages of the Code of Federal Regulations. 40 C.F.R. §§ 63.7480-63.7575 and 15 separate tables (Subpart DDDDD). These provisions explain the applicability of the regulations, the specific standards that apply, and how compliance is demonstrated.

In establishing emission standards EPA uses a statistical tool known as the upper prediction limit ("UPL") to calculate the MACT floor. The UPL assists EPA in accounting for variability in the emissions data (obtained from emission

stack tests) considered in setting the MACT floors.  The consideration of variability of such test results, as well as EPA's use of the UPL to perform that task, has been sanctioned by this Court.  C*ement Kiln Recycling Coal. v. EPA,* 255 F.3d 855, 871-72 (D.C. Cir. 2001); *U.S. Sugar I,* 830 F.3d at 636-39.

## 2.     The Regulation of Boilers

The Boilers at issue here are industrial and commercial boilers and process heaters used in manufacturing, mining, extraction of petroleum and natural gas, lumber manufacturing, steel works, and other specified areas.  87 Fed. Reg. at 60,818.  One of the hazardous air pollutants that Congress directed EPA to regulate is HCl, which is the central concern of Petitioner U.S. Sugar Corporation.  HCl, which can negatively affect the lungs, skin, kidneys, and central nervous system, is the predominant hazardous air pollutant emitted by Boilers, comprising 69% of the total.  76 Fed. Reg. at 15,611/1.  Another pollutant regulated under the Challenged Rule is particulate matter ("PM"), which is the main pollutant of concern of the nine biomass Boilers identified by Petitioner AF&PA.

EPA initially regulated Boilers in 2004.  69 Fed. Reg. 55,218 (Sept. 13, 2004) ("2004 Rule").  Based centrally on a dispute over how to define which Boilers would be regulated under section 7412, which covers stationary sources generally, versus 42 U.S.C. § 7429, which requires emission standards for

stationary sources that combust solid waste, the Court vacated the 2004 Rule in 2007. *NRDC v. EPA*, 489 F.3d 1364, 1374-75 (D.C. Cir. 2007).

In support of its vacatur, the Court explained that the wholesale change in sources covered under section 7412 would likely require all new standards for Boilers, based on wholly different populations of covered sources. *Id*.; Industry Br. at 5. The vacatur meant that as of the date of the Court's mandate in 2007, there existed no standards for hazardous air pollutants emitted by Boilers. *See Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987); 87 Fed. Reg. at 60,830.

EPA responded to the vacatur of the 2004 Rule by proposing a full slate of emission standards applicable to Boilers on June 4, 2010. 75 Fed. Reg. 32,006 ("2010 Proposed Rule"). To generate proposed new standards EPA conducted a new comprehensive data collection process, which was necessary not only because the prior standards were vacated but also due to large changes in the number and nature of sources within the category since data was collected for the 2004 Rule. 75 Fed. Reg. at 32,010/-011/1; 87 Fed. Reg. at 60,830/3. Analyzing emissions data collected through a robust testing program in 2009, EPA issued the final standards applicable to Boilers on March 21, 2011. "National Emission Standards for Hazardous Air Pollutants for Major Sources: Industrial, Commercial

and Institutional Boilers and Process Heaters, Final Rule," 76 Fed. Reg. 15,608

("2011 Rule").

On that same date EPA agreed to reconsider limited aspects of the 2011

Rule. 76 Fed. Reg. 15,266 (Mar. 21, 2011). EPA ultimately amended the 2011

Rule in 2013 by, *inter alia*, revising some subcategories of Boilers and refining

certain work practice standards and startup and shutdown procedures. 78 Fed.

Reg. 7138, 7143-47 (Jan. 31, 2013) ("2013 Rule"). The 2011 Rule, as revised by

the 2013 Rule, is referred to as the "Major Boiler Rule."

The Major Boiler Rule established MACT floors for 30 subcategories of

new and existing boilers for hydrogen chloride (HCl), carbon monoxide ("CO") in

two forms, particulate matter (PM), and mercury ("Hg").[3] 78 Fed. Reg. at 7142

(Table 3); *U.S. Sugar I*, 830 F.3d at 597.[4] Thus, the 2013 Rule set out 150

emission standards, half of those for new sources and half for existing sources. 78

Fed. Reg. at 7142, Table 3. Including alternative standards EPA promulgated,

---

[3] The numeric standards for some of these pollutants act as surrogates to control other hazardous pollutants. For example, non-dioxin organic pollutants are controlled through emission standards established for carbon monoxide (CO). Particulate matter (PM) is used as a surrogate to regulate emissions of metallic hazardous pollutants, such as arsenic, cadmium, cobalt, and lead. 76 Fed. Reg. at 15,612.

[4] In lieu of a numeric MACT floor, the Major Boiler Rule established work practice standards for all covered hazardous air pollutants for four subcategories of Boilers. 76 Fed. Reg. at 15,613/1.

which can be complied with in lieu of otherwise applicable standards and which were considered for recalculation in the Challenged Rule, the 2013 Rule contains 202 separate emission standards. *Id*. at Tables 1 & 2 at 7193-98 and Tables 12 and 13 at 7206-10. [5]

The Major Boiler Rule expressly states that *any* Boiler constructed after June 4, 2010 (the date of the proposed rule that resulted in the 2011 Rule) will be considered "new" and therefore subject to the emission standards established for new Boilers. 40 C.F.R. § 63.7490(b); 76 Fed. Reg. at 15,665/1 (2011 Rule). This definition is wholly consistent with the statutory definition of a new source, which as noted above defines a "new" source as a "source the construction or reconstruction of which is commenced after the Administrator *first proposes* regulations under this section establishing an emission standard applicable to such source." 42 U.S.C. § 7412(a)(4) (emphasis added). Consistent with the statutory definition, the regulatory definition of a "new" source was not changed in the 2013 Rule. *See* 78 Fed. Reg. at 7138/3, 7143/1 (using the same June 4, 2010 date to identify "new" sources).

---

[5] Environmental Petitioners cite to a 2016 EPA motion where 66 emissions standards are referred to. Environmental Br. at 11. That reference was to "subcategory/numeric standard combinations." It was not referring to all promulgated standards (*see* 78 Fed. Reg. at 7142) and did not include alternative standards that EPA established. *See* JA__ (*U.S. Sugar I*, No. 11-1108, Doc. 1635275 at 7, "Tsirigotis Dec." at ¶¶ 5, 6, describing some of the additional standards).

The emission standards established for Boilers in the 2011 Rule have been revised several times: in 2013 as noted and again in a limited manner in 2015.[6] EPA has also recalculated subsets of standards based on remands from this Court. More specifically, in 2022 EPA issued the Challenged Rule, which sets forth recalculated emission standards for certain hazardous air pollutants emitted by Boilers, recalculating approximately 17% of the 202 standards established in the Major Boiler Rule (22% if alternative standards are not considered). 87 Fed. Reg. 60,816. In performing its limited recalculations at the Court's direction, EPA used the same data that the Agency relied on to generate the standards first proposed in 2010 and promulgated in the Major Boiler Rule. 87 Fed. Reg. at 60,820/3, 60,821/2 (labeling it the "2013 dataset").

## C. This Court's Decisions on the Major Boiler Rule and Related Rules

Numerous parties, including Petitioners here, challenged the Major Boiler Rule, filing petitions for review in 2011 and again in 2013. Both Industry and Environmental Petitioners challenged many aspects of the Major Boiler Rule, with the Court denying most challenges. *U.S. Sugar I,* 830 F.3d 579 (D.C. Cir.),

---

[6] Pursuant to administrative petitions for reconsideration, on November 20, 2015, EPA revised some limited provisions of the 2011/2013 standards that are not relevant to Petitioners' claims raised here, such as definitions of start-up and shutdown and work practice standards. The 2015 Rule did not revise or address MACT floor standards. 80 Fed. Reg. 72,790 (Nov. 20, 2015).

*revised in part on rehearing*, 844 F.3d 268 (D.C. Cir. 2016) ("*U.S. Sugar II*").

Notably, the regulatory definition of a "new" source as any source constructed

after June 4, 2010, was not challenged in petitions for review of the 2011 or 2013

Rules.

While denying most challenges, the Court found error in how EPA

categorized sources in assessing the best performing sources. The Court found

that although EPA had included in each Boiler subcategory sources that combust

only 10% or more of the subcategory-defining fuel, when identifying the potential

best performing sources in that same category, EPA limited the pool of sources to

those that burned 90% of that fuel. *U.S. Sugar I*, 830 F3d at 628-32. *See also* 87

Fed. Reg. at 60,819. As the Court explained, because EPA improperly excluded a

large swath of Boilers when assessing the pool of sources for consideration as

best-controlled sources, the standards that EPA promulgated required review and

potential revision. *U.S. Sugar II* , 844 F.3d 268. Although the Court initially

vacated the standards in the Major Boiler Rule, *U.S. Sugar I*, 830 F.3d at 632, 637,

it amended its order to instead remand the standards without vacatur. *U.S. Sugar*

*II*, 844 F.3d at 270.

The Court directed EPA on remand to perform calculations that would

"identify those standards for which the MACT floor would have differed if the

EPA had included all best-performing sources in each subcategory in its MACT-

floor analysis" and to revise affected standards "consistent with [the Court's] July 29, 2016 opinion in this case." *Id.* The Court did not direct EPA to revise the existing standards based on updated data or otherwise instruct EPA as to what data it should consider in recalculating the standards.

The issues that the Court identified in *U.S. Sugar I and II* were not the only concerns that EPA had to address in recalculating emission standards. Several months after EPA issued its 2013 revisions to the Major Boiler Rule, the D.C. Circuit decided *National Association of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1151 (D.C. Cir. 2013) ("*NACWA*"). The Court there found that in cases involving limited datasets, EPA's use of its variability statistical tool, the upper prediction limit (UPL), led to the anomalous result that emission standards for a new source, which are based on the single best-performing source, were less stringent than emission standards for existing sources, which are based on the best performing 12% of sources in a category. The Court remanded the rule there to allow EPA to address this apparent anomaly.

Although *NACWA* involved sewage sludge incinerators governed by 42 U.S.C. § 7429, "the statutory directive on setting MACT standards is virtually identical under" sections 7412 and 7429. *NACWA*, 734 F.3d at 1119. Accordingly, the *NACWA* decision directly affected the Boiler standards at issue in the then-pending *U.S. Sugar* case, because EPA had used the same UPL that led

to the anomalous results identified in *NACWA*.  Doc. 1482091 at 5, 7.  EPA

therefore brought the *NACWA* decision to the attention of the Court in *U.S. Sugar*

in 2014 by moving for a remand of the record, specifically to address the Court's

concerns about the UPL methodology and the anomalous results.  *Id.*; 87 Fed.

Reg. at 60,820/2-3.

In its 2014 motion in *U.S. Sugar*, EPA expressly sought remand of the

"Hydrogen Chloride ('HCl') standard for units in all subcategories designed to

burn solid fuel" for new sources, as well as those for PM for certain biomass units,

the two main standards contested by Industry Petitioners here.  EPA's Mot. for

Remand, *U.S. Sugar v. EPA*, No. 11-1108 (D.C. Cir. Feb. 28, 2014), Doc.

1482091 at 10, ¶ 1a; 11, ¶ 14.a.  Industry petitioners in *U.S. Sugar*, including both

Industry Petitioners here, did not oppose EPA's motion for a remand of the record

on these grounds.  However, Petitioners asked the Court to vacate the identified

emissions standards rather than remand them to EPA without vacatur.  Opp'n to

Remedy, *U.S. Sugar v. EPA*, No. 11-1108 (D.C. Cir. Mar. 13, 2014), Doc.

1483894.  The Court granted EPA's motion and rejected Petitioners' request,

remanding to EPA the new source HCl and PM standards for the solid fuel

subcategory, as well as all other new and existing source standards for which EPA

requested remand.  Order, *U.S. Sugar v. EPA*, No. 11-1108 (D.C. Cir. May 15,

2014), Doc. 1493171.

EPA was thus left to deal with various issues concerning the Major Boiler Rule remanded by the Court through several different decisions, while the standards for new and existing sources remained in place. EPA did so in a single rulemaking, promulgating its results in the Challenged Rule. 87 Fed. Reg. at 60,820/3.

## D. The Challenged Rule

The Challenged Rule, promulgated on October 6, 2022, recalculated emission standards implicated by the decisions in *U.S. Sugar* and *NACWA*, which ultimately led to the revision of 34 of the 202 emission standards initially proposed on June 4, 2010, and established in the Major Boiler Rule.[7] The Rule set a compliance date of December 5, 2025, which is three years from the effective date of the Challenged Rule. *Id*. at 60,816/1-60,817. The revisions are projected to result in significant reductions of emissions of mercury, HCl, PM, and other hazardous air pollutants.[8] EPA estimated that the health benefits from

---

[7] The changes promulgated also included those issued in response to *Sierra Club v. EPA*, 884 F.3d 1185, 1189, 1193-95 (D.C. Cir. 2018) ("*Sierra Club II*"), which addressed issues related to EPA's 2015 rule regarding the use of the minimum CO MACT floor at 130 parts per million. *See* n. 5, *supra*. Issues related to this CO standard have been severed and are in abeyance, and thus are not at issue here. Order, Doc. 1989619.

[8] EPA estimates that nationwide emissions of selected hazardous air pollutants (HCl, hydrogen fluoride, Hg, and metals) would be reduced by an additional 117 tons per year and that emissions of filterable PM would be reduced by 586 tons per year (of which 446 tons per year is PM2.5). EPA expects that emissions of

these revised emission standards would have a monetized present value of approximately one-half billion dollars. 87 Fed. Reg. at 60,818/1.

As outlined above, because the Court in *U.S. Sugar* granted EPA's request for a remand of certain Boiler emissions standards in response to the *NACWA* decision, the recalculated standards reflect EPA's analysis and application of the UPL. 87 Fed. Reg. 60,820/2; JA___ (EPA-HQ-OAR-2002-0058-3892, *Response to Remand of the Record for Major Source Boilers*). Accordingly, "[t]he recalculated MACT floors are a result of addressing deficiencies identified by the *U.S. Sugar* court and additionally by the *NACWA* decision on limited datasets." 87 Fed. Reg. at 60,826/3. *See also id.* at 60,819/3-20, 60,830, n.36; Industry Br. at 28-29 (the recalculated standards address the changes required under *NACWA*).

EPA's recalculation based on *NACWA* included a revised approach to subcategories with small (limited) datasets that was upheld in *Sierra Club v. EPA, 895 F.3d 1, 14-15 (2018).* 87 Fed. Reg. at 60,819/3; 60,830, n.36, 37. As a result, the Challenged Rule corrects "the anomalous result the Court identified in *NACWA v. EPA* where the calculated new source floor was less stringent than the existing source floor." 87 Fed. Reg. at 60,822/2. Because EPA was acting solely

---

non-Hg metals (arsenic, beryllium, cadmium, chromium, lead, manganese, nickel, and selenium) would decrease by 4.1 tons per year. The Challenged Rule would also result in 1,141 tons per year of reductions in sulfur dioxide emissions. 87 Fed. Reg. at 60,833-60,834.

to revise limited standards in response to the Court's directives related to specific errors in the Major Boiler Rule, it recalculated the standards based on the same dataset used in generating the standards for the Major Boiler Rule, the 2013 dataset. 87 Fed. Reg. at 60,820/3-60,821.

## SUMMARY OF ARGUMENT

Industry Petitioners never have challenge EPA's longstanding regulation designating any Boiler as "new" if construction commenced after June 4, 2010. Nevertheless, Industry Petitioners argue that any Boiler constructed before August 12, 2020, the date EPA proposed the Challenged Rule, should be considered an "existing" source and therefore not subject to the recalculated emission standards for new Boilers promulgated in the Challenged Rule.

Industry Petitioners' effort to redefine a "new" source not only ignores EPA's long-standing regulation, it also seeks to avoid the *statutory* definition of a "new" source, which defines the term based on when EPA "first proposes" "an emission standard." Emissions standards are specific to both a source subcategory and pollutant. Here EPA first proposed an emission standard for each subclass of Boilers and for each covered hazardous pollutant when it set out each specific standard in the 2010 Proposed Rule, and in the Challenged Rule it revised only a small portion of those individual standards. Statutory provisions must be applied as written, and no *other* provision of 42 U.S.C. § 7412 requires EPA to reset its

definition of a "new source" every time it recalculates a limited subset of emission standards applicable to a specific source category.

Even if the statute provides EPA with the authority to redefine a "new" source based on certain limited circumstances, such exigencies were not present here. In this instance, EPA was acting pursuant to specific directives of this Court to correct limited errors in existing standards, and in that situation it was proper for EPA to refrain from revising or otherwise ignoring its long-established regulatory definition of a "new" Boiler.

Industry Petitioners nevertheless claim that it is unfair to require them to expend resources to meet the standards required of all "new" sources, because they constructed their facilities before EPA had finished recalculating a small subset of the emission standards first promulgated in the Major Boiler Rule. But that is what Congress directed and is consistent with the way in which Congress has structured many environmental statutes, including section 7412; requiring standards to be continually examined and revised, giving emitting facilities a reasonable amount of time to comply with such revised standards, which in this case is three years. Accordingly, this Court has found on a number of occasions that the application of updated regulatory requirements to emitting facilities that may not have anticipated such updates at the time of their construction, is neither unfair nor improperly retroactive.

Moreover, Industry Petitioners should not have been surprised that recalculated emission standards for new sources would be applied to their contemplated new facilities. First, in 2011 EPA issued a regulation that specifically stated that any Boiler constructed after June 4, 2010 would be treated as a new source for regulatory purposes. And when it revised the regulatory requirements in the 2013 Rule, EPA did not change the June 4, 2010 trigger date for defining a new source. This alone was ample notice to those in the regulated community that were contemplating construction of new facilities, that when revising the 2011 emissions standards in a limited way, the June 4, 2010 trigger date for identifying a new source would not change.

Furthermore, Petitioners were well aware that the applicable standards could materially change. Both Industry Petitioners here were parties to *U.S. Sugar I & II*, where the Court: (1) remanded certain standards in 2014, including the new source HCl and PM standards applicable to solid fuel boilers, based on EPA's conclusion that those standards needed to be revisited based on the *NACWA* decision; and (2) directed EPA to revise emission standards for Boilers after correcting the population of potential best-performing sources within each subcategory.

The 2022 Rule does not represent a full-scale rewriting of emission standards for Boilers. To the contrary, it revises fewer than 17% of the standards

in the Major Boiler Rule and does so in a manner that specifically responds to decisions of this Court describing limited infirmities to be addressed. Under these circumstances, EPA's choice to avoid disparate treatment of sources and apply the express wording of the statute and its own regulations, which define any source constructed after June 4, 2010 as "new," is rational and fully consistent with the statute and EPA's regulations. 87 Fed. Reg. at 60,830/3-31.

Environmental Petitioners support EPA's action to look to 2010 to define the Boilers that are subject to any new source recalculated emission standards. Sierra Club's Opp'n to U.S. Sugar's Motion to Stay at 9, Doc. 1983576. Yet, Environmental Petitioners simultaneously ask the Court to require EPA to recalculate those very emission standards based on emissions data that may be available through at least 2020. These inconsistent views on the temporal framework under which EPA generates emission standards is nowhere required by the statute and would itself arguably lead to arbitrary standards.[9]

This Court has recognized, both generally and specifically under 42 U.S.C. § 7412, that EPA has considerable discretion regarding technical issues, including its determination of what data to rely on in establishing or revising air quality

---

[9] This temporal inconsistency is mirrored by Industry Petitioners, who support EPA's continued reliance on the 2013 dataset in recalculating emission standards but seek to define the new sources to which those standards apply by the year 2020.

standards. Indeed, the Court has several times upheld EPA's decision to rely on an original dataset when revising other CAA standards, finding no issue with EPA's decision to refrain from considering more recent data. And the reasons EPA cited here for not using recent data in recalculating a limited subset of the existing emission standards for Boilers (e.g., causing delay, disparate treatment of sources), were the very reasons cited by this Court in other instances when approving EPA's determinations to revise standards based on an original dataset. Nothing in section 7412 provides a basis for prohibiting EPA from similar reliance on an original dataset in this case.

## STANDARD OF REVIEW

The Challenged Rule may be overturned only if EPA's determination is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or in excess of EPA's "statutory jurisdiction, authority, or limitations." 42 U.S.C. §7607(d)(9). In interpreting ambiguous statutory terms, or where the statute is silent with respect to the specific issue, the Court is to defer to the agency's interpretation so long as it is "based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 (1984). *See also Midwest Ozone Grp. v. EPA*, 61 F.4th 187, 192 (D.C. Cir. 2023). When "traditional tools of statutory interpretation" show that the agency's interpretation

is "the best one," the court can uphold the interpretation without resorting to deference principles. *Guedes v. ATF*, 45 F.4th 306, 313 (D.C. Cir. 2022).

To the extent EPA made specific findings in promulgating the Challenged Rule, its determinations are presumed to be valid, *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976), and the "challenger must show the agency action is not a product of reasoned decision-making … [which] is 'a heavy burden,' since [*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)] entails a 'very deferential scope of review' that forbids a court from "'substitut[ing] its judgment for that of the agency.'" *Van Hollen, Jr. v. Federal Election Com'n*, 811 F.3d 486, 495 (D.C. Cir. 2016) (citations omitted). Agency determinations based upon technical matters are entitled to significant deference. *U.S. Sugar I*, 830 F.3d at 606; *Midwest Ozone Grp.,* 61 F.4th at 192.

## ARGUMENT

I. **EPA'S DETERMINATION THAT SOURCES CONSTRUCTED AFTER THE MAJOR BOILER RULE WAS FIRST PROPOSED ARE "NEW SOURCES" IS A REASONABLE APPLICATION OF 42 U.S.C. § 7412**

A. **Both the Statute and EPA's Regulations Support EPA's Application of Recalculated Emission Standards for New Boilers to All Boilers Constructed After June 4, 2010**

Industry Petitioners' central argument is that EPA's application of the recalculated new source emission standards to facilities constructed before the

proposal of the Challenged Rule in 2020 "violates the plain language of the Clean Air Act and EPA's own regulations."  Industry Br. at 20 (heading).  This is incorrect, both under the CAA *and* EPA's regulations.

### 1. 42 U.S.C. § 7412 Supports Treating All Boilers Constructed After June 4, 2010 as New Sources

Industry Petitioners' entire argument centers around how the term "new source" should be defined.  In fact, the statutory provision at issue, 42 U.S.C. § 7412, specifically includes a definition of the term "new source," for the very purpose of the application of emission standards.  EPA's approach reflects a straightforward application of that definition to the facts presented by this case.

The statute provides: "The term 'new source' means a stationary source the construction or reconstruction of which is commenced after the Administrator *first proposes* regulations under this section establishing an emission standard applicable to such source."  42 U.S.C. § 7412(a)(4) (emphasis added). Importantly, as defined, a "new source" is not a source that is built after a specific set emission standards are promulgated.  Instead, for purposes of Section 7412, a source is to be treated as "new" after EPA "*first* proposes regulations under this section establishing *an* emission standard applicable" to the subject source.  *Id.* (emphasis added).  That occurred here on June 4, 2010, when EPA first proposed a suite of emission standards – including emissions standards for the pollutants at issue here – applicable to Boilers.  This reading of the statute is consistent with

courts' general presumption "that the ordinary meaning of [the statutory] language accurately expresses the legislative purpose." *Marx* v. *Gen. Revenue Corp.*, 568 U.S. 371, 376 (2013) (quoting *Hardt* v. *Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2156 (2010)). Thus, EPA's choice of June 4, 2010 as the operative date reflects the best construction of the statute, under the circumstances presented here.[10]

If Congress had intended to tie section 7412's new source definition to something other than the "first" proposal, it presumably would have used different language. For example, in the separate statutory provision governing "new source performance standards," Congress defined a new source to be one that was constructed "after the publication of regulations (or, if earlier, proposed regulations)." 42 U.S.C. § 7411(a)(2). This contrasts with Congress's express choice in section 7412 to define a new source in terms of when the "Administrator *first proposes* regulations under this section establishing an emission standard applicable to such source." 42 U.S.C. § 7412(a)(4) (emphasis added). As EPA explained, this comparison "underscores the fact that Congress specifically

---

[10] Petitioners assert that EPA first proposed emissions standards for Boilers in 2004. Industry Br. at 26, n.12. Because the 2004 Rule was vacated and Boiler emission standards therefore ceased to exist, EPA takes the view that the standards "applicable to the subject source" were first proposed in 2010. 87 Fed. Reg. at 60,830/3. In any event, the Boilers that Petitioners assert should not be treated as new sources were all constructed after 2010 and hence also after 2004.

defined 'new source' in section 112 [7412] to be based on the 'first' proposal of an emissions standard, rather than the more general 'proposed regulations' found in section 111 [7411]." 87 Fed. Reg. at 60,830/2. Simply put, in 42 U.S.C. § 7412(d) Congress used a different and purposeful modifier than applied in other provisions, and that difference in language should be given meaning. *Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021); *Bluewater Network v. EPA*, 370 F.3d 1, 14 (D.C. Cir. 2004).

Although the Challenged Rule reflects certain recalculated emission standards that EPA generated at the direction of this Court, it is indisputable that the date on which "the Administrator first propose[d] regulations under this section establishing an emission standard" for HCl, PM, and other hazardous air pollutants for new Boilers, was June 4, 2010, which were then promulgated in the Major Boiler Rule in 2011. 42 U.S.C. § 7412(a)(4). A limited recalculation of the applicable standards based on the pre-existing administrative record, in response to a court's determination that the original standards must be revisited, does not constitute a "first proposal" of an emission standard applicable to a source category when the standards being recalculated were first proposed in 2010. For this reason, EPA's approach should be upheld as a straightforward application of Section 7412(a)(4) to the facts presented here.

To be sure, EPA has recognized that the phrase "first proposes" in the definition of a new source can be considered ambiguous, depending on the circumstances. *See, e.g.*, 78 Fed. Reg. 10,006, 10,025/1 (Feb. 12, 2013). *See also* 87 Fed. Reg. at 60,830/3-60,831/1 (explaining that application of this phrase depends on context).[11] But acting several years *before* Petitioners here constructed their facilities at issue, EPA explained that this phrase could be applied in precisely the manner it has been applied in the Challenged Rule:

> As we explained previously, there is some ambiguity in the language "first proposes" and such language could refer to different dates in different circumstances, such as the first time the Agency proposes any standards for the source category, the first time the Agency proposes standards under a particular rulemaking record for the source category, or the first time the Agency proposes a particular standard.

78 Fed. Reg. at 10,025/1.

In this case, the limited nature of this rulemaking in response to a court remand makes EPA's selection of 2010 as the date when the standards were "first proposed" a straightforward application of the statute. But even if the Court were to deem it appropriate to view the statutory question presented here through the

---

[11] Grappling with the definition of "new source" in the statute, Industry Petitioners effectively agree that the phrase "first proposes" in the definition of a new source can be viewed as ambiguous. Industry Br. 22-24. Indeed, Petitioners engage in conjecture as to how Congress might have written the provision to make it clearer. *Id*.

lens of *Chevron* deference, EPA's approach should still be upheld as, at the very least, a reasonable construction of the statute.[12]

## 2.    <u>Industry Petitioners' Statutory Arguments Lack Merit</u>

Industry Petitioners argue that had Congress truly intended for a new source to be defined by when EPA first proposes an emission standard, "it would have used the word 'any' before 'emission standard' in Section 112(a)(4)'s new source definition." Industry Br. at 24. Congress's intent cannot, of course, be divined by the myriad words it did not use. Regardless, Petitioners' suggestion that EPA's interpretation is unsupportable because Congress did not unnecessarily in supplement its already complete definition with the word "any" is without merit.

Section 7412(a)(4) reads: "The term 'new source' means a stationary source the construction or reconstruction of which is commenced after the Administrator *first proposes* regulations under this section establishing *an* emission standard applicable to such source." (Emphasis added). Changing the word "an" to "any"

---

[12] To the extent Petitioners may argue that the determination of what constitutes a "new" source under section 7412 is beyond EPA's authority, this Court has explained that it is, in fact, within EPA's purview to determine what is a "new" source" with respect to a given emission standard. *Sierra Club II,* 884 F.3d at 1189 ("The Agency must also distinguish between new sources and existing ones."); *U.S. Sugar I*, 830 F.3d at 594 ("Once the EPA finalizes HAP source categories and subcategories, the CAA mandates that it draw one final dividing line – between 'new' sources and 'existing sources.'"). EPA has, in fact, had occasion to distinguish between new and existing sources. *Id*. at 658 (referring to EPA's consideration of whether a facility's switch to a new combustion material renders it a new source). *See also* pp. 48-49 *infra* (Portland Cement Rule).

does not change the meaning of the sentence nor does it add a temporal element. In this case, EPA first proposed "*an* emission standard" applicable to Boilers on the same day it first proposed "*any* emission standard" applicable to Boilers, June 4, 2010. Petitioners' argument in fact contradicts their own interpretation of 42 U.S.C. § 7412(i)(2), where they read the term "any emission standard" to refer only to the most recent emission standard applicable to a source. Industry Br. at 20-21.

The standard proposed in 2010 for HCl emitted by the subcategory known as solid fuel boilers is "an emission standard." The same is true for the standard proposed in 2010 for PM emitted by the subcategory biomass fluidized beds, and for the 200 other emissions standards set forth in the 2013 Rule. *See* 78 Fed. Reg. at 7142 (setting out "an emission standard" for each subclass for each pollutant). All these were first proposed on June 4, 2010, and the fact that these two (and 32 other) specific emission standards were recalculated to correct remanded standards, while most others were not, does not alter the date when EPA "first propose[d]" "an emission standard" for these specific pollutants in the designated subcategories.

Industry Petitioners alternatively try to avoid the language of the statute. They suggest that the language that appears in section 7412(a)(4), which defines a new source as one that is constructed after EPA *first* proposes emission standards,

is immaterial.  Industry Br. at 23.  But, as the Supreme Court has explained,

"'[w]hen a statute includes an explicit definition, we must follow that definition.'"
*Tanzin v. Tanvir*, 141 S.Ct. 486, 490 (2020), quoting *Digital Realty Trust., Inc. v. Somers*, 138 S.Ct. 767, 776 (2018).  *See also Hubbard v. United States*, 514 U.S. 695, 708 (1995).

Nevertheless, Petitioners argue that EPA cannot rely on a single definition, citing *Utility Air Regulatory Group v. EPA,* 573 U.S. 302, 316-20 (2014) ("*UARG*").  Industry Br. at 23.  The Court there merely found that EPA could not rely on the generic definition of the term "air pollutant," which applied to the entire CAA, when EPA had interpreted that term more narrowly in certain CAA programs governed by separate statutory provisions.  *Id.* at 316.  In *this* case, EPA relied on the definition of "new source" that Congress enacted specifically for the hazardous pollutant program at issue here (definition of "new source" is at 42 U.S.C. § 7412(a)(4)).  EPA would presumably be found to be acting arbitrarily or beyond its statutory authority if it ignored that definition in applying the operative provisions of section 7412.

Ultimately, the Court need not accord deference to EPA's application of the definition of "new source," since EPA's application represents the best reading of the statute given the circumstances presented.  *Guedes*, 45 F.4th at 312-13 ("There is no need [for a court] to decide what deference, if any, a regulation should

receive where we can conclude that the agency's interpretation of the statute is the best one."). Given the history and specific circumstances presented, EPA's application of the key language in the statute ("first proposes") is the best interpretation. But at a minimum, EPA's interpretation and resolution of any ambiguity should be upheld as reasonable. *Chevron*, 467 U.S. at 842-32.

### 3. EPA's Pre-Existing Regulations Treat All Boilers Constructed After June 4, 2010, as New Sources

Industry Petitioners argue that EPA's Boiler regulations, first promulgated in 2011, support their view that a new source should be defined by when EPA first proposes the recalculated emission standards that they challenge, which in this case would be August 12, 2020. But that is incorrect. EPA's regulations define a "new source" Boiler based on the 2010 proposal, and that definition was retained even when emissions standards were revised in the past.

40 C.F.R. Subpart DDDDD (40 C.F.R. §§ 63.7480-63.7575) contains extensive regulations dealing with the application of hazardous air pollutant emission standards to Boilers, which is the only source category at issue here. *See* 40 C.F.R. § 63.7480 ("This subpart establishes national emission limitations . . . for hazardous air pollutants (HAP) emitted from" Boilers). Thus, the provisions of this subpart contain the "context-appropriate meaning" that Industry Petitioners assert is required. Industry Br. at 23.

In defining "what is the affected source of this subpart," the regulations make clear that "[a] boiler or process heater is *new* if you commence construction of the boiler or process heater after June 4, 2010, and you meet the applicability criteria at the time you commence construction." 40 C.F.R. § 63.7490(b) (emphasis added). This provision was promulgated on March 21, 2011, 76 Fed. Reg. 15,664, and the emissions standards were revised in 2013, without changing the June 4, 2010 trigger date. 78 Fed. Reg. 7162. Thus, EPA established ten years ago that when it revised the regulatory requirements that were "first proposed" for Boilers on June 4, 2010, the trigger date (June 4, 2010) for identifying a new Boiler would not change. So, when "EPA announced [in the Challenged Rule] that all sources constructed after June 4, 2010 – the date it first proposed the 2011 Rule – would be considered new sources," Industry Br. at 8, the Agency was reiterating its long extant regulatory definition containing the trigger date for identifying new Boilers.

Although Industry Petitioners challenged the 2011 Major Boiler Rule, which the Court addressed in *U.S. Sugar*, they did not challenge 40 C.F.R. § 63.7490(b), either as being beyond EPA's statutory authority or otherwise, even though they commenced construction of at least one of the facilities they assert are affected by the Challenged Rule in 2011. Industry Br. at 12. Nor did any Petitioner challenge EPA's decision to retain the regulatory definition of "new

source" in the 2013 Rule, even though EPA revised certain new source standards in that Rule yet kept June 4, 2010 as the date for defining a "new" source for the application of revised standards. 78 Fed. Reg. 7138, 7141 (Jan. 31, 2013).

Finally, Petitioners do not challenge this provision in the present action, never mentioning it in their brief. Therefore, any argument that EPA may not apply its existing regulations, which expressly declare all Boilers constructed after June 4, 2010 to be "new," is waived, and Petitioners may not cure this defect by making such a claim in their reply brief in this proceeding. *PDK Laboratories Inc. v. DEA*, 438 F.3d 1184, 1196 (D.C. Cir. 2006) (citing authority); *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 835 (D.C. Cir. 2001). *See also* Doc. 2004070 (June 20, 2023 Order) at 3.[13]

---

[13] Even if Petitioners *had* challenged 40 C.F.R. § 63.7490(b) in their opening brief, that challenge would still be waived. Having failed to challenge this provision when promulgated in 2011 or even in 2013, Petitioners waived their right to challenge EPA's express designation of post-2010 sources as "new sources," since any challenge to a regulatory provision issued under the CAA must be filed "within sixty days of the notice of such promulgation" in the Federal Register. 42 U.S.C. § 7607(b)(1). And that waiver may not be cured now, as the 60-day filing requirement is jurisdictional and may not be altered by the courts. *Okla. Dep't of Env't. Quality v. EPA*, 740 F.3d 185, 191 (D.C. Cir. 2014) (the CAA's 60-day deadline is "jurisdictional in nature"); *Med. Waste Inst. & Energy Recovery Council v. EPA*, 645 F.3d 420, 427 (D.C. Cir. 2011).

A petition for review of a regulation issued under the CAA may proceed more than sixty days after publication of the challenged regulation only if the petition is "based solely on grounds arising after such sixtieth day." 42 U.S.C. § 7607(b)(1). Petitioners have not raised a "ground arising after" argument here, perhaps because anyone reading 40 C.F.R. § 63.7490(b) in 2011 or 2013 would clearly

**B. Industry Petitioners' Reliance on Other Statutory and Regulatory Provisions Does Not Render EPA's Application of New Source Requirements to Sources Constructed After 2010 Inconsistent with the Statute or Unreasonable**

Diverting from the definition of "new source" specifically applied to the regulation of hazardous air pollutants, 42 U.S.C. § 7412(a)(4), Industry Petitioners cite 42 U.S.C. § 7412(i)(1). They argue that this provision forecloses the application of the recalculated emission standards for new Boilers to facilities constructed before August 12, 2020, the date those recalculated standards were proposed. Industry Br. at 20-25. This provision states that

> [a]fter the effective date of any emission standard, limitation, or regulation under subsection (d), (f) or (h), no person may construct any new major source or reconstruct any existing source subject to such emission standard, regulation or limitation unless the Administrator (or a State with a permit program approved under subchapter V) determines that such source, if properly constructed, reconstructed and operated, will comply with the standard, regulation, or limitation.

42 U.S.C. § 7412(i)(1).

Section 7412(i)(1) simply sets forth a minimum requirement for newly constructed sources: that a source will at least be able to comply with the emission standards in existence at the time in order to be granted a construction permit. It does not: (a) define what a new source is or override the existing statutory or

_____

know that facilities built after June 4, 2010 would be regulated as "new sources." Again, because Petitioners have not asserted that the Challenged Rule is a "ground arising after" in their opening brief, they may not do so on reply.

regulatory definitions of "new source"; (b) declare that emission standards for a new source are not subject to recalculation or other change; or (c) freeze emission standards for all time for new sources at the levels that existed at the time of construction. EPA agrees that it may not deny a construction permit for failure to establish that the facility will be able to comply with emission standards that might be recalculated in the future. But that does not mean that the facility will never be subject to different or revised standards after construction. This provision was not meant to give regulated facilities a "free pass" to ignore upcoming recalculated standards that have been ordered by a court.

Industry Petitioners further cite 42 U.S.C. § 7412(i)(2), which provides that for new sources, a regulated entity has three years to comply with revised emission standards if the revision occurred between the proposed rule setting forth the standards and the final rule. Industry Br. at 21. Petitioners concede that this provision has no application to the question presented in this case, *id.*, a point with which EPA agrees. 87 Fed. Reg. at 60,830/2. Petitioners simply supply their own (unsupported) gloss on EPA's concurrence, claiming that the Agency's agreement that this provision does not apply "is dispositive" and means that EPA must ignore the statutory (and regulatory) definition of "new source." Industry Br. at 22.

Instead, section 7412(i)(2) deals solely with the timing of *compliance*, and even then only in a given situation, where the standard changes between the

proposal and final regulation. EPA agrees that this provision is not relevant to the question of whether "new source" should be defined based on when emissions standards were first proposed or when they are recalculated. The question of how long a regulated entity has to comply with revised emission standards, either when the standard changes or otherwise, has no bearing on the trigger date for determining what is a new source under the statute.

Industry Petitioners also cite to EPA's regulations, although not to provisions that apply specifically to Boilers, such as 40 C.F.R. § 63.7490(b). Industry Br. at 20-22. Petitioners cite to 40 C.F.R. §§ 63.5(b)(1) and 63.6(b)(1), but these provisions merely repeat the requirement of 42 U.S.C. § 7412(i)(1) discussed above, which requires approval from the Administrator to construct a new major source. Indeed, these provisions, like section 7412(i) itself, apply "after the effective date of any relevant standard promulgated by the Administrator under this part…." 40 C.F.R. § 63.5(b)(3). Applying pre-construction review requirements and construction compliance dates "after the effective date of any relevant standard," is facially quite different than defining a new source to be any source constructed after a standard is "first proposed" for the source category by the Administrator.

As EPA explained, nothing in these provisions or 40 C.F.R. § 63.2, also cited by Petitioners, requires EPA to re-define new sources when it revises a

subset of existing MACT standards.  87 Fed. Reg. at 60,830/2.  In any event, there is a directly applicable provision, 40 C.F.R. § 63.7490(b), which very clearly describes the date on which *Boilers* are to be considered "new," which is on or after June 4, 2010.  That more specific provision is controlling.  *Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 638 (D.C. Cir. 2021), quoting *RoadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46 (2012) (citing the "'old and familiar rule' that 'the specific governs the general.'").

## C.  EPA's Application of Recalculated New Source Requirements to Boilers Constructed After June 4, 2010 is Reasonable

Moving beyond the statutory language, Petitioners assert that it is "obviously unfair" for their facilities constructed after 2010 to be considered "new sources" with regards to the standards in the Challenged Rule.  Industry Br. at 23, 24, 26.  But there is nothing "unfair" about how the regulatory requirements for Boilers are applied in the Challenged Rule.

### 1.  The Purported Cost of Complying with Regulatory Requirements is Not a Basis to Find EPA's Statutory Interpretation Unreasonable

Petitioners describe the cost to comply with the recalculated emission standards and assert that it is unfair for them to be required to comply with the emission standards for new sources.  First, as outlined above, costs are not to be considered in setting MACT floors.  *Nat'l Lime Ass'n v. EPA*, 233 F.3d at 629

(D.C. Cir. 2000); pp. 8-9, *supra*. Furthermore, defining a new source by the date emission standards for a class of sources was "first proposed," does not call for the application of some type of fairness scale, based on costs or otherwise. The Court is not to apply statutory requirements based on what one party, or even the Court, believes is "fair." That is a matter for Congress to take up. Here, Congress has made the relevant decision to define new sources by the date emission standards were "first proposed" and it accommodated fairness concerns by giving regulated entities three years to comply with revised requirements (if they change from those in a proposed rule).

In any event, there is no unfairness because Petitioners should have anticipated increased compliance costs associated with their contemplated construction of new facilities. Industry Petitioners were Petitioners in *U.S. Sugar* and thus were well aware that certain emission standards had to be recalculated, including to avoid the anomalous results identified in *NACWA*, as the HCl and PM standards at issue in *U.S. Sugar* were specifically remanded based on *NACWA* pursuant to EPA's motion. And Petitioners need only have read the regulations applicable specifically to Boilers, 40 C.F.R. § 63.7490(b) (as well as the statutory definition of "new source"), to ascertain that *any* facility constructed after June 4, 2010, was already expressly deemed under EPA's regulations to be a "new source" for regulatory purposes. *See* pp. 33-35, *supra*.

Even if Petitioners ignored these facts and expected their new facilities to be treated as existing facilities, such expectations do not provide a ticket around express regulatory requirements. Regulated sources often have their expectations upset when EPA (or other agencies) strengthen, revise, or recalculate standards or requirements governing their operation. This is simply inherent in the nature of regulation, and environmental regulation in particular, and even more so when the requirements are to be based on the best technology available, as is the case under 42 U.S.C. § 7412. While an agency may be deemed to have "unfairly" applied regulatory standards if it does so in a manner that is impermissibly retroactive, as detailed at Section I,D *infra*, that did not occur here.

Petitioners also overstate the cost issue. Of the new units with test data available, 71% are already complying with the recalculated standards for HCl -- the pollutant for which Petitioners recite their cost figures. 87 Fed. Reg. at 60,824/2, 60,831/2-3. Additionally, EPA projects that only 54 of 577 Boilers subject to the standards (9%) will incur *any* costs as a result of the Challenged Rule. *Id*. at 60,833/1. Thus, while U.S. Sugar may incur some compliance costs at a single facility in Florida, most units will incur no costs with regard to the recalculated standards, for HCl or other covered pollutants.[14]

---

[14] Industry Petitioners continually reference the stringency with which the standard for HCl was revised, stating that it is more than one hundred times as stringent as the standard in the Major Boiler Rule. Industry Br. at 1, 11, 14, 19,

Finally, while claiming that it is unfair for them to incur costs to comply with the recalculated standards, Petitioners ignore the benefits associated with such application, which generally reflect avoided health costs for the infirmities the regulated pollutants are anticipated to cause. 87 Fed. Reg. at 60,818/1 (estimating the present value of saved health costs to be one-half billion dollars). Those benefits accrue, in part, from the projected reduction of 110 tons per year of HCl, 586 tons per year of PM, and further reductions of mercury, arsenic, lead, and other harmful pollutants. 87 Fed. Reg. at 60,833. *See also id.* at 60,834-56 (estimating benefits of reduction of certain pollutants in certain states). Such benefits must be factored into any argument about unfairness, which again is a matter for Congress to address.

### 2.     EPA Never Indicated that Regulated Entities Could Ignore Mandated Recalculation of Emission Standards

Industry Petitioners next claim that EPA's statutory interpretation is unreasonable because "EPA represented" that sources could continue to comply with the Major Boiler Rule and that the Rule's standards would not be revised in a manner that would cause them to incur costs. Industry Br. at 7. Petitioners cite the Declaration of Panagiotis Tsirigotis of EPA as purported evidence that the HCl

---

34. The level of the emissions reduction is essentially irrelevant to Petitioners' arguments. Petitioners do not have to create new state-of-the art technology to meet some unreachable standard. They merely have to install equipment to meet the standard that most Boilers are already achieving.

emission standard for new solid fuel boilers would not be affected by the Court's remand in *U.S. Sugar*, arguing that this is a basis for concluding that the recalculated standards for new sources may not be applied. Industry Br. at 28, 33-34.

The Tsirigotis Declaration was submitted by EPA in support of its motion to remand, rather than vacate, the emission standards, which the Court granted in *U.S. Sugar II*. It was not submitted to support or explain a statutory interpretation, to reflect any final decision regarding what future actions were necessary to recalculate the emission standards in accordance with the remand, or to establish revised standards. Nor could it have.

The Challenged Rule both included all relevant sources as directed by *U.S. Sugar* and addressed the Court's expressed concern with illogical results in *NACWA*, by recalculating its application of the UPL for the standards that had already been remanded by the Court. 87 Fed. Reg. at 60830/3, n.35. *See also U.S. Sugar I*, 830 F.3d. at 632, n.20. The Tsirigotis Declaration was directed to a preliminary analysis of how emissions standards might be affected solely as a result of revising the group of sources to be considered when assessing the best single and 12% of sources. JA__ (Tsirigotis Declaration at ¶¶ 8-9). The Tsirigotis Declaration did not consider potential recalculations based on the infirmities in the UPL analysis identified in *NACWA*. Tsirigotis Declaration ¶¶ 8-

9.  Instead, for his preliminary analysis, Mr. Tsirigotis explained that EPA "conducted the same UPL analysis that was performed in the [challenged] rulemaking…." *Id.* at ¶ 8.

Moreover, as Petitioners explain, their claims here relate to *all* standards established for *all* pollutants, not merely HCl.  Industry Br. at 1, 19.  The Tsirigotis Declaration, while preliminary, explained that other standards *were* likely to be affected by the Court's decision in *U.S. Sugar* and its directive to EPA to reanalyze the data and revise standards as appropriate for various subcategories of Boilers.  JA__ (Tsirigotis Declaration at ¶ 9).  And EPA's voluntary remand similarly referred to such other standards.  This includes the standards for emissions of particulate matter, one of the pollutants that is the subject of Industry Petitioners' claims.  Industry Br. at 1, 8 n.5.

Additionally, Industry Petitioners fail to establish why a preliminary statement relating to which pollution standards may require revision would serve as a functional (and ostensibly binding) statutory construction.  The portion of the Tsirigotis Declaration cited by Industry Petitioners, ¶ 9, is simply a chart representing a "preliminary analysis" of what standards might be affected by the Court's decision in *U.S. Sugar*.  *Id.* ¶¶ 7-9; Industry Br. at 7 (candidly describing it as a "preliminary analysis").  As the Court explained generally regarding EPA's steps taken to issue the Boiler standards, Petitioners cannot rely on EPA's

"*preliminary* prediction[s]" of the standards to be applied.  *U.S. Sugar I,* 830 F.3d

at 641 (emphasis in original).

### 3.    EPA's Approach Here is Not Inconsistent with Past Practice

Industry Petitioners assert that the application of recalculated emission

standards in this case is inconsistent with how EPA has applied revised emission

standards to new sources in other instances, purportedly rendering its actions here

arbitrary and capricious.  Industry Br. at 24-25.  First, nowhere has EPA taken the

position that it is *required* to revise the new source trigger date in circumstances

where revised standards are based on the same record in response to a court

remand.  Moreover, EPA applied the requirements at issue based on the

circumstances presented and it has, in the past, applied the relevant provisions in

exactly the same manner it did here.

The situations cited by Industry Petitioners reflect different circumstances

than those presented by the recalculated standards for Boilers promulgated in the

Challenged Rule.  For instance, Petitioners cite the emission standards established

for Portland Cement manufacturers, which were examined in *Nat'l Lime Ass'n v.*

*EPA*, 233 F.3d 625 (D.C. Cir. 2000).  There, upon remand, EPA established

standards for HCl, mercury, and organic hazardous air pollutants and applied them

to new sources only going forward.  Industry Br. at 30-32.

Unlike here, in *Nat'l Lime* EPA was not examining a limited subset of emission standards to determine whether and how they needed to be recalculated. It was, instead, setting standards in the first instance. As the Court found, EPA had failed to set *any* MACT floors for HCl, mercury and organic hazardous air pollutants. *Nat'l Lime*, 233 F.3d at 630, 633-34. In other words, there were no standards for these pollutants that were "first proposed," until EPA later proposed them.

Similarly, the Medical Waste Incinerator rule cited by Petitioners in their comments on the Challenged Rule involved a different statutory provision that contains no reference to when EPA "first proposes" the applicable standard. It also involved a wholesale revision of the standards for this category of sources, based on all new data where EPA had identified infirmities in the original dataset. 87 Fed. Reg. at 60,831/2; *Med. Waste Inst. and Energy Recovery Council v. EPA*, 645 F.3d 420, 426 (D.C. Cir. 2011).

Petitioners cite to other rulemakings in support of their position that EPA *must* redefine a "new" source when revising standards. Industry Br. at 24, 25, & n.11. Petitioners argue that "when EPA periodically updates new source standards, its normal practice has been to apply revised standards prospectively." Industry Br. at 24 (citing examples). This statement merely exhibits the difference

between the periodic updates referred to in Petitioners' statement and the limited revision of standards subject to the remand here.

It is correct that EPA has applied revised new source emissions standards to sources constructed after the date of the proposed revisions -- but in circumstances different than the Challenged Rule. The emissions standards cited by Petitioners were promulgated pursuant to EPA's separate duty under the CAA to reexamine full sets of standards, determine whether they require revision in light of specific statutory criteria, and if so to revise those standards, which would then be based on an entirely new rulemaking record. *See, e.g.*, 71 Fed. Reg. 42,724 (July 27, 2006), cited at Industry Br. at 24, explaining that the revised standards there were generated as a result of the technology and risk reviews required under sections 7412(d)(6) and (f)(2). The same is true for the other rules cited by Petitioners. *See* 70 Fed. Reg. 19, 992 (Apr. 15, 2005), cited at Industry Br. at 24 and the rules cited at Industry Br. at 25, n.11.

As EPA explained, these other rulemakings generally involved EPA's risk and technology reviews under 42 U.S.C. §§ 7412(d)(6) and/or (f)(2), which involve the calculation of *all new standards*, which is predicated on the collection of new information and applies different criteria. 87 Fed. Reg. at 60,831/2 (explaining that these rulemakings involved "a wholesale revision of the standards, unlike this action."). Under such reviews, if EPA determines that

revision is appropriate based on its risk and technology review, those reviews generally involve the calculation of all new standards based on new data or information. *Id.* And where a court has vacated all emission standards for a source category, such as occurred with regard to Boilers in 2007, EPA often collects new data and promulgates all new standards to correct significant and sometimes fundamental errors and to create standards where none apply, which EPA did in promulgating the 2011/2013 Boiler standards. *See also* Industry Br. at 31-32 (citing a Portland Cement rulemaking where the court "essentially required EPA to reexamine the entire issue" of the emission standards.).

In other proceedings not involving a wholesale revision to regulatory requirements, but instead a more limited revision of emission standards such as here, EPA has retained the original proposal date as the date by which new sources are defined. For instance, in a more recent Portland Cement rule, EPA was acting pursuant to a reconsideration petition and was issuing revised standards. Industry representatives argued that under the statutory definition of "new source," EPA "should change the date for determining new source status from May 9, 2009 [when standards were originally proposed] to July 18, 2012, the date of the proposed reconsideration rule." 78 Fed. Reg. 10,006, 10,025/1 (Feb. 12, 2013). EPA rejected this suggestion, explaining:

> [I]t is reasonable to retain the May 6, 2009 date as the date the Agency "first proposed" standards for this source category. This is the date that

EPA first proposed these standards under this particular rulemaking record. Today's action is a reconsideration action, and although it revises the particulate matter new source standard, it is premised on the *same general rulemaking record*. It is thus reasonable to view the date EPA "first proposes" standards to be the May 2009 date. Further, Industry commenters essentially advocate an approach whereby any time the Agency changes a new source standard, in any way, on reconsideration, the new source trigger date would change. Such a result is not consistent with Congress' intent in defining the term "new source" in section 112(a)(4), to be the date the Agency "first proposes" standards.

*Id.* (emphasis added). EPA took a similar view in issuing the 2013 Boiler Rule, as it does in the 2022 Challenged Rule.

The recalculated standards at issue were not promulgated pursuant to a risk and technology review nor did they otherwise represent a wholesale revision of the standards, such as occurs after vacatur. Instead, as outlined *above*, EPA was acting pursuant to the remands and directives of this Court, which were limited to several issues on which EPA did not prevail in *U.S. Sugar* and *NACWA*. Under these circumstances, it was not arbitrary and capricious to continue to apply the June 4, 2010 trigger date for designation of a new source set forth in EPA's existing regulations. 40 C.F.R. § 63.7490(b).

### 4. The Revised Standards were Issued in Response to a Court Remand, Contrary to Petitioners' Allegation Otherwise

In responding to EPA's explanation of why its position here (responding to a limited remand) is different than that applied in other circumstances (e.g., in response to vacatur or as part of a full risk and technology review), Industry

Petitioners argue that the "HCl standard for new solid fuel boilers was not remanded in *U.S. Sugar*." Industry Br. at 28. This is incorrect.

First, the Court in *U.S. Sugar* did not identify the specific emission standards that needed to be recalculated on remand. That would have been premature given that the Court's mandate was for EPA to reexamine the pool of sources in each category so it could then determine which new and existing Boiler emissions standards needed to be revised. 830 F.3d at 631. Furthermore, Petitioners are challenging the application of all standards applicable to their Boilers, including specifically the recalculated standards for particulate matter, the pollutant of concern at the nine biomass plants cited by Petitioners. Petitioners admit that the standards for particulate matter were remanded by the Court. Industry Br. at 8, n.5.

Moreover, the emissions standard for HCl for new sources *was* remanded by this Court even earlier in the *U.S. Sugar* case. *See* pp. 17, 22, *supra* (citing EPA's motion in *U.S. Sugar* to remand precisely these standards). Thus, whether acting pursuant to the directives of this Court in *U.S. Sugar*, *NACWA*, or both, EPA was recalculating a subset of emission standards (including those for HCl) "first proposed" in 2010, solely to address flaws identified by this Court.

That EPA was responding to two different flaws in its existing emission standards identified by this Court in two different instances does not alter the

limited nature of EPA's actions, which were based on the Court's specific directives.  Following two limited directives does not transform EPA's limited recalculation into a vast, all-inclusive revision of all standards, such as that which might occur following a vacatur of all standards and instruction from a court to undertake a completely different approach.

Setting the MACT floor is a matter of crunching the numbers.  *Sierra Club II*, 884 F.3d at 1191 ("[U]sing the data it had on boilers' CO emission, EPA crunched the numbers to set a MACT Floor.").  That is what EPA did in the Challenged Rule, and that is all it did.  As EPA explained, its 2022 emission standards do not reflect a new process or methodology under which it collected more recent data and established new standards.  Instead, they reflect a straightforward recalculation of the Major Boiler Rule standards, based on the original data supporting those 2011/2013 standards, in direct response to the specific remands of this Court calling for such recalculation.  87 Fed. Reg. at 60,820-22, 60,830/3-60,831/1.  Those data support the emission standards "first proposed" in 2010, with recalculations made pursuant to the narrow direction of this Court.

### D. The Application of New Source Standards to Facilities Constructed Before 2020 is Not Impermissibly Retroactive

Utilizing the word "retroactive" persistently in their brief, Industry Petitioners center their argument around the allegation that the Challenged Rule

improperly applies emission standards for new sources retroactively to any plant constructed after 2013 but before August 12, 2020.  Industry Br. at 12-14, 20-27. There is, however, no improper retroactive application of standards here.

Under the Challenged Rule, affected entities are not fined or punished for having emitted over the recalculated MACT floor in the past, or even presently. Instead, the Rule requires regulated entities to comply with the revised standards in the future, giving them three years from the effective date, until December 5, 2025, to demonstrate compliance.  87 Fed. Reg. at 60,817/1.

Industry Petitioners assert that they did not contemplate having to comply with recalculated new source requirements when they constructed their facilities. Whether accurate or not, a regulatory action that does not punish past behavior but only upsets expectations based on current regulatory requirements, is not impermissibly retroactive.  *Chem. Waste Mgmt., Inc. v. EPA*, 869 F.2d 1526, 1536 (D.C. Cir. 1989); *Sinclair Broad. Grp., Inc v. FCC*, 284 F.3d 148, 166 (D.C. Cir. 2002); *DirecTV, Inc. v. FCC*, 110 F.3d 816, 825-26 (D.C. Cir. 1997); *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006) ("[A]n agency order that 'alters the future effect, not the past legal consequences' of an action, or that 'upsets expectations based on prior law,' is not retroactive.") (citations omitted).

In determining whether an action is impermissibly retroactive, courts

distinguish between actions that are primarily retroactive and those that are secondarily retroactive. *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 159 (D.C. Cir. 2010). A primarily retroactive action "imposes new sanctions on past conduct" and is deemed "invalid unless specifically authorized" by statute. *Id.* A secondarily retroactive action is one that "merely 'upsets expectations'" and is not presumptively invalid; it is deemed "invalid only if arbitrary and capricious." *Id.* (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 269 (1994)). *See also Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 670-71 (D.C. Cir. 2009) (citing *Mobile Relay Assocs.*, 457 F.3d at 11 (first quote) and *Chem. Waste Mgmt. v. EPA,* 869 F.2d 1526, 1536 (D.C. Cir. 1989) (second quote):

> [C]hanges in the legal landscape [are not presumptively retroactive, because] if that were all it took to render a rule impermissible under the APA, it would spell the end of informal rulemaking. We have thus repeatedly made clear that an agency order that only "upsets expectations based on prior law is not retroactive," *Mobile Relay Assocs.,* 457 F.3d at 11. That describes precisely this case. Here the Commission has impaired the future value of past bargains but has not rendered past actions illegal or otherwise sanctionable. "It is often the case that a business will undertake a certain course of conduct based on the current law, and will then find its expectations frustrated when the law changes." *Chem. Waste Mgmt. v. EPA,* 869 F.2d 1526, 1536 (D.C.Cir.1989). Such expectations, however legitimate, cannot furnish a sufficient basis for identifying impermissibly retroactive rules.

Here, the Challenged Rule is not primarily retroactive because it does not impose penalties for past emissions from any facility, including those owned or

represented by Petitioners. And the Rule, even if perceived to be secondarily retroactive, is not invalid because it is not arbitrary and capricious. *See* discussion *supra* and *infra*.

The recent decision in *Board of County Commissioners of Weld County, Colorado v. EPA*, 72 F.4th 284 (D.C. Cir. 2023) ("*Weld County*") highlights the distinction between primary and secondary retroactivity. There, EPA revised the area in which regulatory requirements for attainment with National Ambient Air Quality Standards ("NAAQS") applied, which would then require emission reduction actions to be taken based solely on the revisions. This alone did not constitute an improperly retroactive regulation, even if it upset regulated entities' expectations, as it would not "alter the past legal consequences of past actions." *Id*. at 293.

However, in *Weld County* EPA revised emission standards that a State had three years to comply with but did so more than three years after EPA's original promulgation of those standards. Accordingly, "Texas never had the requisite opportunity to reach timely attainment" because the deadline for compliance passed before EPA revised the emission standards that Texas was required to comply with. *Id*. at 293-94. Noting that EPA had effectively "eliminate[d] Texas's three year attainment runway," the Court found EPA's action improperly retroactive because it "retroactively adjusted Texas's legal rights by increasing the

State's exposure to the harsh consequences that follow from failing to meet an already past deadline." *Id*. at 294.

EPA did no such thing in this case. To the contrary, in issuing the recalculated emission standards, it affirmatively gave entities three years to comply with those standards, i.e., it provided a "three-year attainment runway." 87 Fed. Reg. at 60,817/1. While the Challenged Rule might have altered "the future effect" of Petitioners having constructed facilities in a certain manner or otherwise "upset[] [Industry Petitioners'] expectations based on prior law," *Mobile Relay Assocs.* 457 F.3d at 11, *that* does not constitute improper retroactive regulation.

Nor should Petitioners have had an expectation that applicable emissions standards for new sources would not be revised. For instance, U.S. Sugar Corporation commenced construction of Clewiston Boiler 9 in 2016, with some planning and preparation work done in 2015. U.S. Sugar Mtn. (Doc. 1980099) at 5 & Ex. B at ¶ 2. Given that U.S. Sugar and AF&PA were Petitioners in *U.S. Sugar*, and that their petitions for review in that case were filed in 2011 and 2013, all Industry Petitioners were well aware when they commenced construction of their respective facilities that the emission standards, and the way EPA had calculated them, were under review by this Court. And Petitioners knew in July 2016 that this Court had remanded those standards to EPA to be recalculated.

All Industry Petitioners also knew in August 2013, just months after EPA issued the revised Major Boiler Rule, that this Court identified EPA's application of the UPL in certain circumstances as "illogical" and remanded to EPA in part to explain its approach. *NACWA,* 734 F.3d at 1144. The same approach faulted in *NACWA* was used in the 2013 Major Boiler Rule, resulted in the same "illogical" outcome for the solid fuel HCl and PM standards, and was the basis for the remand of those standards in May 2014 in *U.S. Sugar*, which Petitioners here did not contest. 78 Fed. Reg. 7138, 7142 (Table 3).

Finally, as outlined above, all Industry Petitioners knew (or should have known) before they moved one shovel of dirt, that EPA in its 2011 Rule defined a new Boiler as one built after June 4, 2010, and that EPA did not revise that regulation when it revised certain Boiler standards in 2013. 40 C.F.R. § 63.7490(b). Accordingly, consistent with the precedent established in the 2013 Rule, Petitioners could have no reasonable expectation that the 2010 trigger date would not continue to apply when EPA further revised the standards in response to the Court's remands.

## II.   THE MACT FLOOR FOR HYDROGEN CHLORIDE (HCl) IS NOT ARBITRARY AND CAPRICIOUS

In a separate, more limited claim, Industry Petitioners assert that EPA used improper data points in assessing the variability of the data used to determine the MACT floor for new sources for HCl. Specifically, Petitioners assert that EPA

improperly relied on stack tests that showed results below the detection level ("non-detect") for HCl in setting the standards for that pollutant. Industry Br. at 14-18, 35-40. Unlike their retroactivity claim, which applies to all standards EPA revised in the Challenged Rule for all pollutants, they claim that only the revised standards for HCl are arbitrary and capricious on this basis. *Id*. As discussed below, because the underlying *factual* basis for Petitioners' argument is facially incorrect, their claim must be denied.

Hazardous air pollutant emissions fluctuate over time, and for many reasons. *U.S. Sugar I*, 830 F.3d at 598. Emissions data are usually gathered in three-run stack tests, which provide three snapshots of a source's emissions. *Id*. Because such snapshots cannot reflect all conditions under which a facility operates over time or the fluctuation of emissions, EPA uses a statistical tool known as the upper prediction limit (UPL) to account for variability in emissions levels. *Id.* at 598, 632-39.

Industry Petitioners argue that EPA improperly used the UPL to determine that the Boiler identified as PB-44 should form the basis for the MACT floor for HCl for new Boilers, and instead should have identified the Wellons Boiler as the best controlled source. But basing the standard on the Wellons Boiler would have yielded the same illogical result that the Court in *NACWA* expressly rejected and which was the basis for its remand, where a new source limit, which is based on

the single best-performing source, is less stringent than the existing source limit, which is based on the average of the 12% best performing sources. 87 Fed. Reg. at 60,823/3.

The reason that reliance on the Wellons Boiler would lead to an anomalous result is due to the variability in results from its emission tests. EPA found that the Wellons Boiler "has a UPL that was 81 times higher than the lowest short-term average emission test and that ratio is not within the range that we see when we evaluate larger data sets using our MACT floor calculations." JA___ (EPA-HQ-OAR-2002-0058-3946 at 10. Indeed, the variance at this unit was five times higher than that observed at the PB-44 unit, which had test runs only 7% higher than the Wellons Boiler lowest stack test average. 87 Fed. Reg. at 60,824. Accordingly, EPA found that the unit with the lowest average emissions, the Wellons Boiler, could not be deemed to be the best performing source because it did not adequately reflect the variability of emission test results. Choosing the Wellons Boiler as the best performing source would equate to ignoring the Court's remand in *NACWA*.

As EPA explained, the PB-44 unit had only slightly higher test run emission averages than the Wellons Boiler but consistently low emissions. *Id.* Given that PB-44 had the second lowest emission test average results with a variance five times lower than the Wellons Boiler and did not yield a new source limit less

stringent than the existing source limit, EPA found it reasonable to conclude that when variability is factored in using the UPL, PB-44 is the "best performing" single source for HCl.

Petitioners do not quarrel with EPA factoring in variability in setting emission standards for major sources or the use of the UPL to assess variability. JA___ (EPA-HQ-OAR-2002-0058-3971, AF&PA Comments) at p. 1 ("EPA is appropriately considering variability in emissions *when setting standards*….); p. 2 ([W]e support EPA's use of calculation methodologies that incorporate emissions variability to determine the actual performance of the best performing units in the source category/subcategory when limited test data are available."); p. 2 ("EPA has well established that the UPL is appropriate to use with stack test data that represent a snapshot in time for reasonably estimating the emissions performance actually achieved by the sources that comprise the floor on an ongoing basis.").

Indeed, Industry Petitioners spend much of their argument explaining why addressing variability, and not just basing standards on results from three stack tests, is necessary, describing how it establishes the basis for a more accurate standard. *See* Industry Br. at 36-40, (citing EPA regulations and court decisions upholding the use of the UPL and explaining the need to address variability in establishing the emission standards). Industry Petitioners further cite to (and approve) the requirement that EPA base the UPL on three test runs. *Id*. at 38.

Industry Petitioners do not dispute that in setting the standard based on the emissions data from the best performing Boiler it identified, PB-44, EPA relied on three test runs. *Id*. at 38-39. Instead, Petitioners argue that because those test runs for the PB-44 facility purportedly showed levels of HCl from that facility that were so low as to be non-detect, they somehow render the decision to identify PB-44 as the best performing source invalid. *Id*. at 38-40. Industry Petitioners' argument fails on multiple grounds.

"Non-detect data" is "emission levels too low to register in an emissions test." *NACWA*, 734 F.3d at 1154. However, EPA still considers sources with non-detect data when evaluating potential best-performing sources. When establishing MACT floor standards, EPA generally sets the standard at a higher calculated level to ensure emissions can be accurately measured. JA___ (EPA-HQ-OAR-2002-0058-3839 at 1-2). Indeed, in this case, the standard at issue was set at the 3xRDL value, with "RDL" being the "representative detection level." 87 Fed. Reg. at 60,821-22.

The practice of setting an emission standard at three times the RDL (the detection level) has long been recognized as an acceptable practice by this court and is done to ensure that measurement uncertainty in emissions data does not inappropriately result in an emission standard set in an unrealistic manner. *See NACWA*, 734 F.3d at 1155 (upholding EPA's practice of selecting three times the

representative method detection level value as the emission standard, if that value is greater than the calculated UPL value, so as to account for "measurement variability and imprecision."). Petitioners make no attempt to argue that setting the emission standard at three times the representative detection level, whether non-detect or not, is arbitrary and capricious.

Even more importantly, the underlying premise of Petitioners' argument is simply incorrect; the establishment of the MACT floor for HCl based on emissions achieved at PB-44 was *not* based on non-detect results. Petitioners declare: "EPA relied on three test runs that were all *non-detect* for HCl." Industry Br. at 38-39 (emphasis in original). But Petitioners' brief cites to nothing in the record to support this assertion.

Emission test results that EPA relied on are set forth in a chart generated by EPA. JA___ (Revised MACT Floor Analysis, EPA-HQ-OAR-2002-0058-3273, attachment 3, Tab C-1b(i)). As the chart shows, the levels of the pollutant at issue (HCl identified in column K) reported for PB-44 (identified in column H) are set forth at rows 14-16. This chart shows actual "Test Run Emission Values" in column Q and includes specific values for PB-44, i.e., emission levels *were* detected. Moreover, Column P is labeled "Non-Detect?" and includes references of ND (for "non-detect") or BDL (for "below detection level"). While there are other units where ND or BDL is noted (*see, e.g.*, column P, rows 3-7), there is no

such designation for the three test runs conducted at PB-44. Finally, Column S identifies with a "1" those tests in which there was a non-detect result. There is no such designation for any of the three test results for the PB-44 unit.[15] Because the basis of Petitioners' argument, that "EPA's data does not include the real emission values from PB-44," Industry Br. at 16, n. 9, is factually incorrect, Petitioners' claim must be denied.

## III.  EPA WAS NOT REQUIRED TO BASE THE RECALULATED EMISSION STANDARDS IN THE CHALLENGED RULE ON UPDATED DATA

Environmental Petitioners argue that in responding to the remand in *U.S. Sugar*, EPA was required by the statute to recalculate emission standards for both new and existing sources based on updated data from all Boilers. Petitioners alternatively argue that if not required to do so by statute, it was arbitrary and capricious for EPA to rely on the original dataset in recalculating the limited subset of emission standards in the Challenged Rule. In fact, EPA acted well within statutory parameters and in an eminently reasonable manner.

_____

[15] Because Industry Petitioners fail to cite in their brief to any record references for supposed non-detect readings of HCl at the PB-44 facility, it is impossible to understand the factual basis for their assertion. *See* Industry Br. p. 16, citing only to the general discussion of non-detect results in the preamble to the Challenged Rule. Perhaps Petitioners are relying on a superseded reference to emissions tests. EPA explained that in formulating the final standards in the Challenged Rule, it corrected test run values that had been incorrectly reported as zero, non-detect or negative in the database. 87 Fed. Reg. at 60,821/1.

**A.      Neither the Clean Air Act Generally, Nor 42 U.S.C. § 7412
Specifically, Required EPA to Recalculate the Emission
Standards for Boilers Based on an Updated Dataset**

Environmental Petitioners do not dispute that in promulgating recalculated

emission standards for both new and existing Boilers, EPA was not promulgating

all new standards for the full Boiler source category but instead was acting

pursuant to a limited remand in *U.S. Sugar*.  Environmental Br. at 2.  What was

*not* included in that remand was any reference to a statutory requirement or other

directive for EPA to base its recalculations on updated data.  *U.S. Sugar II*, 844

F.3d at 270.  With no such requirement or instruction, EPA implemented its

statutory responsibility and applied the directives of the Court by revising a

relatively small subset (17%) of the emission standards established in the Major

Boiler Rule, basing such revisions on the same 2013 dataset that underlies the

83% of remaining emission standards that were not revised.

**1.      EPA Exercised Sound Judgment in Determining the
Appropriate Dataset to Consider**

Because of compliance reporting requirements, EPA did possess emissions

compliance reports from various facilities for years after 2013.  EPA therefore

considered whether it should use those compliance reports to develop new

standards or whether to rely largely on the existing record, which would reflect the

emissions standards that should have originally been established.  While it might

have been technically feasible for EPA to ultimately process recent data in

recalculating a subset of the emission standards, EPA reasonably continued to rely on the 2013 dataset for multiple reasons, including:

(a) it was not conducting a comprehensive revision of Boiler standards, but rather recalculating only a small subset of the applicable standards in response to the Court's limited remand, unlike the "wholesale revision" of the Boiler Rule ordered in *NRDC v. EPA*, where all emission standards for Boilers were vacated (87 Fed. Reg. at 60,821/3, 60,822/1, 60,831);

(b) the Court in *U.S. Sugar* directed EPA to narrowly correct its analysis of the 2013 dataset, not to "initiate a new standard-setting process or to assemble new data" (87 Fed. Reg. at 60,821/2-3);

(c) revision of the limited subset of standards "using newer emissions information [ ] could result in the potentially inequitable outcome of some units being subject to more stringent standards solely because of the EPA's error in its initial MACT floor calculations, while other units unaffected by the court decision would remain unchanged." (87 Fed. Reg. at 60,822/1);

(d) "[r]evising all of the boiler MACT standards, including the standards that have not been remanded, would require EPA to incur a significant resource burden." (*Id*); and

(e) revising the standards based on new data "could result in wholesale changes to standards that were largely upheld by the D.C. Circuit." (*Id*.).

Addressing just one of these bases, the resource burden, Environmental Petitioners imagine that considering updated emissions compliance data to revise emission standards is a simple task, akin to checking a few numbers on a spreadsheet. Environmental Br. at 11. That, however, is not the case. First, EPA would need to not only compile the emissions data for each subcategory and for each covered pollutant but also assure its reliability in every instance. For example, where EPA has questions about how emissions data was collected or about whether a particular result is accurate, it must confirm the data with the source. In circumstances where the dataset is limited, which can occur often, EPA must take additional steps. JA__ (EPA-HQ-OAR-2002-0058-3946) (describing these steps in a detailed, technical 14-page memo).

It is only at that point that EPA begins its statistical analysis of the data for each subcategory and pollutant. This analysis first requires EPA to determine the "data distribution" of an emission profile, as either "normal" or "lognormal," which is important for purposes of applying the appropriate statistical equation to the data. JA__ EPA-HQ-OAR-2002-0058-3892 at 6-9; JA__ (EPA-HQ-OAR-2002-0058-3273). Once these steps are completed, EPA applies the relevant UPL equation to address variability. *See* pp. 58-60, *supra*, discussing application of such issues for just two sources, PB-44 and Wellons. EPA determined that

engaging in this comprehensive process was not necessary or warranted and would unnecessarily constrain agency resources.

Weighing *all* of the above-described factors EPA outlined in the Challenged Rule, the Agency determined that it was best to recalculate the existing emission standards based on the 2013 dataset, particularly since EPA could in this instance ensure that adequate standards were implemented through its beyond-the-floor approach. *See* discussion, *infra*. EPA's judgment in such technical matters is entitled to extreme deference. *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1051-52 (D.C. Cir. 2001); *Midwest Ozone Grp.*, 61 F.4th at 192. This is particularly true for the application of statistical analyses, such as that conducted by EPA in setting emission standards under 42 U.S.C. § 7412. *Id.*, quoting *Maryland* v. EPA, 958 F.3d 1185, 1196 (D.C. Cir. 2020) (such analyses are "perhaps the prime example of an area of technical wilderness into which judicial expeditions are best limited to ascertaining the lay of the land."); *U.S. Sugar I*, 830 F.3d at 606 ("We also owe particular deference to EPA when its rulemakings rest upon matters of scientific and statistical judgment within its sphere of special competence and statutory jurisdiction.") (citations omitted). Petitioners have presented no sound basis for usurping EPA's technical determinations regarding the appropriate dataset in this instance.

## 2. Nothing in the Statute Requires EPA to Consider the Most Recent Data when Recalculating Existing Emission Standards

Petitioners argue that the sound technical judgment of EPA should be overridden because the statute *requires* the Agency to rely on recent data when recalculating environmental standards pursuant to remand. But this Court has found that under the CAA EPA need not base emission standards or similar requirements on the most recent data available, and the bases for EPA not doing so in this case are the same as those that the Court has found adequately support EPA's choice to rely on prior-collected data in revising other CAA requirements.

For instance, in *Mississippi Commission on Environmental Quality v. EPA*, 790 F.3d 138 (D.C. Cir. 2015), EPA revised National Ambient Air Quality Standards ("NAAQS") issued under 42 U.S.C. §§ 7407-08. In that case, Sierra Club argued that EPA was required to make attainment determinations based on more recent data and that, if EPA had done so, it would have found that eleven counties deemed to be in attainment with the emission standards were actually in nonattainment, which would require significant remedial steps to be taken to achieve attainment. *Id.* at 157.

Notwithstanding the existence of more recent data that would lead to a different (more stringent) conclusion, the Court found EPA's reliance on the original dataset to be both consistent with the statute and neither arbitrary nor

capricious.  The Court agreed with EPA's concern that a requirement "to consider

such new information would result in a never-ending process in which

designations are never finalized." *Id*. at 158.  The Court concluded: "EPA could

reasonably conclude that the process must end at some point.  We conclude that

the agency did not act arbitrarily in ending it here." *Id.*  There is no provision of

42 U.S.C. § 7412 that would allow one to conclude that EPA is prohibited from

declaring a reasonable cut-off for data examination.

Even more on point, the Court recently addressed the issue of what data

EPA must analyze in assessing compliance with emission standards where those

standards were subject to a remand from this Court.  In *Weld County,* the Court

addressed EPA's determinations as to whether various locales complied with

applicable emission standards, after remanding those determinations to EPA for

further review.  72 F.4th at 288.  EPA promulgated revised designations of

whether an area complies with allowable emission levels three years after EPA's

original designations, with the revised designations "rest[ing] only on data that

was available to EPA when it promulgated its original designations." *Id*.

This Court upheld EPA's decision to revise the designations based on the

original data, without considering more recent data.  The Court pointed to EPA's

explanation that relying on the original data would "standardize its analysis and

thus facilitate consistent treatment" of regulated parties and that "using the

original data would streamline the process," allowing EPA to revise the

designations "as expeditiously as practicable." *Id.* at 289 (citation omitted). As

the Court summarized:

> We recognize that an agency generally must base its decisions on the
> best available data. But the question here is whether EPA was required
> to use one data set (the most recent certified data) in assessing northern
> Weld County's contribution to ozone pollution in greater Denver even
> though it had used another data set (the certified data available at the
> time of the original designations) in assessing the contribution of at
> least eight other counties in the same area. In these circumstances, EPA
> plausibly explained why the benefits of a matched dataset – greater
> parity among counties and faster turnaround – make the original data a
> better choice than partial updating.

*Id.* at 290. As outlined above, fairness and parity among regulated sources, along

with a lack of resources to consider revisions based on new data in a timely

manner, were two of the bases that EPA described supporting its decision to

recalculate the emission standards for a limited subset of Boilers based on a single

set of data, the 2013 dataset.

Environmental Petitioners argue that the specific wording of 42 U.S.C. §

7412 is different from other CAA requirements, and that it requires the Court to

wholly ignore the various bases EPA delineated in this limited instance for relying

on the 2013 dataset. Petitioners focus on the phrase in 42 U.S.C. § 7412(d)(3)(A),

which states that EPA is to establish MACT floors that shall not be less stringent

than the "average emission limitation achieved by the best performing 12 percent

of the existing sources (*for which the Administrator has emissions information*)

….."  Environmental Br. at 7 (emphasis added).  Petitioners argue that under this wording, if the Administrator has emissions information, he *must* use it, and since EPA had post-2013 data when it proposed the Challenged Rule, it must use it when recalculating standards in response to the Court's remands.  Environmental Br. at 29-30.

But as EPA explained, the qualifying language, "for which the Administrator has emissions information," is intended to ensure that EPA "need not obtain emission data from 100 percent of the source category or subcategory in order to identify the best performing 12 percent" of sources before formulating a standard, so as "to prevent delay in regulating emissions of hazardous air pollutants."  87 Fed. Reg. at 60,821/3.  This interpretation is consistent with the 1990 amendments to the statute, which were specifically designed to "prevent delay in regulating emissions of hazardous air pollutants." *Id.*  Ensuring that the Administrator has adequate data to formulate emissions standards (i.e., standards "for which the Administrator *has* emissions information," 42 U.S.C. § 7412(d)(3)(A)) (emphasis added), is a far cry from mandating that emissions standards be based on every last bit of data in existence.

Noting that the emission standards to be established by EPA "shall not be less stringent than the emission control that is achieved in practice by the best controlled similar source, as determined by the Administrator,"  42 U.S.C.

§7412(d)(3), Environmental Petitioners also focus on the clause "achieved in practice," functionally adding a temporal element requiring that standards be continually updated based on any new data, to determine what is being achieved in practice right now. But the statute neither defines "achieved in practice" nor does it dictate how the agency must determine the timing of emission reductions "achieved in practice" by other sources.

Instead, what *is* clear from this provision is that Congress left it to the discretion of EPA to determine how to assess the emission levels "achieved in practice" by other sources: "The maximum degree of reduction in emissions that is deemed achievable for new sources in a category or subcategory shall not be less stringent than the emission control that is *achieved in practice* by the best controlled similar source, *as determined by the Administrator*." 42 U.S.C. § 7412(d)(3) (emphasis added). And while Congress identified the specific hazardous pollutants to be controlled, it did not define what data should be considered or how data should be analyzed in establishing emission standards for those identified pollutants. Instead, Congress left that task to EPA: "The Administrator may establish, by rule, test measures and other analytical procedures for monitoring and measuring emissions, ambient concentrations, deposition, and bioaccumulation of hazardous air pollutants." 42 U.S.C. § 7412(b)(5).

Based on these and other provisions, this Court has consistently announced that under 42 U.S.C. § 7412 EPA has considerable latitude in determining how to collect data for establishing the standards, what data is to be considered, and how such data are to be assessed in establishing the standards. For instance, in *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 867 (D.C. Cir. 2001), Sierra Club, similar to Petitioners here (Environmental Br. at 33-34), argued that EPA violated 42 U.S.C. § 7412(d)(3) in setting MACT floors because it was relying on "worst case data" to derive the standards. But EPA explained its reasoning for relying on such data and the Court upheld EPA's actions, explaining that "EPA typically has wide latitude in determining the extent of data-gathering necessary to solve a problem." *Cement Kiln*, 255 F.3d at 867.

In *NACWA,* the Court turned to the very statutory language Environmental Petitioners rely on here and found that EPA is afforded discretion in these decisions. The Court explained that "the requirement that the existing unit floors not be less stringent than the average emissions limitation achieved by the best performing 12 percent of units does not, on its own, dictate how the performance of the best units is to be calculated." *NACWA*, 734 F.3d at 1131, quoting *Sierra Club v. EPA*, 167 F.3d 658, 661-62 (D.C. Cir. 1999) (internal quotation marks omitted).

In *U.S. Sugar,* which directed EPA to recalculate the emission standards at issue here, the Court explained that EPA's consideration of the data and generation of emission standards need only "reflect a reasonable estimate of the emissions achieved in practice by the best performing sources." *U.S. Sugar I*, 830 F.3d at 636. *See also id.*, quoting *Cement Kiln*, 255 F.3d at 871 ("Floors need not be perfect mirrors of the best-performers' emissions" and instead must only lead to a "reasonable inference as to the performance of the top 12 percent of units."); *Mossville*, 370 F.3d at 1240-42 (EPA may use estimates of emission levels that have been achieved or are achievable in establishing the emission standards.).

The Court then repeated the admonition that the specific requirement for setting MACT floors set out in section 7412 does not dictate how the performance of the best units is to be calculated. *U.S. Sugar I*, 830 F.3d at 636. Concluding that "the statute says nothing about how the Agency should determine which units are the best," the Court found that "[b]ecause the statute is ambiguous as to how the EPA should identify those units, we must defer to the Agency's choice so long as it is reasonable." *Id.* at 611.

It is reasonable for EPA to have established a regime for compliance testing and reporting so as to ensure continuing assessment of compliance with existing standards. But nowhere in the statute, EPA's regulations, or elsewhere, is there evidence of Congressional intent to impose on EPA the onerous burden of using

such compliance reporting to continuously, or even periodically, update the existing emission standards.

### 3. EPA Properly Applied the Statute to the Circumstances Presented

As outlined above, Congress established a specific process under which EPA is to update standards based on more recent data, through its periodic risk and technology review process. 42 U.S.C. §§ 7412(d)(6), (f)(2). These provisions require EPA to "take[] into account developments in practices, processes and control technologies" that may have resulted in reduction of emissions by sources over ensuing years since standards were originally promulgated. But not even these provisions *require* EPA to issue new standards. *See, e.g., Nat'l Assn. for Surface Finishing v. EPA*, 795 F.3d 1, 7-9 (D.C. Cir. 2015). Instead, the statute effectively assumes that EPA need not continually revise standards based on updated data, and instead should determine, pursuant to the parameters in these provisions, whether comprehensive revision of the standards is warranted.

EPA does not dispute that in some cases it may be appropriate to issue revised standards based on new data. Here though, EPA explained that it was recalculating the standards pursuant to a limited remand of the D.C. Circuit. That remand directed EPA to identify only those standards that would have differed if EPA had included all best-performing sources in each subcategory in its MACT-floor analysis. 87 Fed. Reg. at 60821/2-3. Because neither this remand nor the

directive in *NACWA* instructed EPA to initiate a new standard-setting process, collect or consider new data, or go beyond the limited remand in revising only *some* emission standards, it was reasonable for EPA to conclude that it was not required to collect or consider new emissions data to correct the standards that "would have differed." *Id*.; *U.S. Sugar II,* 844 F.3d at 270. And considering the original dataset avoided the very type of delay in issuing recalculated standards that Environmental Petitioners complain about. Environmental Br. at 9, 29.

More than this though, EPA found that it could be unfair to rely on updated data, given the limited reach of the remand. As noted, the Challenged Rule revised only a relatively small subset of the emission standards established for Boilers, finalizing revisions to 34 of 202 distinct emission limits, with 6 of the 34 emission standards becoming less stringent and 28 remaining the same or becoming more stringent. 87 Fed. Reg. at 60,817, 60,832/3; JA___ (Regulatory Impact Analysis at 15). This left in place 168 emission limits for other subcategories of Boilers, all of which were promulgated in the Major Boiler Rule.

Under Environmental Petitioners' argument that the subject revisions must be based on the most recent data available, a large percentage of subcategories of Boilers would be subject to standards based on the 2013 dataset (those standards finalized in the Major Boiler Rule and not revised) while subcategories of Boilers identified in the Challenged Rule would be subject to standards based on different

data (that collected in compliance reports through 2020). Given this inequitable

treatment of similarly situated Boilers, EPA's choice to rely on the original dataset

in revising the standards pursuant to the specific infirmities the Court identified, is

a reasonable approach that is consistent with the statute. And given the statutory

provisions outlined above that grant the Administrator significant discretion with

regard to how data is to be considered, EPA's determination in this instance to

recalculate the standards based on the original dataset does not conflict with any

statutory requirement.

## B.     The Recalculated Standards are Not Arbitrary or Capricious

Environmental Petitioners argue that basing the recalculated standards on

the 2013 dataset was arbitrary and capricious. As purported evidence, Petitioners

state that "22 out of the 34 remanded limits – are worse than the level every boiler

has been required to achieve for many years." Environmental Br. at 3.

While it is true that 22 of the 34 MACT floor standards were *initially*

calculated to be less stringent, Petitioners conflate the MACT floor with the final

recalculated standards. As previously outlined, only 6 of the 34 recalculated

standards result in an emission standard that is less stringent than previously

applied. Indeed, in their comments on the proposed rule, Environmental

Petitioners pointed only to these 6 emissions limits as purportedly being unlawful,

saying that "these limits do not reflect the average emission levels actually

achieved by the relevant best performing units." JA___ (EPA-HQ-OAR-2002-0058-3970, Env. Comments at 25).[16]

As EPA noted, in practice these six standards "are not effectively different," since affected sources would install the same control technology to meet either the 2011/2013 emission standards or the 2022 standards in the Challenged Rule. 87 Fed. Reg. at 60,826/3. In any case, EPA explained that there is no compliance data for these 6 limits. 87 Fed. Reg. at 60,826/3. So EPA could not have considered new emissions data in calculating these 6 limits. Indeed, EPA expressly found that there would be no emissions increases based on these six revised limits because there are no Boilers now in existence that are subject to these 6 limits. *Id.*

---

[16] Given the multiple steps involved, it is not unexpected that the recalculation of the MACT floor in response to the Court remands could, in certain circumstances, result in a higher emissions number. As EPA explained, it first reviewed the dataset to identify best performers consistent with the remand in *U.S. Sugar*, in some cases resulting in a revised ranking of sources. 85 Fed. Reg. 52,198, 52,203 (Aug. 24, 2020). EPA then applied the UPL in the manner it did for the 2013 Rule, with adjustments for limited datasets required under the Court's decisions. *Id.* After calculation of the UPL, EPA evaluated whether to apply fuel variability factors, using the same methodology as in the 2013 Rule. Finally, EPA applied its standard procedures to ensure that the available measurement methods would provide accurate emissions measurements at the levels of the standards. In some cases, the representative detection level used to ensure measurement precision changed compared to the 2013 Rule because of changes in the best performing units. *Id.* at 52,204.

When reassessing emissions standards for each source subcategory, the calculation of the MACT floor can change based on changes in identification of the best performing sources or sources, or based on adjustments to the calculation to address the concerns raised by the Court in *NACWA*, or otherwise. *See* n. 17. While in some cases the recalculations on these bases resulted in less stringent standards, in most cases they resulted in equal or more stringent standards.[17] Indeed, EPA took pains to ensure that the emissions standards would be as stringent as possible, making beyond-the-floor adjustments for 16 of the 34 adjusted standards to ensure that this was the case. 87 Fed. Reg. at 60,825-26. This had the effect of ensuring that all but the six standards references above (for which there are no emitting sources), were at least as stringent as they were in the Major Boiler Rule. Contrary to Petitioners' argument, it does not matter that EPA applied a beyond-the-floor approach to ensure that the most stringent standards were being applied, as sources must comply with these standards, which

---

[17] The Court recognized that under its remand, some emission standards might end up being less stringent, explaining that the "CAA, however, demands that source subcategories take the bitter with the sweet." *US Sugar*, 830 F.3d at 631. Thus, while it is true that the expanded pool of sources evaluated in a sub-category could result in a more stringent standard, there was no guarantee that all standards would become more stringent.

ultimately reflect the levels achieved by the best performing sources based on the 2013 dataset.[18]

Environmental Petitioners continually misstate EPA's reasoning for determining that the remanded standards should be recalculated based on the same data available at the time the original standards were developed. EPA did not, as Petitioners allege, "candidly disclose [that] it did not want to set floors reflecting the emission levels actually achieved by the best performing boilers because they could be 'more stringent.'" Environmental Br. at 13, citing 87 Fed. Reg. at 60,822/1. *See also id*. at 3, 13, 15, 17, 22, 23, 29, 30, repeating the same claim. Instead, the paragraph of the preamble repeatedly cited by Environmental Petitioners merely explains one of the bases for EPA's determination to set the recalculated standards based on the 2013 data: that reliance on updated data could lead to the inequitable outcome of some units (those affected by the remand) having to comply with standards based on one set of data and other units having to comply with standards based on a different dataset. 87 Fed. Reg. at 60,822/1. Petitioners' assertion, that EPA relied on the original dataset because it sought to

---

[18] Petitioners argue that EPA's cursory review of compliance data to confirm that sources are meeting the 2013 standards demonstrates that EPA should have used compliance data to set the floor standards. Environmental Br. at 21-24. But the processes are completely different. EPA has explained the multiple steps of the MACT floor-setting process is not a simple undertaking even where a limited number of emissions standards is involved. *See* pp. 65-66, *supra*.

implement the least stringent emission standards possible, has no basis in fact or in the record.

In the Challenged Rule EPA did not set out to establish worse (less stringent) *or* better (more stringent) emission levels. Instead, EPA's efforts were focused solely on correcting the 2011/2013 standards in response to this Court's mandate and thus to set the standards where they should have been in the first place. EPA did so by properly considering the sources to be included in each category and subcategory and otherwise addressing infirmities in the application of the UPL identified in *NACWA*. EPA applied the data as directed to by the Court and set the emission standards based on what the data required, not on some unstated mandate to make the standards more or less stringent. 87 Fed. Reg. at 60,831/1.

Petitioners do not deny that consideration of post-2013 data could present inequitable results, with different sources having standards applied based on different datasets. Instead, they declare that this is a "policy" consideration that is irrelevant in complying with the statute. Environmental Br. at 28. But as outlined above, EPA has broad discretion in assessing the nature and timing of the data to be considered in establishing emission standards. And this Court has already recognized that relying on prior data where doing otherwise would result in a set of inequitable standards, applied differently to various classes or types of sources,

was a sound basis for relying on a single original dataset.  *See* pp. 69-70, *supra*.

EPA's actions do not represent an unsupported policy determination.

Rather, they represent a reasonable application of the statutory requirements

which this Court has upheld in similar contexts, for similar reasons, that are

consistent with the statute.  In this case EPA revised a subset of the appliable

emission standards in a fair and expedient manner and it was not arbitrary and

capricious for the Agency to do so.

## **CONCLUSION**

For the foregoing reasons, the petitions for review of all parties should be

denied.

Respectfully submitted,

OF COUNSEL:                                    TODD KIM
                                               Assistant Attorney General
SUSMITA DUBEY
LUCAS MAY                                      /s/ *Perry M. Rosen*
U.S. Environmental Protection Agency           PERRY M. ROSEN
Office of General Counsel                      United States Department of Justice
William Jefferson Clinton Building             Environment & Natural Resources Div.
1200 Pennsylvania Ave., NW                     Environmental Defense Section
Mail Code 2344A                                P.O. Box 7611
Washington, D.C. 20460                         Washington D.C.  20044

DATE: Sept. 18, 2023

## <u>CERTIFICATE OF COMPLIANCE UNDER FED. R. APP. P. 37(A)(7)(b)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) and the Court's Order of June 20, 2023 (Doc. 2004070) because this brief contains 19,322 words, excluding the parts of the brief exempt under Fed. R. App. P. 32 (a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in proportionally spaced typeface using Microsoft Word 14-point Times New Roman type.

So certified this 18th day of September, 2023 by

/s/   *Perry M. Rosen*
Perry M. Rosen
Counsel for Respondents

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing Brief of Respondent Environmental Protection Agency, et al., was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of said filing to the attorneys of record for Petitioners and all other parties, who have registered with the Court's CM/ECF system.

So certified this 18th day of September, 2023, by

/s/   *Perry M. Rosen*
Perry M. Rosen
Counsel for Respondents