<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| U.S. SUGAR CORP., <br><br> *Petitioner*, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, <br><br> *Respondent*. | Case No. 22-1271 |

**MOTION OF SIERRA CLUB TO INTERVENE IN SUPPORT OF RESPONDENT**

Pursuant to Federal Rules of Appellate Procedure 15(d) and 27, and Rule 15(b) of this Court, Sierra Club hereby moves for leave to intervene in support of Respondent U.S. Environmental Protection Agency ("EPA" or "the agency") in case 22-1271. Petitioner U.S. Sugar Corp. opposes this motion and EPA takes no position on it.

**INTRODUCTION**

In this case, U.S. Sugar Corp. challenges EPA's final rule entitled "National Emission Standards for Hazardous Air Pollutants: Industrial, Commercial, and Institutional Boilers and Process Heaters" and published at 87 Fed. Reg. 60,816 (Oct. 6, 2022). The rule revises EPA's air toxics standards for industrial, commercial and institutional boilers and process heaters ("Industrial Boilers") in response to this Court's remands of these standards in *U.S. Sugar v. EPA*, 830 F.3d

579 (D.C. Cir. 2016), *on rehearing en banc*, 671 Fed. Appx. 822 (mem) (2016); and *Sierra Club v. EPA*, 884 F.3d 1185 (D.C. Cir. 2018). *See* 87 Fed. Reg. at 60,816/3. Of particular relevance here, EPA's rule strengthens 28 limits governing the emissions of hazardous air pollutants from Industrial Boilers. *Id.* at 60,817/1.

Sierra Club has worked for decades to protect public health and the environment from the hazardous air pollution emitted by Industrial Boilers. It commented on EPA's proposed response to the remands in *U.S. Sugar* and *Sierra Club*, and (with other groups) brought the litigation that led to these remands. EPA-HQ-OAR-2002-0058-3970, Comments of California Communities Against Toxics, Sierra Club, and Earthjustice ("Sierra Club Comments"). Sierra Club also successfully challenged EPA's initial emission standards for Industrial Boilers, which this Court vacated in *NRDC v. EPA*, 489 F.3d 1250 (D.C. Cir. 2007).

Sierra Club's members live, work, and recreate in communities where Industrial Boilers are operated at major sources of hazardous air pollutants, and these members are exposed to Industrial Boilers' toxic emissions. Such exposure is harm in itself, and also threatens their health and diminishes their ability to enjoy recreational activities and daily life in their own homes and communities. If U.S. Sugar prevailed in its challenge, Industrial Boilers likely would be allowed to emit more toxic pollution, increasing these harms. Sierra Club therefore requests leave to intervene in this case to respond to petitioner's arguments.

## BACKGROUND

According to EPA, Industrial Boilers continue to emit more than 1900 tons of toxic metals per year, more than 10,000 tons of hydrogen fluoride, more than 15,000 tons of hydrogen chloride, and more than 40,000 tons of hydrocarbons, including such highly toxic chemicals as benzene and formaldehyde. *See* EPA-HQ-OAR-2002-0058-3383, App. B-5; 78 Fed. Reg. 7138, 7154 (Jan. 31, 2013) (showing anticipated emission reductions); 87 Fed. Reg. at 60,833-34 & tbl.6. Industrial Boilers also emit mercury, dioxins, polychlorinated biphenyls, and polycyclic matter ("POM"), all of which Congress singled out in § 112(c)(6) of the Clean Air Act, 42 U.S.C. § 7412(c)(6), because of their potent toxicity, persistence in the environment, and tendency to bioaccumulate in animals and people.

The challenged rule is EPA's response to the remands in *U.S. Sugar* and *Sierra Club*. 87 Fed. Reg. at 60,816/3. In *U.S. Sugar*, this Court found that many of the individual emission limits in EPA's Industrial Boilers rule did not reflect the average emission levels actually achieved by the Industrial Boilers with the lowest emission levels. 830 F.3d at 630-632. For example, in determining the statutory minimum stringencies ("floors") for its limits for "solid fuel" units, EPA excluded many of the units in this subcategory that were burning cleaner fuels and achieving lower emission levels from its analysis. *Id.* Because Clean Air Act § 112(d)(3) unambiguously requires EPA's emission limits to reflect the average emission

3

levels achieved by the relevant best performing sources, those with the lowest emissions, EPA's floor approach was unlawful. 42 U.S.C. § 7412(d)(3); *U.S. Sugar*, 830 F.3d at 630-632. *See Sierra Club v. EPA*, 479 F.3d 875, 880-81 (D.C. Cir. 2007).

In response to the remand, EPA states that it revised its rankings of the best-performing units to include units it previously excluded. 87 Fed. Reg. at 60,820-21. *See generally* EPA-HQ-OAR-2002-0058-3948, Revised MACT Floor Analysis (2019) for the Industrial, Commercial, and Institutional Boilers and Process Heaters National Emission Standards for Hazardous Air Pollutants – Major Source. As a result, 28 of the 34 defective emission limits in EPA's Industrial Boilers rule became more stringent. 87 Fed. Reg. at 60,817.

Because U.S. Sugar has not yet filed its statement of issues in the present case, Sierra Club does not know what aspects of the Industrial Boilers rule U.S. Sugar Corp. plans to challenge. During the rulemaking, however, U.S. Sugar Corp. objected to EPA's interpretation of the statutory term "new source" under Clean Air Act § 112(a)(4). Whereas EPA interprets "new source" to refer to any source for which construction commenced after June 4, 2010, the date EPA proposed its current emission standards for Industrial Boilers, U.S. Sugar claims it should apply only to boilers for which construction commenced after August 24, 2020, the date EPA proposed its response to the remand in *U.S. Sugar*. EPA-HQ-OAR-2002-

4

0058-3969, Comments of U.S. Sugar Corp. ("U.S. Sugar Comments") at 3-7. U.S. Sugar Corp also objected to the stringency of EPA's hydrogen chloride limits for new solid fuel boilers and, more generally, to the agency's approach to determining the statutory minimum stringencies ("floors") of its emission limits under § 112(d)(3). *Id.* at 7-18. The Florida Sugar Industry, of which U.S. Sugar Corp. is a member, raised similar issues in its comments. EPA-HQ-OAR-2002-0058-3966, Comments of Florida Sugar Industry.

U.S. Sugar Corp.'s arguments have significant legal and practical implications. For example, "new source" floors must reflect the emission level achieved by the single best performing unit in a category or subcategory. 42 U.S.C. § 7412(d)(3). "Existing source" floors, however, reflect either the best performing 12 percent of units for which EPA has emissions information or, in some circumstances, the best performing 5 for which EPA has or could reasonably obtain emissions information. *Id.* § 7412(d)(3)(A)-(B). Thus, "existing source" floors are usually less stringent than "new source" floors.

If the Court were to accept U.S. Sugar Corp.'s argument that Industrial Boilers built between 2010 and 2020 are "existing sources" rather than "new sources," boilers built in this time period would be allowed to comply with less stringent emission limits. U.S. Sugar Comments. Also, if the Court were to accept U.S. Sugar Corp.'s arguments that EPA miscalculated the stringency of its floors

5

for one or more of the limits in the Industrial Boilers rule, it could vacate those limits or direct EPA to weaken them.

## ARGUMENT

### I. STANDARD APPLICABLE TO A MOTION TO INTERVENE

Under Federal Rule of Appellate Procedure 15(d) and this Circuit's rules, a motion to intervene need only include "a concise statement of the interest of the moving party and the grounds for intervention." Fed. R. App. 15(d); D.C. Cir. R. 15(b). Further, "in the intervention area the 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967) (reversing intervention denial under Fed. R. Civ. P. 24(a)); *see also Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312 (D.C. Cir. 2015) (describing test for intervention).

### II. SIERRA CLUB MEETS THE REQUIREMENTS FOR INTERVENTION.

**A.     This Motion is Timely Filed and Will Not Cause Delay.**

Because U.S. Sugar Corp. filed its petition for review on October 24, 2022, this motion is timely filed on November 22, 2022. Fed. R. App. P. 15(d). No briefing schedule has been set, and Sierra Club's participation will be consistent with the efficient adjudication of this case.

**B.     Sierra Club Has Legally Protected Interests in Defending the Rule.**

Sierra Club has long worked to protect its members and the environment from hazardous air pollution generally and the toxic pollution emitted by Industrial Boilers in particular. *See, e.g.*, *U.S. Sugar*, 830 F.3d at 606-610; *Sierra Club*, 884 F.3d at 1188-1189; *NRDC*, 489 F.3d at 1254-1255; *National Lime Ass'n v. EPA*, 233 F.3d 625 (D.C. Cir. 2000). Sierra Club participated in EPA's rulemaking to respond to the remand orders in *U.S. Sugar* and *Sierra Club* by submitting extensive comments that urged EPA to make its standards more protective. Sierra Club Comments at 1-27.

U.S. Sugar Corp. urged EPA to make the standards weaker. In comments on EPA's proposed response to the remand in *U.S. Sugar*, it argues that Industrial Boilers built between 2010 and 2020 should be allowed to meet the less stringent emission limits that apply to existing sources and given an additional 3 years to comply. U.S. Sugar Comments at 3-7. It also argues that EPA weaken its hydrogen chloride limit for new solid fuel-fired boilers. *Id.* at 7-18.

Sierra Club members and their families live, work, and recreate near Industrial Boilers operated at major sources of hazardous air pollutants, including solid fuel-fired units for which construction commenced between 2010 and 2020. They are harmed by exposure to the hazardous air pollutants these Industrial Boilers emit. Further, emissions from these Industrial Boilers diminish their ability

7

to enjoy their daily lives in their homes and communities. *See* Vreeland Declaration, Dziadek Declaration, Hargrove Declaration, Roff Declaration.

If U.S. Sugar Corp. prevailed in this litigation, Industrial Boilers would be allowed to emit more hazardous air pollutants into the communities where Sierra Club members live, work, and recreate. As a result, the harm that toxic emissions from Industrial Boilers cause Sierra Club members would be increased and prolonged. *See* Vreeland Declaration, Dziadek Declaration, Hargrove Declaration, Roff Declaration. Accordingly, Sierra Club has legally protected interests in defending the rule against U.S. Sugar Corp.'s challenge. This Court has granted intervention in cases where "a [petitioner] seeks relief, which, if granted, would injure the prospective intervenor." *Crossroads*, 788 F.3d at 317-18 (allowing intervention to prevent injury).

Sierra Club does not believe that intervenors in petitions for review of agency action such as this one need to show Article III standing. To the extent this Court has required and continues to require respondent-intervenors to do so, however, this motion and the accompanying declarations illustrate that Sierra Club's interests at stake in this matter establish standing. *See* Vreeland Declaration, Dziadek Declaration, Hargrove Declaration, Roff Declaration; *Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167, 183 (2000) ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they

8

use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity" (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *NRDC v. EPA*, 749 F.3d 1055, 1062 (D.C. Cir. 2014) (finding standing where environmental groups' members alleged they would be harmed by higher emissions allowed by affirmative defense provision in challenged air rule).[1]

## C. Movants' Interests May Not Be Adequately Protected.

Sierra Club cannot rely on EPA to protect its interests in this litigation. Although EPA strengthened some of the emission limits in the Industrial Boilers rule, it did not do so voluntarily. Rather, it did so only in response to the remand in *U.S. Sugar* and only after vigorously defending unlawfully weak emission limits in

---

[1] Recent cases in the Supreme Court strongly imply that because parties seeking to intervene as respondents do not seek any relief, they do not need to show standing. In *Town of Chester v. Laroe Estates*, 137 S. Ct. 1645, 1650-1651 (2017), the Supreme Court traced the requirement that plaintiff-intervenors demonstrate standing to the principle that "[f]or all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." *Id.* at 1647. It suggested that a party that did not seek different relief from plaintiffs would not need to show standing. *Id.* at 1651 (citing *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 402 n.22 (1982)). From the reasoning in *Town of Chester*, it follows that intervenor-respondents—which do not seek any relief at all—have even less reason to show standing. *See also McConnell v. FEC*, 540 U.S. 93, 233 (2003) ("It is clear … that the Federal Election Commission (FEC) has standing, and therefore we need not address the standing of the intervenor-defendants, whose position here is identical to the FEC's."), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010); *Clinton v. City of New York*, 524 U.S. 417, 431-32 n.19 (1998) ("we need not consider whether the appellee unions also have standing to sue").

the litigation. Given this history, it is not clear whether or how the agency will defend this action in court.

The adequacy of representation test is "not onerous. *Crossroads*, 788 F.3d at 312. A movant need show only that representation "may be" inadequate. *Dimond v. District of Columbia*, 792 F.2d 179, 192-93 (D.C. Cir. 1986) (citation omitted). In recognition of potentially divergent governmental and other interests, this Court "ha[s] often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003); *see also United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1293 (D.C. Cir. 1980) (allowing intervention where "the United States does not face the identical harm that [movants] would suffer"). The divergence of interests between EPA and Sierra Club is especially clear here, where the two have been directly opposed on the stringency of EPA's emission standards for Industrial Boilers in multiple prior cases. *See U.S. Sugar*, 830 F.3d at 606-610; *Sierra Club*, 884 F.3d at 1188-1189; *NRDC*, 489 F.3d at 1254-1255

Finally, because it represents people who live, work, and recreate near Industrial Boilers and are exposed to their toxic emissions, Sierra Club will offer a distinct perspective that may be of assistance to this Court. *See, e.g.*, *NRDC v. Costle*, 561 F.2d 904, 912-13 (D.C. Cir. 1977).

## CONCLUSION

Sierra Club respectfully request leave to intervene as a respondent in support of EPA in this case.

DATED: November 22, 2022        Respectfully submitted,

/s/ *James S. Pew*
James S. Pew
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 667-4500
jpew@earthjustice.org

*Counsel for Sierra Club*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Counsel hereby certifies, in accordance with Federal Rules of Appellate Procedure 32(g)(1) and 27(d)(2)(A), that the foregoing **Motion to Intervene in Support of Respondent** contains 2,319 words, as counted by counsel's word processing system, and thus complies with the 5,200 word limit.

Further, this document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) & (a)(6) because this document has been prepared in a proportionally spaced typeface using **Microsoft Word 2016** using **size 14 Times New Roman** font.

DATED: November 22, 2022

/s/ *James S. Pew*
James S. Pew