## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**Case No. 22-1271**
**(and consolidated cases)**

UNITED STATES SUGAR CORPORATION,
*Petitioner*,

v.

ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

**PETITIONER UNITED STATES SUGAR CORPORATON'S
MOTION TO STAY EFFECTIVE DATE OF THE BOILER MACT RULE
PENDING REVIEW OR, ALTERNATIVELY, FOR AN EXPEDITED
BRIEFING SCHEDULE**

United States Sugar Corporation ("U.S. Sugar") petitioned the Court for judicial review of EPA's final rule entitled National Emission Standards for Hazardous Air Pollutants for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters, 87 Fed. Reg. 60,816 (Oct. 6, 2022) (the "Boiler MACT Rule"). Pursuant to 5 U.S.C. § 705, Federal Rule of Appellate Procedure 18, and Circuit Rule 18, U.S. Sugar moves to stay the effective date of the Rule with respect to Boiler 9 at its Clewiston, Florida sugar mill pending the Court's resolution of its petition on the merits. U.S. Sugar previously requested a stay from EPA (Ex. A). To date, EPA has failed to afford the relief requested. On

January 3, 2023, EPA's counsel notified U.S. Sugar that EPA "is not in a position to provide a response at this time."

Alternatively, if the Court declines to issue a stay, U.S. Sugar requests an expedited briefing schedule so that its narrow challenges to the Rule can be resolved as expeditiously as possible to allow sufficient time to comply with the Rule if its petition is denied. U.S. Sugar proposes filing its opening brief within 60 days of the Court acting on this request, with EPA filing its response brief 45 days later, and U.S. Sugar filing its reply brief 21 days after that. Because other parties are not expected to raise the issues to be presented by U.S. Sugar, it would be appropriate to sever those issues for the expedited treatment requested.

EPA has informed U.S. Sugar that it objects to either a stay or expedited briefing, and intends to file a response addressing both requests.[1]

---

[1] U.S. Sugar also consulted with the parties in the consolidated cases concerning its motion for a stay or expedited briefing. The environmental petitioners in case No. 22-1303 oppose U.S. Sugar's motion for a stay but do not oppose U.S. Sugar's request for expedited briefing provided their case is severed. The Trade Association Petitioners have informed U.S. Sugar that they do not oppose the motion for a stay of the Rule. The Trade Association Petitioners have also informed U.S. Sugar that they do not oppose the motion for expedited briefing but solely as it relates to the issues that U.S. Sugar is raising in its own petition. To the extent expedited briefing would apply to the Trade Association Petitioners' issues and their case No. 22-1302, the Trade Association Petitioners oppose the motion for expedited briefing.

**INTRODUCTION**

U.S. Sugar's petition challenges a narrow part of the Boiler MACT Rule—the Rule's revised emission standard for hydrogen chloride ("HCl") that applies to "new" solid fuel boilers. EPA first proposed the revised HCl standard in 2020, which is nearly ***100 times*** more stringent than prior standards. Although emission standards for "new sources" typically apply only to sources constructed ***after*** a standard's effective date (*i.e.*, to sources that are actually "new"), EPA applied the revised HCl standard to all solid fuel boilers constructed after June 4, 2010—more than twelve years ago. EPA required that operators demonstrate compliance with the revised HCl standard within three years of the Rule's effective date.

EPA's retroactive application of its nearly 100-times more stringent HCl standard for "new sources" violates the Clean Air Act. It also puts U.S. Sugar in a precarious position. U.S. Sugar began construction of Boiler 9 in 2016 and placed it into service in 2019 in reliance on then-existing emissions standards for "new sources." Boiler 9 fully complies with those standards. In fact, it is already the cleanest-burning bagasse-fueled boiler in the country. *See* Decl. of Michael Ballenger ¶ 9 (Ex. B). To attempt to comply with the revised HCl standard within EPA's three-year deadline, U.S. Sugar will be required to embark immediately on a lengthy, burdensome, and costly process to study, design, purchase, and install new emission controls, if compliance is possible at all. U.S. Sugar anticipates that

attempting to comply with the revised HCl standard for Boiler 9 will cost at least $20 million and potentially disrupt its business operations.

U.S. Sugar seeks to stay the Boiler MACT Rule's effective date with respect to Boiler 9 pending the Court's resolution of its petition. Staying the Rule's effective date will allow U.S. Sugar a fair opportunity to seek judicial review while ensuring that it has the full three years allowed by EPA to comply with the revised HCl standard if its petition is denied. The requested relief is necessary because U.S. Sugar is likely to prevail on the merits and will suffer irreparable harm if it is forced to begin the onerous process of attempting to comply with the revised HCl standard while its petition challenging that very standard is pending.

## BACKGROUND

### *Existing Standards When U.S. Sugar Constructed Boiler 9*

Section 112(d) of the Clean Air Act requires EPA to establish emission standards for major sources that reflect the application of maximum achievable control technology ("MACT"). *See* 42 U.S.C. § 7412(d)(2). For "new sources," MACT standards cannot be "less stringent that the emission control that is achieved in practice by the best controlled similar source." *Id.* § 7412(d)(3). For "existing sources," MACT standards "may be less stringent" but "not less stringent … than … the average emission limitation achieved by the best performing 12 percent of the existing sources." *Id.* § 7412(d)(3)(A).

EPA originally promulgated MACT standards for industrial boilers on September 13, 2004. *See* National Emission Standards for Hazardous Air Pollutants for Industrial, Commercial, and Institutional Boilers and Process Heaters, 69 Fed. Reg. 55,218 (Sept. 13, 2004), *as amended* 70 Fed. Reg. 76,918 (Dec. 28, 2005). This Court vacated and remanded EPA's 2004 MACT standards. *See NRDC v. EPA*, 489 F.3d 1250 (D.C. Cir. 2007).

EPA promulgated updated MACT standards for industrial boilers on March 21, 2011, which had been proposed on June 4, 2010. *See* National Emission Standards for Hazardous Air Pollutants for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters, 76 Fed. Reg. 15,608 (Mar. 21, 2011), *as amended* 78 Fed. Reg. 7,138 (Jan. 31, 2013) and 80 Fed. Reg. 72,789 (Nov. 20, 2015) ("2011 MACT standards"). Relevant here, the 2011 MACT standards established an HCl emission limit of 0.022 lb/MMBtu for "new" solid fuel boilers constructed after June 4, 2010. *See* Boiler MACT Rule, 87 Fed. Reg. at 60,832, Tbl. 4. The 2011 MACT standards drew many court challenges. *See U.S. Sugar Corp. v. EPA*, No. 11-1108 (D.C. Cir. filed Apr. 14, 2011) (lead case).

### *U.S. Sugar Constructs Boiler 9 Based On Existing Standards*

U.S. Sugar commenced construction of Boiler 9 at its Clewiston sugar mill in 2016 and began operating the boiler in 2019. Ballenger Decl. ¶ 8. U.S. Sugar uses Boiler 9 to burn bagasse (the leftover byproduct from milling sugarcane) to

provide required steam and heat for its sugar mill. *See* Oct. 23, 2020 Comments submitted by Trinity Consultants on behalf of U.S. Sugar, at 1, EPA Doc. ID No. EPA-HQ-OAR-2002-0058 ("U.S. Sugar Comments") (Ex. C).

U.S. Sugar invested over $65 million to design, construct, and commission Boiler 9 with state-of-the-art air pollution control technology. Ballenger Decl. ¶ 9. In fact, Boiler 9 is the best-controlled bagasse-fueled boiler in the country and is cleaner-emitting than the boilers used by U.S. Sugar's competitors to this day. *Id.* Boiler 9 replaced three older boilers (Boilers 1, 2, and 4) at the Clewiston facility, resulting in significant emission reductions for a variety of pollutants, including carbon monoxide, volatile organic compounds, and particulate matter. *See, e.g.*, U.S. Sugar Comments at 5, Tbl. 1; Ballenger Decl. ¶ 10.

U.S. Sugar designed and built Boiler 9 to comply with the 2011 MACT standards that applied to "new" solid fuel boilers at the time (*e.g.*, 2015-19). Ballenger Decl. ¶ 11. Initial compliance testing conducted after Boiler 9 was commissioned in 2019 confirmed that Boiler 9 complied with all applicable emission standards, including the HCl emission limit of 0.022 lb/MMBtu for "new" solid fuel boilers. *Id.*

### EPA Seeks To Retroactively Apply The Revised HCL Standard

On July 29, 2016—well after U.S. Sugar had started planning and preparing for construction of Boiler 9—this Court issued its decision on the challenges to the

2011 MACT standards. *See U.S. Sugar Corp. v. EPA*, 830 F.3d 579 (D.C. Cir. 2016), *revised in part on rehearing en banc*, 844 F.3d 268 (D.C. Cir. 2016). As EPA acknowledges, this Court "upheld [the 2011 MACT standards] against all challenges brought by industry petitioners and virtually all challenges brought by environmental petitioners," but "vacated the MACT floor emission limits for those subcategories where the EPA had excluded certain units from its MACT-floor calculation because those units burned less than 90 percent of the subcategory defining fuel." Boiler MACT Rule, 87 Fed. Reg. at 60,819; *see U.S. Sugar Corp.*, 830 F.3d at 667. This Court later revised its decision to remand the affected standards without vacating them. *U.S. Sugar*, 844 F.3d at 270.

This Court did ***not*** vacate or remand the HCl standard for "new" solid fuel boilers. In fact, EPA represented to the Court (and the parties) that the HCl standard for "new" solid fuel boilers was ***not*** affected by the Court's decision. *See* Decl. of Panagiotis E. Tsirigotis ¶ 9, *U.S. Sugar Corp. v. EPA*, 830 F. 3d 579 (D.C. Cir. 2016) (No. 11-1108), Doc. No. 1635275 (Ex. D).[2]

---

[2] In contrast to *new* solid fuel boilers, which EPA represented would not be affected by the Court's decision, EPA represented that the HCl standard for *existing* solid fuel boilers would be affected but only by "approximately … 10 percent," which "will not likely impact the controls needed to comply with the revised standards." Tsirigotis Decl. ¶ 11. EPA made these determinations based on a "preliminary analysis" (*id.* ¶ 7), but never notified the Court (or the parties) of any change to its analysis before issuing the proposed Rule in 2020.

On August 24, 2020—after U.S. Sugar had already begun operating Boiler 9—EPA first proposed revised MACT standards for industrial boilers in response to the Court's decision in *U.S. Sugar.* EPA promulgated those standards on October 6, 2022, with a December 5, 2022 effective date. *See* Boiler MACT Rule, 87 Fed. Reg. at 60,816. Most of the revised standards represent minor adjustments. *See* Ballenger Decl. ¶ 5. With respect to HCl, however, EPA revised the emission limit for "new" solid fuel boilers to nearly ***one-hundredth*** of the previous standard—0.00021 lb/MMBty (compared to .022 lb/MMBty). Boiler MACT Rule, 87 Fed. Reg. at 60,832, Tbl. 4. EPA concedes that its revised HCl emission limit for "new" solid fuel boilers first proposed in 2020 is "significantly more stringent" than prior standards. *Id.* at 60,831.

EPA also announced that solid fuel boilers constructed after June 4, 2010 would be considered "new sources" subject to the significantly more stringent HCl standard. *See* Boiler MACT Rule, 87 Fed. Reg. at 60,830. As an "allowance," EPA provided that "facilities have up to 3 years after the effective date of the final rule to comply with the revised emission limits." *Id.* at 60,832.

## ARGUMENT

By statute, reviewing courts may "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Similarly, Federal Rule of Appellate

Procedure 18(a)(2) authorizes courts to issue stays pending review. In considering motions for stays pending review, the Court considers "the likelihood that the moving party will prevail on the merits; (ii) the prospect of irreparable injury to the moving party if relief is withheld; (iii) the possibility of harm to other parties if relief is granted; and (iv) the public interest." Circuit Rule 18(a)(1).

In evaluating whether to stay a rule, courts generally apply "a sliding scale under which a particularly strong showing in one area can compensate for weakness in another," provided that "at least some" irreparable injury has been shown. *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 11-12 (D.D.C. 2009) (internal quotation marks and citations omitted).

Here, all four of the stay factors strongly support U.S. Sugar's request to stay the Boiler MACT Rule's effective date with respect to Boiler 9 pending review of its petition on the merits. Staying the Rule's effective date will allow U.S. Sugar a fair opportunity to seek judicial review while ensuring that it has the full three years allowed by EPA to attempt to comply with the significantly more stringent HCl standard if its petition is denied. *See, e.g.*, *R.J. Reynolds Tobacco Co. v. FDA*, 823 F. Supp. 2d 36, 39 (D.D.C. 2011) (enjoining enforcement of rule requiring heightened warnings on tobacco products within fifteen months "until fifteen months *after* resolution of plaintiffs' claims on the merits"), *vacated on other grounds*, 696 F.3d 1205 (D.C. Cir. 2012).

## I.    U.S. Sugar Is Likely To Prevail On The Merits.

EPA's attempt to treat U.S. Sugar's Boiler 9 as a "new source" subject to the revised HCl emission standard for "new" solid fuel boilers first proposed in 2020 violates the plain language of the Clean Air Act.

Sections 112(i)(1)-(2) of the Act govern the "schedule for compliance" for "new sources." 42 U.S.C. §§ 7412(i)(1)-(2). Section 112(i)(1) provides the general rule that "new sources" are typically subject to emission standards in effect when the source is constructed:

> ***After the effective date*** of any emission standard, limitation, or regulation … , no person may construct any new major source … subject to such emission standard, regulation or limitation unless the Administrator (or a State with a permit program approved under subchapter V) determines that such source, if properly constructed … , will comply with the standard, regulation or limitation.

*Id.* § 7412(i)(1) (emphasis added); *accord* 40 C.F.R. § 63.5(b)(3) ("***After the effective date*** of any relevant standard … , no person may, without obtaining written approval in advance from the Administrator … [c]onstruct a new affected source that is major-emitting and subject to such standard") (emphasis added).

Section 112(i)(2) provides a limited, "special rule" if an emission standard becomes "more stringent" between a rule's proposal and promulgation. 42 U.S.C. § 7412(i)(2). In that circumstance, "a new source which commences construction … ***after a standard, limitation or regulation applicable to such source is***

10

*proposed* and before such standard, limitation or regulation is promulgated shall not be required to comply with [the more stringent] promulgated standard until the date 3 years after the date of promulgation." *Id.* (emphasis added); *accord* 40 C.F.R. § 63.5(b)(1) ("A new affected source for which construction commences *after proposal* of a relevant standard is subject to relevant standards for new affected sources, including compliance dates.") (emphasis added).

Importantly, in response to U.S. Sugar's comments, EPA conceded that Section 112(i)(2)'s limited, "special rule" does not apply to Boiler 9. *See* Boiler MACT Rule, 87 Fed. Reg. at 60,830 ("EPA agrees that section 112(i)(2) does not address the commenter's request"); U.S. Sugar Comments at 3-4. That is because the revised HCl standard did not become more stringent between the Boiler MACT Rule's proposal in 2020 and promulgation in 2022. Nor did U.S. Sugar construct Boiler 9 between the 2020 proposal and 2022 final rule. Instead, the revised HCl standard became more stringent (by a factor of 100) compared to the mature, final rule promulgated in 2011 (as amended in 2013 and 2015). EPA's concession is dispositive. Because Section 112(i)(2)'s limited, "special rule" does not apply, U.S. Sugar's Boiler 9 falls under Section 112(i)(1)'s general rule and is subject to the emission standards in effect when it was constructed. EPA does not—and cannot—point to any other applicable exception to Section 112(i)(1).

Seeking to avoid this straightforward, plain-language application of Section 112(i), EPA relies on the definition of "new source" in Section 112(a)(4). *See* Boiler MACT Rule, 87 Fed. Reg. at 60,830-31. Section 112(a)(4) defines "new source" as "a stationary source the construction … of which is commenced after the Administrator first proposes regulations … establishing an emission standard applicable to such source." 42 U.S.C. § 7412(a)(4). EPA contends that it "first proposed" emission standards for industrial boilers on June 4, 2010 and that all boilers constructed after June 4, 2010 are therefore subject to the revised HCl standard first proposed in 2020 and finalized in 2022. *See* Boiler MACT Rule, 87 Fed. Reg. at 60,830-31.

EPA's interpretation is contrary to Section 112's explicit language. Under Section 112(a)(4), EPA "first proposed" the 100-times-more stringent HCl standard *in 2020*, not 2010. 42 U.S.C. § 7412(a)(4). Nothing in Section 112 allows EPA to retroactively apply a significantly more stringent emission standard first proposed in 2020 based on the date an earlier, mature final rule was proposed. Section 112(i)(2) provides a limited, "special rule" where a standard becomes more stringent between proposal and promulgation, but EPA concedes that did not happen here. *See* Boiler MACT Rule, 87 Fed. Reg. at 60,830. EPA is ultimately attempting to fashion a new exception to Section 112(i)(1) that appears nowhere in the statute. EPA's attempt to subject Boiler 9 to a significantly more stringent

"new source" HCl standard first proposed in 2020 ignores, and violates, Section 112(i)(1), 42 U.S.C. § 7412(i)(1).[3]

EPA finds it significant that on rehearing *en banc* in *U.S. Sugar,* this Court decided—with the parties' agreement—to remand without vacating the 2011 MACT standards affected by its holdings. *See* Boiler MACT Rule, 87 Fed. Reg. at 60,831; *U.S. Sugar*, 844 F.3d at 270 ("Vacating the standards at issue here would unnecessarily remove many limitations on emissions of hazardous air pollutants from boilers and allow greater emissions of those pollutants until EPA completes another rulemaking and implements replacement standards.").

But the Court's decision to leave the 2011 MACT standards in place while "EPA complete[d] another rulemaking" supports U.S. Sugar, not EPA. The HCl standard for "new" solid fuel boilers was not remanded by the Court in the first place, and EPA represented that the standard was not affected. *See* Tsirigotis Decl. ¶ 9. And even if the standard were affected, the Court's decision to remand without vacating affected standards ensured that source operators ***continued to comply with the 2011 MACT standards***. U.S. Sugar did exactly that when it designed, built, and commissioned Boiler 9 in 2015-19. Indeed, in seeking remand without vacatur, EPA represented that "a remand would not create undue hardship for

---

[3] U.S. Sugar's petition also challenges the revised HCl standard itself. U.S. Sugar's objections to the HCl standard are set forth in detail in its comments to the proposed Rule. *See* U.S. Sugar Comments at 7-17.

source operators" and that "[i]t is not unreasonable for covered sources to continue to comply with the statutorily-mandated standards." EPA's Petition for Panel Rehearing as to Remedy at 1-2, 12, *U.S. Sugar Corp. v. EPA*, 830 F.3d 579 (D.C. Cir. 2016) (No. 11-1108), Doc. No. 1635275. In making these representations, EPA gave no hint that it would later seek to retroactively apply a significantly more stringent HCl standard for "new" solid fuel boilers first proposed in 2020 to all solid fuel boilers constructed after June 4, 2010.

## II.    U.S. Sugar Will Suffer Irreparable Harm Without A Stay Of The Rule's Effective Date.

U.S. Sugar would be irreparably and seriously harmed if it is required to attempt to comply with the nearly 100-times more stringent HCl standard for "new" solid fuel boilers while its petition is pending. "Economic harm may … be irreparable if the loss is serious in terms of its effect on the [petitioner]. And courts … have considered administrative and compliance costs … part of the irreparable harm analysis." *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 67 (D.D.C. 2020) (internal quotation marks and citation omitted); *see District of Columbia v. USDA*, 444 F. Supp. 3d 1, 39 (D.D.C. 2020) (finding irreparable harm "in the form of significant regulatory and administrative burdens").

Furthermore, "[f]inancial injury" is "irreparable where no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d

544, 555 (D.C. Cir. 2015) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)); *see In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) ("financial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date") (alteration and quotation marks omitted). That is true here. U.S. Sugar's injuries cannot be remedied at the end of this litigation if it succeeds on the merits. Its harm will be irreparable because it cannot recover money damages from the United States government due to sovereign immunity. *See, e.g.*, *Whitman-Walker Clinic, Inc. v. DHHS*, 485 F. Supp. 3d 1, 57-59 (D.D.C. 2020) (citing cases).

The financial costs and disruptive administrative burden of complying with the revised HCl standard for "new" solid fuel boilers—which U.S. Sugar can never recover if it succeeds in this litigation—are substantial.

In the Boiler MACT Rule, EPA acknowledged that "some facilities [with 'new' boilers constructed after 2010] may require additional add-on controls or monitoring equipment to be designed, purchased, and installed in order to meet the more stringent emission limits." 87 Fed. Reg. at 60,832. EPA therefore allowed up to three years to demonstrate compliance with revised standards. *Id.*

Without a stay, U.S. Sugar will be required to embark immediately on a lengthy, burdensome, and costly process to study, design, purchase, and install new emission controls on Boiler 9 to attempt to meet the nearly 100-times more

stringent HCl standard, if compliance is possible at all.[4] The required process and the related costs and disruption to U.S. Sugar's operations are spelled out in detail in the attached declaration of Michael Ballenger (at ¶¶ 12-28). Attempting to meet the revised HCl standard within the three-year deadline would generally require five steps: (1) scientific evaluation; (2) engineering add-on controls; (3) permitting; (4) construction; and (5) commissioning the new system. *Id.* A summary of the expected project schedule—based on best-available estimates for an aggressive schedule to meet the compliance deadline—is below:

**Estimated Project Schedule (Ballenger Decl. ¶ 27)**



---

First, U.S. Sugar would need to scientifically evaluate HCl emissions from Boiler 9 under varying operating conditions to allow it to engineer add-on controls. Ballenger Decl. ¶ 14(a). U.S. Sugar anticipates that it will be required to perform five rounds of testing to gather sufficient data, which is estimated to cost $500,000 and require three to six months to complete. *Id.* ¶ 15.

Second, U.S. Sugar would need to work with manufacturers to engineer a new pollution control system to attempt to meet the revised HCl standard. Ballenger Decl. ¶¶ 14(b), 16-20. Traditional methods for controlling HCl include wet scrubbers or lime injection. *Id.* ¶ 16. Neither method is "off-the-shelf" for a custom boiler like Boiler 9, nor have they been applied to bagasse-fueled boilers to meet HCl emission levels anywhere close to the revised HCl standard. *Id.* If traditional methods (which would likely cost at least $20 million) are insufficient, U.S. Sugar would need to custom engineer a first-of-its-kind control system for a bagasse-fueled boiler. *Id.* ¶¶ 17-18. U.S. Sugar estimates that the engineering evaluation alone will take one year to complete at a cost of $1 million (not including the actual equipment costs). *Id.* ¶¶ 17, 20.

Notably, if the revised HCl standard (or anything close to it) had been in place or even proposed in 2015-19, Boiler 9 would have required a significantly different design, including different HCl controls, and would have required tens of millions of dollars in additional capital to construct. *See* U.S. Sugar Comments at

5. With the significantly increased capital costs, the emission-reduction project upgrading to Boiler 9 would not have been financially viable, and U.S. Sugar would have continued operating the older, higher-emitting Boilers 1, 2, and 4 to supply the steam and heat needs for its Clewiston sugar mill. *Id.* at 5-6.

Third, assuming a suitable pollution control system could be engineered, U.S. Sugar will need to obtain authorization from the Florida Department of Environmental Protection to install the new system. Ballenger Dec. ¶¶ 14(c), 21. U.S. Sugar estimates that the environmental permitting will cost up to $250,000 and can take up to one year or more. *Id.* ¶ 21. Due to time constraints, the permitting process would likely need to overlap with other steps and avoid any unanticipated delays (e.g., delays related to public involvement). *Id.*

Fourth, U.S. Sugar would need to construct the new pollution control system. Ballenger Dec. ¶¶ 14(d), 22-25. While the physical assembly and installation may take a few months, supply chain disruptions may lead to longer lead times. *Id.* ¶ 23. Moreover, U.S. Sugar will need to attempt to align construction with the 4-6 weeks per year that Boiler 9 is placed into a planned outage after the conclusion of sugar harvesting season. *Id.* ¶ 24. If U.S. Sugar is required to install a new pollution control system during crop season, it would be forced to halt or reduce operations significantly to install the controls, resulting in significant disruption to U.S. Sugar's business. *Id.* ¶ 25.

Finally, U.S. Sugar would need to commission the new pollution control system. Ballenger Decl. ¶¶ 14(d), 26. As part of the start-up, U.S. Sugar would need to perform stack testing to demonstrate compliance with the new HCl standard, which typically takes a few months to complete. *Id.* ¶ 26.

As demonstrated above, U.S. Sugar will suffer irreparable harm unless the Court stays the effective date of the Boiler MACT Rule with respect to Boiler 9 pending the Court's resolution of its petition. While U.S. Sugar is not sitting on its hands and has begun studying whether and how Boiler 9 can meet the revised HCl standard, it should not be required to engage in a costly and technologically-difficult retrofit of Boiler 9—potentially involving disruption to its operations—while its petition is under review. U.S. Sugar would have no other remedy to be made whole in the event the Court upholds its petition challenging EPA's retroactive application of the revised HCL standard for "new" sources.

## III.    The Balance Of Equities And Public Interest Support Postponing The Rule's Effective Date.

The balance of the equities and public interest strongly support staying the Boiler MACT Rule's effective date as to Boiler 9. Boiler 9 is a state-of-the-art boiler that significantly reduced emissions by replacing three older boilers and fully complies with the MACT standards for "new" solid fuel boilers that were in place (or proposed) when it was designed and built in 2015-19. Ballenger Decl. ¶¶ 10-11. Boiler 9 is already more advanced—and cleaner emitting—than the older

bagasse-fueled boilers still used by U.S. Sugar's competitors to this day. *Id.* ¶ 9. Through the Boiler MACT Rule's "significantly more stringent" standard for "new" sources (Boiler MACT Rule, 87 Fed. Reg. at 60,831), EPA is essentially penalizing U.S. Sugar for upgrading to a state-of-the-art boiler in 2015-19.

In the Boiler MACT Rule, EPA asserts that "it was reasonable to assume … that revised standards would in some cases be more stringent" in response to the remand in *U.S. Sugar.* 87 Fed. Reg. at 60,831. Yet when U.S. Sugar commenced construction of Boiler 9 in 2016, it could not possibly have assumed that EPA would (i) propose a nearly ***100-times*** more stringent HCl standard for "new" solid fuel boilers in 2020 and (ii) seek to apply the standard to "new" boilers dating back to 2010. EPA had represented that the HCl standard for "new" solid fuel boilers was not affected by the remand (Tsirigotis Decl. ¶ 9) and that operators would not be burdened by the remand because they could continue to comply with the 2011 MACT standards. *Supra* at pp. 13-14. And even for the HCL standard for *existing* solid fuel boilers that was affected by remand, EPA represented that the standard would change by approximately 10 percent, which would not likely impact the controls needed to comply with the revised standard. Tsirigotis Decl. ¶ 11.

The revised HCl standard for "new" solid fuel boilers first proposed in 2020 would have rendered Boiler 9 financially unviable had it been in place (or proposed) in 2015-19. *See* U.S. Sugar Comments at 5-6. Now U.S. Sugar must

spend $20 million or more to upgrade Boiler 9 to attempt to comply with the revised standard (if compliance is technologically possible at all). And it would need to disrupt business operations if it is unable to install the new pollution control system after the conclusion of sugar harvesting season.

The stay sought by U.S. Sugar is limited and would not harm the public interest. EPA asserts in the Boiler MACT Rule that "virtually all sources constructed or reconstructed after the 2010 proposal are in fact meeting the revised [HCl] standard." 87 Fed. Reg. at 60,831. And to U.S. Sugar's knowledge, no other petitioners intend to challenge EPA's attempt to retroactively apply the revised HCL standard for "new" solid fuel boilers. Therefore, as a practical matter, the stay sought by U.S. Sugar is unlikely to have significant impact beyond Boiler 9. And even with a stay, if EPA ultimately prevails, U.S. Sugar would still be required to comply with the Rule within three years of the court's decision on the merits. In the meantime, the air quality in and around Clewiston is among the best in the State of Florida. *See, e.g.*, U.S. Sugar, State of Our Air Report at 2-3 (Feb. 2022) (discussing public and private air monitoring data) (Ex. E).

## IV.    Alternatively, The Court Should Expedite The Litigation

If the Court does not stay the Boiler MACT Rule with respect to Boiler 9, it should expedite the litigation of U.S. Sugar's claims (which may be severed from

the consolidated petitions addressing other issues). Fed. R. App. P. 2; D.C. Cir. R. 2. U.S. Sugar respectfully suggests the following expedited schedule:

Certified list of the record:     30 days after this Court rules on this motion;

U.S. Sugar's principal brief:     due 60 days after ruling;

EPA response brief:               due 45 days after principal brief;

U.S. Sugar's reply brief:         due 21 days after EPA's response brief;

Deferred appendix/final briefs:   due 14 days after reply brief.

## CONCLUSION

For the foregoing reasons, U.S. Sugar requests that the Court stay the effective date of the Boiler MACT Rule with respect to Boiler 9 to allow U.S. Sugar a full three years to comply with the Rule in the event the Court denies its petition. Alternatively, U.S. Sugar requests that the Court enter an expedited briefing schedule to resolve the narrow issues presented by U.S. Sugar.

Respectfully submitted,

Dated:  January 4, 2023                /s/ Timothy S. Bishop
                                       Attorney for Petitioner

                                       Timothy S. Bishop
                                       Matthew C. Sostrin
                                       Nicholas Vera
                                       MAYER BROWN LLP
                                       71 S. Wacker Drive
                                       Chicago, IL  60606
                                       (312) 782-0600

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing motion complies with the requirements of

Fed. R. App. P. 27(d) because it contains 5,115 words and is formatted in double-

spaced 14-point Times New Roman font.


/s/  Timothy S. Bishop
Timothy S. Bishop
Attorney for Petitioner

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of January, 2023, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the D.C. Circuit via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

/s/ Timothy S. Bishop
Timothy S. Bishop
Attorney for Petitioner